**FALLS STAMPING & WELDING COMPANY, Plaintiff,**

v.

**The INTERNATIONAL UNION, UNITED AUTOMOBILE, AIRCRAFT & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA et al., Defendants.**

**Civ. A. No. C76–170A.**

United States District Court, N. D. Ohio, E. D.

Sept. 27, 1979.

Gary Banas, Steven Sigalow, Buckingham, Doolittle & Burrows, Akron, Ohio, for plaintiff.

Ray C. Sheppard, Erickson & Sheppard, Akron, Ohio, Robert M. Phillips, Landskroner & Weaver, Cleveland, Ohio, for defendants.

Special Master Roger I. Abrams, Associate Professor of Law Case Western Reserve University, Cleveland, Ohio.

## ORDER

CONTIE, District Judge.

Presently pending before the Court in the above captioned matter is defendants' motion for action upon the Special Master's report and upon objections thereto.[1] Also pending is their motion for the Court to reconsider its refusal to grant interest on the back-pay awards to individual employees. Upon consideration and for the reasons stated below, the motion for action on the Special Master's report shall be granted, and defendants' motion for reconsideration shall be denied. The Master's report shall be accepted with certain modifications. Plaintiff's objections to the report shall be sustained in part and overruled in part, and defendants' objections shall be overruled.

The procedural history of this case is long and complex. As relevant to the present motions, the Court has received a Special Master's report that was prepared upon matters submitted to the Special Master by the Court's Order of May 15, 1979, pursuant to Rule 53, Federal Rules of Civil Procedure. The damage issue, specifically a determination of the amount of back pay and fringe benefits owed individual defendant employees by the plaintiff company, was referred to the Master for appropriate findings of fact and conclusions of law.

▬ Upon the motions before it, the Court must determine whether the Master's factual findings and legal conclusions are correct. In reviewing the report, "the court shall accept the master's findings of fact unless clearly erroneous." Rule 53(e)(2). Although not given the same weight as jury findings, the Master's findings of fact are treated with high regard by the trial court. C. Wright & A. Miller, Federal Practice and Procedure § 2614 (1971). *See also* 5A Moore's Federal Practice ¶¶ 53.12[1], at 3002, and 53.12[4], at 3008–13 (rev. 2d ed. 1979). The Court may adopt the Master's factual findings, and if the Court does so the findings will be treated as the Court's. Rule 52(a). The Master's conclusions of law

1. The Special Master's report is attached hereto as Exhibit A.

are another matter. Although the Master's conclusions of law are taken into consideration, the Court makes its decision on its own legal conclusions.

The Court notes that it has determined by its Order of September 18, 1978 that the company's failure to reinstate the employees had resulted in loss or damage to them. In order to avoid injustice, those employees are entitled to back pay, including fringe benefits, from the date of termination (June 8, 1976), to the date of actual reinstatement (June 8, 1978), or to the date of the employee's participation in an economic strike that was held against the company.

Each employee had a duty to mitigate his or her damages by obtaining comparable employment during the period of absence from the plaintiff company. Any earnings from that interim employment reduce the amount of the back-pay award. *See* D. Dobbs, Remedies § 3.6, at 183 (1973). In the present case, the union, on behalf of the employees, must establish initially the damages, i. e., the amount owed each claimant by the company. Although the duty to mitigate is on the discharged or terminated employee, and although the union, which acts on behalf of the employee, must establish damages, the company must prove an amount, if any, by which the back-pay award should be reduced for failure to mitigate. *See, e. g., McAleer v. McNally Pittsburgh Mfg. Co.*, 329 F.2d 273, 275–76 (3d Cir. 1964); *Taylor v. Tulsa Tribune Co.*, 136 F.2d 981, 983 (10th Cir. 1943); Dobbs, *supra* § 3.7, at 189, and § 12.25, at 925. *Accord, McCann Steel Co. v. NLRB*, 570 F.2d 652, 655 n. 4 (6th Cir. 1978) (National Labor Relations Board practice).

### I

The plaintiff raises objections to the Master's findings of fact as well as to his conclusions of law. The Court will first address challenges to the factual findings. The Master conducted hearings, reviewed files, and reported on 110 claimants. The plaintiff raised specific objections to the Master's findings in 43 of the 110 cases.

One of the recurring objections pertains to the date on which any given individual employee began to participate in an economic strike against the company. The Court, by Orders of January 9, 1979 and June 19, 1979 ruled that a claimant who had participated in the strike would lose back pay as of the first date of participation. To aid in the determination of the date of participation, the Master considered evidence from three company witnesses. In addition, the Master accepted into evidence lists maintained by Mr. Lange, who was one of the three witnesses and president of the company. The lists contained names of persons involved in certain strike incidents on various dates. It was primarily on these lists that the Master relied when determining the dates of individual participation in the strike. Plaintiff objects to the reliance on the lists in cases where the witnesses put the claimants at the strike site before the date stated on the lists. The Court, however, will not disturb the Master's findings. The Master made his findings on credible evidence, and the Court will not find that his giving the lists more weight than oral testimony was clearly erroneous. Furthermore, the burden was on the plaintiffs to establish the date on which strike participation by individual former employees began. Plaintiffs evidently were not able to establish dates with enough certainty to satisfy the trier of fact.

A second recurring objection deals with the Master's calculations of back pay in cases where the claimant is entitled to only part of a given year's salary and fringe benefits. The Master multiplied the calculation of the full year's award (including base pay rate, incentive pay, vacation, shift differential, leadman rates) by the percentage of the year that was worked. Plaintiff argues that this "mechanistic method" works to its disadvantage inasmuch as this approach does not account for variation throughout the year in such items as base pay rates, weekly percentage increase of vacation pay, and allocation of holiday pay. The Court will not disturb the Master's

findings in this instance. What the plaintiffs essentially request is a review of the Master's method of calculating the awards. One of the reasons that the Court referred this matter to a Special Master was to alleviate the Court of the time-consuming task of determining the amount owed each claimant. The Court, in viewing the entire report, believes that the Master made careful and reasoned decisions regarding specific calculations based on all of the available evidence. Unless the plaintiff can show that the method of computation that was utilized by the Master was unreasonable and worked a manifest unfairness, there is no basis for disturbing the Master's technique.

█ Plaintiff also objects to findings that certain employees had adequately mitigated their damages. Plaintiff argues, inter alia, that an aggressive search for interim employment was not conducted, that reasons for quitting a job were not adequate, or that quitting a job in fact amounted to a total failure to mitigate. Once again, the Court will not disturb the Master's findings unless these findings are clearly erroneous. The Master was in a position to evaluate the credibility of claimants as they testified to their activities. He was further justified in taking into consideration factors such as age, safety, and previous training. After a review of the record the Court concludes that the Master based his findings on the totality of the circumstances surrounding each case, and the Court accepts those findings.

Another recurring objection of the plaintiff concerns the refusal of the Master, when calculating the award, to reduce the amount by funds that certain claimants had received from or through public assistance, social security, unemployment compensation, union assistance (including payment of insurance premiums), part-time work, or a second job. Inasmuch as these objections deal more with legal conclusions concerning whether the items should serve to reduce the award than with findings of fact, the Court reserves discussion of this issue to a subsequent portion of the Order.

The Court feels compelled to address six of the cases to which the plaintiff has raised objections:

# 12 BASIL BUSCH. At page 1113 of the Master's Report ("Findings of Fact"), the Master states in relevant part:

The claimant also suffered two periods of disability during 1976, an appendectomy in September which kept him out of the job market for six weeks, and an auto accident immediately thereafter in October, 1977, which required a few months of recuperation. Thus, commencing in early September, 1977, through the end of the year, the claimant was not seeking employment.

Later in the Report, at page 1152 under "Determination of Damages," the following appears:

Basil Busch used reasonable diligence in seeking interim employment prior to September, 1976, and was fully employed in 1977 and 1978. However, he was disabled for four months during 1976, which requires an adjustment in 1976 gross back pay. . . . During a four-month period in 1976, Mr. Busch was out of the job market and was not mitigating his loss.

Plaintiff, identifying the apparent inconsistencies between the above statements, maintains "that the disability period covers six weeks in 1976 and 15 weeks in 1977." Plaintiff's Objections to Master's Report, at 11. Upon a review of the record, the Court finds that all of the available evidence as contained in the union's statement, the answers to interrogatories, and the transcript of the hearings indicates that Mr. Busch was out of the work force for 6 weeks in 1976 and for 3½ months in 1977. The claimant's gross back pay ($21,654.49) should be reduced for a 6 week disability in 1976 and a 14 week (3½ months) disability in 1977. Consequently, the Court reduces the claimant's gross back pay award by a percentage equal to the percentage of the base period that the claimant was disabled. The gross back pay should be reduced by $1,228.46 for 1976 and by $2,932.14 for 1977, totalling a $4,160.60 reduction. The adjusted gross back pay award ($17,493.89) should

be reduced by actual interim earnings ($11,-545.39). The claimant is owed $5,948.50.

**# 13 JANE CARLTON.** The company argues that the claimant's entire search for employment was conducted prior to the back pay period. The Master, however, had to balance the company's assertion with the claimant's testimony that she looked for work "all the time" until 1978, applying for employment that was listed with the Bureau of Employment Services. Inasmuch as the company did not offer information to support its position, the Master's findings that the claimant is entitled to back pay to the time of her strike participation will not be disturbed.

**# 39 WILLIAM FEARS.** All parties and the Master agree that the deduction for claimant's 1976 interim earnings should be calculated on the basis of working 40 hours a week at $2.30 an hour for 17 weeks. The Master reached $1,472—clearly an error in computation. The correct deduction for 1976 interim earnings should be $1,564.

**# 44 WILLIAM GWEEN.** Plaintiffs argue that the Master did not include in his calculations for interim earnings wages earned by the claimant through Manpower in 1977. Claimant's deposition at page 11 would indicate that he had indeed worked through Manpower in 1977, but nothing in the rest of the file would support such a finding. The file contains W–2 forms and/or statements from employers, including a statement from Manpower for the 1976 employment, but there is no record that the claimant had worked for Manpower in 1977. Furthermore, the plaintiff does not offer the Court any support for the allegation that the claimant had earned an additional $756 from Manpower in 1977. The Master's findings will not be disturbed.

**# 73 PAUL MOYER.** The Master determined that the claimant is entitled to back pay until June 17, 1977, the date of his strike participation. The Master calculated the amount of back pay for 1977 on the basis of 25 weeks. As noted by the company, January 1 through June 17 covers only 24 weeks. Applying the formula used by the Master, the Court finds that the claim-

ant's award for 1977 should be $5,006.39. The claimant's total adjusted gross back pay ($11,040.78) must be reduced by his interim earnings ($4,799.44). The claimant is owed $6,241.34.

**# 86 BETTY RUCKER.** The company raised the same objection to the 1977 calculation for this claimant as was raised for # 73. Calculating the back pay for 24 instead of 25 weeks, the Court finds that the claimant's 1977 award should be $3,482.41. The total back pay award is $7,789.64.

## II

The Master has correctly identified the sources of law that are applicable in the resolution of issues in an action involving a breach of a collective bargaining agreement. As Justice Douglas articulated in *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 456–57, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957), the substantive law should be

> federal law, which the courts must fashion from the policy of our national labor laws. . . . The Labor Management Relations Act expressly furnishes some substantive law. . . . Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of that legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem.

In addition, the Court may look to applicable state law. *Id.* Under the above directive of the Supreme Court, the Master, in reaching conclusions of law concerning back-pay awards, looked to cases that had been tried 1) under NLRB practices, 2) under Title VII of the Civil Rights Act of 1964, 3) under state law, and 4) by labor arbitrators.

Reviewing the Master's conclusions of law, the Court has found them to be consistent with its own conclusions. The Court finds no purpose to be served by reiterating the Master's thorough and cogent resolution

of the legal issues. The Court does, however, address specific objections that the plaintiff raises relative to the legal support for the Master's method of calculating damages.

■ The general contract rule for determining damages was stated by the Supreme Court in *Wicker v. Hoppock*, 73 U.S. (6 Wall.) 94, 99, 18 L.Ed. 752 (1867):

> [W]hen a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. The latter is the standard by which the former is to be measured. The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed.

In the employment contract context, the employee is entitled to the amount of money he would have received if he had continued to work for the company. The amount owed under the contract or collective bargaining agreement must be reduced by the income that the employee received from substitute employment or by the amount that he or she would have received if a reasonable effort had been made to find interim employment. *See* Dobbs, *supra* § 12.25, at 925.

■ Some of the claimants who mitigated their damages by obtaining full-time employment found additional part-time work, or in one case, additional full-time work. The Master did not reduce the back-pay awards by the amount of income from the supplemental employment. The rationale was that if the claimant had been reinstated under the original arbitration award, the claimant could have been working part time in addition to fulfilling full-time obligations with the plaintiff. Likewise, if an employee maintained a second, full-time position that would not have interfered with full-time work for the plaintiff, income from the second position should not reduce the back-pay award. In each of the situations where the claimant had already mitigated

damages by obtaining full-time employment, the back-pay award will not be reduced by income that the claimant received from supplemental employment during the back-pay period.

The Master also refused to offset the back-pay awards by the value of benefits that had been received from collateral sources. The international union paid over $150,000 in emergency benefits to various claimants who had not obtained interim employment.[2] The union also paid insurance premiums on behalf of some of the claimants so that the insurance coverage that had been provided by the company would not lapse. Some claimants received funds from unemployment compensation, welfare, and social security. If the claimant had mitigated damages to an extent that satisfied the Master, he did not reduce the back-pay award by the amount received from or through the collateral source.

Plaintiff maintains that funds from sources other than interim earnings should reduce the amount of the back-pay award. Plaintiff argues that if such a reduction is not made, the claimant is made more than whole and that in some cases double recovery would ensue. A similar issue was addressed in *NLRB v. Gullett Gin Co.*, 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951). In that case, the Court had to decide whether the NLRB had to deduct state unemployment compensation payments from a back-pay award to a discharged employee. The Supreme Court held that the NLRB in its discretion could effect a policy whereby it refused to deduct unemployment compensation payments when computing back pay. *Id.* at 364, 71 S.Ct. at 339. In dictum, the Court continued as follows:

> To decline to deduct state unemployment compensation benefits in computing back pay is not to make the employees more than whole, as contended by respondent. Since no consideration has been given or should be given to collateral *losses* in

2. As noted by the Master, it is irrelevant for present purposes whether the amounts that the claimants received from the union are characterized as "benefits" or "gifts" or "loans." It is

sufficient that the money was not payment in return for work that the claimants performed for the union, therefore the funds cannot be characterized as "earnings."

framing an order to reimburse employees for their lost earnings, manifestly no consideration need be given to collateral benefits which employees may have received. *Id.* (emphasis in original).

■ This Court finds the *Gullett* reasoning to be persuasive in resolving the issue at bar. The Supreme Court's reasoning applies by analogy to all collateral sources that have been addressed in the present case, not just to unemployment compensation benefits.[3] This Court realizes that it is not bound by NLRB policy. The NLRB was established to "vindicate public, not private rights," *Virginia Electric & Power Co. v. NLRB*, 319 U.S. 533, 543, 63 S.Ct. 1214, 1220, 87 L.Ed. 1568 (1943), but to the extent that the issues presented in NLRB cases are similar to other labor cases in federal court, and to the extent that both the NLRB and the courts seek to make deserving claimants whole, this Court gives deference to the NLRB model for awarding back pay.

Plaintiff calls the Court's attention to *Satty v. Nashville Gas Co.*, 522 F.2d 850 (6th Cir. 1975), *modified on other grounds*, 434 U.S. 136, 139, 98 S.Ct. 347, 350, 54 L.Ed.2d 356 (1977). In *Satty*, a Title VII case, the Sixth Circuit Court of Appeals upheld a reduction of back wages by "unemployment insurance." *Id.* at 855. The Second Circuit Court of Appeals cited *Satty* with approval in a discussion concerning the deduction of public assistance funds from a back-pay award in another Title VII case. *EEOC v. Enterprise Association Steamfitters*, 542 F.2d 579, 591 (2d Cir. 1976), *cert. denied* 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977). The plaintiff urges the Court to adopt the policy of reducing the awards by amounts equal to the funds that were received from collateral sources, as permitted by the Sixth Circuit in *Satty*.

■ The Court recognizes the affinity between Title VII and the NLRB model for back-pay awards. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (Title VII case) (Supreme Court highlighting the NLRB policy of awarding back pay). In Title VII cases the Sixth and Second Circuits choose not to follow NLRB policy in calculating the award. But this Court finds no reason to apply Title VII back-pay policy to a labor case when there is a clearly delineated labor policy. Accordingly, the Court, consistent with judicially approved NLRB policy, holds that back pay for the claimants will be reduced only by interim earnings that were or should have been received.

### III

Defendants have filed a motion to reconsider the Court's refusal by its Order of September 18, 1979 to grant interest on the back-pay damage awards. Upon consideration, the Court declines to modify its order and the motion will be denied.

Defendants have also filed objections to the report of the Special Master. They contend that the plaintiff has failed to prove by clear evidence that claimants had participated in the strike before December, 1977. As stated above, the Court will not disturb the Master's findings of fact unless those findings are clearly erroneous. The Court is satisfied that the evidence upon which the Master relied was sufficient to establish strike participation by various employees. Defendants' objections will therefore be overruled.

Accordingly, the defendants' motion for court action is hereby granted; defendants' motion to reconsider is hereby denied; the Special Master's report is hereby approved, adopted in its entirety, and incorporated herein with the modifications made by the within Memorandum; plaintiff's objections

**3.** The claimants may be subject to recoupment of unemployment benefits by the State of Ohio under R.C. 4141.35(B)(1) once back pay is received from the company. Similarly, claimants may be obligated to repay the international union for funds that were received during the back-pay period. Whether or not recoupment is required, however, is not dispositive of the issue before this Court. This Court seeks to bring to a close the disputes before it and leaves the State of Ohio and the international union to make their own decisions regarding which funds will be recovered.

to the report are hereby sustained in part and overruled in part; defendants' objection is hereby overruled.

IT IS SO ORDERED.

## EXHIBIT A

## SPECIAL MASTER'S REPORT

To the Honorable United States District Court for the Northern District of Ohio, the Report of Roger I. Abrams, Special Master:

## I. INTRODUCTION

### A. *The Appointment of the Special Master*

By its Order of May 15, 1979, as amended May 22, 1979, the District Court determined that the resolution of the remaining remedy issues in this action

> would clearly require an undue expenditure of judicial time and effort. Thus the Court finds that the damage issue herein is complex and that the circumstances of this action in that regard are exceptional. In view thereof, the Court concludes that the resolution of the damage issue requires reference to a Special Master in accordance with Rule 53, Federal Rules of Civil Procedure.

The Court appointed the undersigned as Special Master and charged the Special Master to make a determination of "the specific amount of back pay and fringe benefits owed each individual affected employee" pursuant to the Orders of the Court of September 18, 1978 and January 9, 1979. The Special Master was authorized to "take testimony" and "direct the submission of briefs and memoranda". The Special Master's Report, containing "appropriate findings of fact and conclusions of law," was to be filed with the Court on or before July 16, 1979, later extended by Court Order to October 31, 1979.

### B. *Factual Setting and Prior Proceedings*

A brief preliminary recitation of the factual setting and prior proceedings in this action would be useful. Over four years ago the unionized employees of Falls Stamping & Welding Company (herein, the "Company") went on strike in protest against certain disciplinary action taken by the Company. The strike occurred during the term of a collective bargaining agreement, effective May 20, 1974 to May 19, 1977, entered into by the Company and the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America and its Local Union No. 1194 (herein, the "Union"). Second-shift employees went on strike on September 9, 1975, and were discharged by the Company the following day. First-shift employees went on strike on September 10, 1975. The following day the District Court granted the Company's request for a temporary restraining order enjoining the strike. When these employees failed to return to work, they were also discharged by the Company on September 16, 1975. In total, over 110 employees were discharged by the Company. Thirteen of the dischargees were immediately rehired by the Company as "new employees", without their accumulated seniority rights. The grievances filed concerning the Company's actions were brought to arbitration under the procedures set forth in the collective bargaining agreement. On May 28, 1976, after extended hearings and accompanied by a lengthy opinion, the Arbitrator rendered his Award, ordering the reinstatement with seniority of the discharged employees, but without back pay. Two employees, Francis Koslik and Dorothy Dale, were ordered reinstated with seniority and back pay from October 1, 1975. The Award was to be effective not later than five working days from the receipt of the Award.

On June 7, 1976, the Company initiated the present action to vacate and/or modify the Award of the Arbitrator. The Union [1]

---

**1.** The original defendants in this action included the International and Local Unions; the Local Union's President, Mr. Thomas Heffernan; the Arbitrator, Mr. George F. Hayes; and

Mr. Charles Long, an employee of the Company, whom the Company alleged would be replaced under the Arbitrator's Award. On June 23, 1976, Hayes and Long were dismissed as

counterclaimed for enforcement of the Award and for compensatory and punitive damages against the Company "for its willful refusal to implement the terms of the arbitrator's decision". In its Memorandum Opinion and Order of July 6, 1976, the District Court vacated the Arbitrator's Award as constituting an abuse of the Arbitrator's authority under the collective bargaining agreement in light of the contract language granting the Company the right to discharge employees who strike during the term of the contract. Because the Award was vacated, the Court concluded that the Union's counterclaim for enforcement and damages was meritless.[2] The Union appealed. Almost two years later, by a per curiam opinion, the United States Court of Appeals for the Sixth Circuit reversed the judgment of the District Court and remanded the case with instruction to reinstate the Award of the Arbitrator.[3]

Pursuant to the mandate of the Circuit Court, the District Court reinstated the arbitration decision in its Order of September 18, 1978. In that Order it addressed the Union's claim for "back pay with interest and any other economic entitlements due them from June 8, 1976 to the date of actual reinstatement." In its earlier Memorandum Opinion and Order of July 6, 1976, the Court determined that the defendants' counterclaims were meritless in view of its decision vacating the Arbitrator's Award. Although the defendants did not appeal the counterclaims determination, the District Court found "good cause" to depart from its prior determination in light of the Circuit Court's action. The District Court determined that "its prior conclusion that de-

fendants' counterclaims were meritless to be now without a sound legal foundation and substantially erroneous." The failure of the Company to reinstate the employees pursuant to the Award of the Arbitrator "has resulted in loss or damage to said employees." In order to avoid "a grave or manifest injustice," the District Court determined that the employees ordered reinstated by the Arbitrator's Award of May 28, 1976 "are entitled to the back pay and other fringe benefits they would have earned from June 8, 1976 until their actual reinstatement. Such damage award, however, must be diminished by the amount actually earned by the employees elsewhere during said period. Further, the employees are not entitled to interest on the back pay damages award."[4] Prior to the entrance of this Order, the Company had on June 8, 1978, offered reinstatement to all the discharged employees.

The Company later moved the Court to amend its Order of September 18, 1978 to include the statement prescribed by 28 U.S.C. § 1292(b), thereby certifying the Order for an interlocutory appeal to the Circuit Court. By its Order of January 9, 1979, the Court granted the Company's motion, but the Circuit Court declined to hear the interlocutory matter. In its Order of January 9, 1979, the Court also dealt with two additional remedy issues on which it had earlier called for the submission of briefs by the parties. The first issue addressed was the question of whether the back pay determination was properly within the jurisdiction of the Court or, rather, was subject to arbitration. The parties by stipulation agreed that "the issue of the amount of back pay due pursuant to the Court's Order of September 18, 1978 is

---

defendants by the Court upon the motion of the Company. Mr. Heffernan remains a defendant in this proceeding and, although no longer Union President, is one of the claimants in this action, as shall be discussed below. For convenience the defendants shall be referred to collectively as "the Union".

**2.** *Falls Stamping & Welding Co. v. U. A. W., et al.*, 416 F.Supp. 574 (N.D.Ohio 1976).

**3.** *Falls Stamping & Welding Co. v. U. A. W., et al.*, 575 F.2d 1191 (6th Cir. 1978).

**4.** Koslik and Dale, the two employees who were ordered by the Arbitrator to be reinstated with back pay from October 1, 1975, were ruled by the Court to be "entitled to the back pay and any other benefits they would have earned from October 1, 1975 to the date of their actual reinstatement. Such damage award must, of course, be likewise diminished by any amount earned during said period, and no interest is to be added thereon."

properly before this Court and not arbitrable pursuant to the applicable collective bargaining agreement." In view of the stipulation, the Court determined that it had authority with regard to this matter.

The second issue the Court characterized as presenting a "difficult question". As noted above, the parties to this action were parties to a collective bargaining agreement, effective May 20, 1974 until May 19, 1977. Subsequent to the discharge of the employees in September, 1975, the Company continued to operate under that agreement with an almost entirely new workforce. The agreement expired by its terms after the parties failed to reach a new agreement through collective negotiations. On June 10, 1977, the Union commenced an economic strike against the Company.[5] It was the Company's contention to the District Court that the termination of the collective bargaining agreement precludes the allowance of any back pay to the 1975 dischargees reinstated by the Arbitrator's Award after June 10, 1977, the date of the economic strike. The Court, in its Order of January 9, 1979, rejected the Company's argument in its broadest form. The Court was not

> inclined to assume that such employees would have participated in the economic strike of 1977 had they been immediately rehired pursuant to the arbitrator's award in June, 1976. Such assumptions would be purely speculative on the basis of the record presently before the Court.
>
> Therefore, the Court concludes that, under the subject collective bargaining agreement, the employees reinstated under the arbitration award entered May 28, 1976 are entitled to back pay beyond the termination of said agreement and until their actual reinstatement absent any clear showing that they actually participated in the economic strike of 1977. Thus to the extent plaintiff can demonstrate that any affected employee did participate in any manner in such strike, the amount of back pay owed such individual shall be limited to that accruing prior to June 10, 1977.

During the course of the proceedings before the Special Master, a disagreement arose between the parties concerning the interpretation of this Order. Upon motions of the parties, the District Court on June 27, 1979 reaffirmed its Order of January 9, 1979 as applying to "all employees of plaintiff who were improperly discharged in 1975 and ordered reinstated under the arbitration award entered May 28, 1976." With regard to the limitation on the extent of back pay, the Court clarified its earlier Order and concluded that

> in the interest of justice . . . the amount of back pay owed any affected employee who is shown by plaintiff to have participated in the economic strike shall be limited to that accruing prior to the first day of his actual strike participation. Thus, back pay to said affected employee shall not automatically terminate as of June 10, 1977, but rather shall end as of the day upon which they actually participated in the economic strike.
>
> Therefore, where plaintiff can establish that any employee discharged in 1975 and reinstated under the arbitration award took part in any manner in the economic strike which commenced June 10, 1977, the back pay owed such employee shall be limited to the amount accruing prior to the date of such activity. In other words, each affected employee who picketed plaintiff and received strike benefits therefore or otherwise actively participated in the economic strike which apparently continues today is not entitled to back pay beyond the time he engaged in strike activity.

The Court reasoned that the conduct of the discharged employees in taking part in the 1977 economic strike "demonstrates that, if reinstated prior to the expiration of the collective bargaining agreement, they would not have worked beyond the day they took part in the strike."

---

**5.** According to testimony presented before the Special Master, this economic strike continues until this day, over two years after it began.

On August 8, 1979, over three weeks subsequent to the close of hearings before the Special Master, the Company filed a motion with the District Court seeking the dismissal of the Union's counterclaim for damages on behalf of its members based upon the grounds that the Union lacks sufficient standing to claim individual monetary amounts for these persons and, alternatively, that the counterclaim may not be maintained as a class suit. . On August 27, 1979, the Company moved to stay the proceedings before the Special Master pending determination of its motion to dismiss, arguing that in the event that the motion to dismiss is granted by the District Court "the time and effort spent by the Special Master unfortunately will have been for naught."

The District Court, on August 31, 1979, denied both Company motions. The motion to dismiss was denied on two alternative grounds. The Court found that the Company "waited too long to raise these contentions" and thus the claim was barred under the equitable doctrine of laches:

> In the instant case the Unions, the individual claimants, the Court and the Special Master have invested their time and energy to conclude this litigation. The Court finds that under the circumstances, the plaintiff's delay was unreasonable and that it has prejudiced the other parties to the action.

Alternatively, the Court concluded that the Company's motion must be denied on the merits. The Court noted that the Unions in this action were not proceeding as class representatives in a class action, and thus the requirements of Rule 23, Federal Rules of Civil Procedure, were inapposite. Likewise, the standing argument was rejected: "Where, as here, the Union seeks monetary damages for the employees based on the collective bargaining agreement, the Union can properly proceed on behalf of the individual claimants. *Kroger Co. v. International Brotherhood of Teamsters*, 380 F.2d 729 (6th Cir. 1967); *U. A. W. v. Textron,*

*Inc.*, 312 F.2d 688 (6th Cir. 1963)." In light of its ruling on the Company's motion to dismiss, the Court denied as moot the Company's motion for a stay of proceedings before the Special Master.

C. *Proceedings Before the Special Master*

Commencing June 1, 1979, the Special Master met with the parties to this action and conducted hearings pursuant to the Court's Order of May 15, 1979. Testimony was taken from 50 witnesses during the six dates of hearing ending July 16, 1979. In addition, four separate meetings were held with counsel and with the parties. During the course of these extensive discussions with the parties, many difficult issues were resolved informally by mutual agreement. The parties proceeded in good faith to resolve in an expeditious manner the complex factual and legal issues referred to the Special Master. Considering the arduous road traveled by this case over the years, the parties are to be complimented on the manner in which they facilitated the task of the Special Master.

The Special Master directed that the parties submit briefs on legal issues on July 20, 1979, with a complete submission on each individual claimant[6] to follow. While there was some delay in filing the individual submissions, much of it was justified by the complexity of the task involved.

D. *The Reference to the Special Master*

As noted above, the Court's reference of this matter to the Special Master extends "to a determination of the amount of back pay and fringe benefits owed" to each of the claimants. The Court's Orders specify that the claimants are entitled to back pay and fringe benefits they would have earned from June 8, 1976 until they were actually offered reinstatement with the Company.[7] The parties are in agreement that reinstatement was offered as of June 8, 1978, and thus the "back pay period" runs for two years. Findings of fact will be made below

---

**6.** An employee discharged and ordered reinstated by the Arbitrator's Award of May 28, 1976 will be referred to herein as a "claimant".

**7.** Koslik and Dale, as noted above, are entitled to back pay and fringe benefits dating from October 1, 1975 until offered reinstatement.

as to the amounts each claimant would have earned had he or she been reinstated pursuant to the Arbitrator's Award, i. e. the "gross back pay", which would have been received during the back pay period.[8]

The Court's Order of September 18, 1979 expressly states that damage awards "must be diminished by the amount actually earned by the employees elsewhere during said period" and that the employees are not entitled to interest on the back pay damage award. It is apparent from a close study of the Court's Orders in this action that it is the basic goal of the Court that the claimants be made whole for the loss suffered as a result of the Company's refusal to reinstate them as directed by the Arbitrator. The "make-whole principle" is a familiar one in many areas of national labor policy, and it is a guiding standard as well in ordinary employment contract law. The interim earnings of a claimant are deducted because the individual employee is entitled to recover from the Company his loss in pay; nothing more, nothing less. In addition, under the "make-whole principle" amounts are to be deducted which a claimant *could* have earned in interim employment if he had used reasonable efforts to obtain such employment. A failure to mitigate damages increases the injury received by the employee, and "he cannot recover judgment for the amount of this avoidable and unnecessary increase. The law does not penalize his inaction; it merely does nothing to compensate him for the loss that he helps to cause by not avoiding it." 5 Corbin, *Contracts*, § 1039, at 243 (1964).

The parties are in agreement that in computing the amounts owed individual claimants, deductions should be made not only for actual interim earnings but also for amounts the employee could have earned through the use of reasonable diligence during the back pay period. Thus, the findings of fact will include discussion of both actual interim earnings of the claimants during the back pay period and the efforts each individual made to seek and maintain employment during the period June 8, 1976 until June 8, 1978.

In its Order of January 9, 1979, the Court ruled that the mere fact that the collective bargaining agreement between the parties expired and the Union went out on strike on June 10, 1977 did not mean that individual claimants were entitled to no back pay after the termination of the agreement. The Court found that the "parties must have reasonably contemplated and intended that the remedies of the reinstatement and back pay . . . would be available under the agreement" and it construed the "agreement as providing for reinstatement and back pay subsequent to its termination". The Court indicated that the affected employees "would probably have been reinstated but for plaintiff's actions . . prior to the termination of the subject collective bargaining agreement. Additionally, although they could have been discharged immediately after the agreement expired, the Court is unwilling to assume that plaintiff would have discharged them after the agreement was terminated by the union." After the agreement terminated, the Union launched an economic strike

8. As will be explained in more detail below, the gross back pay calculation includes projected earnings during the back pay period based on the applicable base and incentive rates of pay, shift differential, vacation pay and Christmas bonus. Not included in the gross back pay calculation, but recoverable under the Court's Order as a "fringe benefit" is the amount of medical and life insurance premiums which the Company would have paid during the back pay period. The evidence in the record in this regard is not complete. The collective bargaining agreement, Section 66, describes the insurance coverage but does not value it. During the back pay period, the International Union offered to pay the insurance premiums of claimants in need so as to continue the coverage they had when employed by the Company. Findings of fact will be made as to those premium amounts; at least with regard to those claimants this evidence does indicate the amount in earned insurance premiums they would have received during the back pay period from the Company. Other claimants obtained insurance coverage on their own or through their spouses. With regard to those persons, in the absence of evidence as to the value of this lost fringe benefit, no findings can be made on insurance premium amounts.

against the Company. The Court ruled in its Orders of January 9, and June 19, 1979 that individual claimants clearly shown by the Company to have actually participated in any manner in the 1977 economic strike would lose their rights to back pay as of the first day of their participation. Thus, findings of fact will be made concerning actual strike participation and the date on which such participation began.[9]

As stated above, 13 claimants were immediately rehired by the Company as new employees after their discharge in September, 1975, and continued to work for the Company until the economic strike on June 10, 1977.[10] The parties are in agreement that these persons are entitled to no back pay, but, since they were not rehired with their full seniority, they are entitled to the increment in pro-rated vacation pay, bonuses, and leader pay which they would have received had they been restored to their full seniority rights from June 8, 1976 until June 10, 1977. The Union makes no claim for any amounts for these persons after the commencement of the 1977 economic strike in which they participated. Findings of fact will be made below concerning the amounts that these claimants would have earned during the subject period.

The Company contends that certain additional monies received by the claimants during the back pay period should be deducted from gross back pay. These include significant amounts of assistance received by many claimants from the International Union, welfare benefits, unemployment compensation and social security payments. Findings of fact will be made as to whether an individual claimant received these various monies during the back pay period and .

in what amount. The question whether these amounts should be deducted from the amounts due the claimants will be addressed at length in the conclusions of law.

On June 27, 1979, after full discussion with the parties, the Special Master issued an Interim Report concerning certain individual claimants in this action. As set forth in more detail in that Interim Report, these claimants did not complete affidavits containing information concerning interim earnings as required by the Court's Order of September 18, 1978; nor did they appear at depositions properly noticed by the plaintiff; nor did they reply to Interrogatories properly served by the plaintiff. Thus, the Special Master concluded that the total failure of these claimants to supply any information acted to forfeit any entitlement they might have to recovery of back pay. Findings of fact will be made concerning the claimants included in this category.[11]

## II. FINDINGS OF FACT

Pursuant to the Order of the Court of May 15, 1979, the Special Master conducted hearings in this proceeding. A transcript of the testimony received on this reference is filed herewith. In addition, the record includes claimants' affidavits, answers to interrogatories and depositions and various exhibits entered into evidence. The complete record is also herewith transmitted to the Court. Having considered all the evidence in the record, my findings of fact with regard to the individual claimants are as follows:

1. MOLLY ANDERSON, 39,[12] was successful in obtaining employment from three separate employers during the back pay period. In 1976 she worked for Crawford

---

**9.** During the early weeks of the 1977 economic strike, Mr. Ernest Lange, Jr., President of the Company, compiled lists of the names of persons who were participating in strike activity at times when certain "incidents" occurred. The lists were admitted into evidence in this proceeding. Findings will be made as to whether a claimant's name appeared on Mr. Lange's lists.

**10.** The evidence shows that a fourteenth dischargee, Mr. Charles Barnes, was immediately rehired, but quit his employment prior to the

issuance of the Arbitrator's Awards; thus, he is not a claimant in this proceeding.

**11.** Since the issuance of the Interim Report, the Company has demonstrated to the Special Master that another claimant, Mr. Don Williams, who was not included in the Interim Report, also fits into the same category. Findings will be made accordingly.

**12.** Claimants' ages were ascertained from their affidavits, executed in October, 1978.

Bindery and earned $577.07 until she was laid off. On December 27, 1976 she began work for Empire Manufacturing Company, where she earned $102.80 in 1976 and $772.78 in 1977. She had to quit her employment with Empire on February 23, 1977 because she lost her transportation out to the plant. After a number of months of searching for work, applying to a number of employers in Canton and Barberton (such as Timken) but without success, Ms. Anderson was able to return to Crawford Bindery on June 20, 1977, where she earned $859.37 until she was again laid off. In 1978, the claimant worked for Akron Selle Co., earning $2,759.76 during the back pay period of that calendar year. The claimant did receive unemployment compensation and welfare benefits, but the record does not indicate the amounts of these payments. The claimant's gross back pay figures (i. e., the amounts she would have earned from the Company had she been reinstated in accordance with the Award of the Arbitrator) have been calculated as follows: $4,122.28 in 1976, $7,627.09 in 1977, and $3,703.14 in 1978. Ms. Anderson participated in the 1977 economic strike activity. Three Company witnesses testified to the claimant's participation and her name appears on Mr. Lange's list of June 17, 1977.

2. GREG BALMER did not complete an affidavit containing information concerning actual earnings during the back pay period as required by the Court's Order of September 18, 1978; nor did he appear at his deposition properly noticed by the Company; nor did he reply to interrogatories which were properly served by the Company. Thus, the claimant has totally failed to supply the information essential to the determination of a damage amount.

3. BOBBY BELL, 29, began his search for work from the very beginning of the back pay period, applying for positions at various machine shops, such as Logan Machine, and at Alside, an aluminum siding company. When his search for work proved unsuccessful, the claimant went on active duty with the Armed Forces from August 5, 1976, until November 23, 1976. During his time of service, of course, he did not seek interim employment. After being honorably discharged, the claimant again took up his search for work, looking for jobs as a power lift operator or a machine operator; he applied at Acro Tool & Die, Massey-Ferguson and other similar shops on a regular once-a-week basis. If the claimant heard there was a job available, he testified that he would "go and seek it out." Finally, Mr. Bell was successful in obtaining employment on May 5, 1977, at Western Reserve Psychiatric Rehabilitation Center, where, during the back pay period, he earned $5,222.40 in 1977, and $5,302.40 in 1978. The claimant received $450.00 in Union assistance. His back pay calculations are as follows: $5,215.00 for 1976, $9,298.13 for 1977, and $4,612.61 for 1978 (total, $19,125.74).

4. JUANITA BEIRLAIR, 33, was employed in three jobs during the back pay period. Her Answers to the Company's Interrogatories list eight additional places where she sought employment and notes that she applied at other employers whose names she cannot recall. The claimant was employed from November, 1976 until March, 1977 by Kent Industries, where she earned $619.28 in 1976 and $528.00 in 1977. She quit her job at Kent after receiving a call from Stouffer's in Solon telling her she "would be going to work on the following Tuesday, but they had to check out [the claimant's] references". (Dep. pp. 4–5) When they checked her reference, Falls Stamping and Welding Company, they sent the claimant a letter telling her they were sorry but they did not need her. She again began the search for work, applying at General Electric, Anne Marie Nursing Home in Aurora, Container Corporation in Ravenna, Oak Rubber, White Rubber, Alert Stamping, Samuel Moore Paint Company, plus many more. "I was out practically daily putting in applications." (Dep. p. 11) She finally obtained a position with Alert Stamping on June 22, 1977 and worked there until October, 1977, earning $1,114.04. From October, 1977 through the end of the back pay period, the claimant worked at Hunter Manufacturing, earning $1,075.44 in

1977 and $3,622.57 in 1978. The claimant participated in the 1977 economic strike activity. Her name appears on Mr. Lange's list of June 17, 1977. The claimant's gross back pay figures are as follows: $5,009.14 for 1976, $8,651.59 for 1977, and $4,338.36 for 1978. She received $1,100.00 in Union assistance, and the Union paid $607.32 in insurance premiums for the claimant.

5. HARRY BLAKNEY, 29, was not employed during the back pay period, and the record indicates that he made only a few sporadic attempts at seeking employment. He received $4,266.00 in Union assistance, and the Union made payments of $850.25 in insurance premiums for the claimant during the back pay period. The claimant's back pay figures are as follows: $4,348.31 for 1976, $7,815.20 for 1977, and $3,987.78 for 1978. The claimant's Answers to the Company Interrogatories list three places where he sought employment, all within a single two-week period around March, 1977. In his deposition testimony, the claimant listed two additional places where he sought employment in 1978. In general, the claimant's attitude as evidenced in his testimony was either that he was unsure whether he had the training or skill for certain jobs (such as being a short-order cook) or that he wanted to make more money than certain jobs would offer. He did not seek out employment opportunities, even though, as he testified in his deposition, "I knew there were openings." (Dep. p. 17) This claimant participated in the 1977 economic strike activity as of July 14th, when his name appears on Mr. Lange's list. Three Company witnesses testified to his strike participation and the claimant admits such participation, but would date its commencement as of December, 1977.

6. PAUL BOXLER was immediately rehired by the Company in September, 1975 as a "new" employee without seniority, and went on strike June 10, 1977. If the Company had complied with the Arbitrator's Award and reinstated the claimant's seniority, he would have received vacation pay of $613.67 in 1976, $582.77 in 1977, and $392.43 in 1978. He received a total of $219.60 in vacation pay as a new employee. In addition, Mr. Boxler's pro-rated Christmas bonuses are $62.48 for 1976 and $43.50 for 1977. He received a single bonus of $10.00 as a new employee.

7. HOWARD BROCKMAN, 28, was employed during the entire back pay period by Teledyne Monarch Rubber Company, where he earned $10,548.98 during 1976, $23,034.74 in 1977, and $12,534.70 in 1978. His gross back pay from the Company amounts to $6,615.40 in 1976, $11,860.45 in 1977, and $5,872.63 in 1978.

8. RONALD BROUSE, 28, used extraordinary effort in seeking interim employment during the back pay period. He was finally successful in July, 1977 in obtaining a position with the Summit County Engineer. He filed written applications with 37 companies and made visits to over 100 other companies who would not even accept applications. The Company acknowledges that the claimant "was very diligent in seeking alternative employment." His total gross back pay figure is $22,111.66, and his actual interim earnings were $8,316.00. Brouse received $2,940.00 in Union assistance.

9. JOYCE BULLARD, 40, also used extensive efforts to seek and maintain employment during the back pay period. She was employed by Stop-n-Go from September 15, 1976 until August 13, 1977, when she obtained a position with Patcher Rubber Company, where she was employed for the rest of the back pay period. In addition, the claimant listed 15 companies where she sought employment and testified in her deposition that she sought employment "at about every factory in Summit and Wayne County." (Dep. p. 6) Her actual interim earnings were $1,148.00 in 1976, $5,005.37 in 1977, and $1,734.00 in 1978. Her gross back pay is calculated as follows: $6,280.97 in 1976, $11,030.18 for 1977, and $5,560.00 for 1978. She received $2,080.00 in Union assistance. Ms. Bullard was clearly shown to have participated in the 1977 economic strike activity as of July 7th, when her name appears on Mr. Lange's list.

10. BOBBY BULLARD, 41, was, as the Company admits, "very diligent in seeking

employment" during the back pay period. He listed 14 places where he unsuccessfully sought employment in 1976 and 1977 prior to obtaining employment at Trusco, Inc. on November 3, 1977, where he worked through the end of the back pay period. In his interim employment the claimant earned $1,409.63 in 1977 and $4,877.16 in 1978. He received $3,000.00 in assistance from the International Union. The claimant's gross back pay figures are: $4,725.88 for 1976; $8,737.40 for 1977, and $3,928.68 for 1978 (total $17,391.96). Three Company witnesses placed the claimant on the picket line during June to December, 1977. Mr. Lange recalled seeing him there during "warmer weather", but his name did not appear on Mr. Lange's list. When asked during his deposition about picketing, the claimant twice flatly denied participation, and the matter was not pursued further, either in his deposition or in his hearing testimony.

11. STEPHAN BUNNER, 23, was employed at three different jobs during the back pay period. At the commencement of the back pay period in June, 1976, claimant held a part-time position with Sohio, earning $2.65 an hour. From Sohio, the claimant earned $4,642.42 in 1976 and $1,282.26 in 1977. According to the claimant he quit his job with Sohio because he was not earning enough to support his family. Apparently when he quit Sohio in early 1977, the claimant knew he had a job opportunity with Little Tykes, but that he would have to wait a while for that position to open. He was unemployed for approximately six weeks. Around April, 1977, the claimant hired in to Little Tykes, where he was making $3.18 an hour for a full 40-hour week. It is estimated that he worked there for some 14 weeks; his earnings were $1,780.80. He quit his job at Little Tykes, again because the pay was too low, and, after a month wait (which involved an excursion to Florida), obtained a position at C & C Machine, where he earned $2,811.34 in 1977 and $3,596.95 in 1978. His gross back pay is calculated to be $5,006.80 in 1976, $8,942.59 in 1977, and $4,329.67 in 1978 (total, $18,279.06).

12. BASIL BUSCH, 28, obtained two jobs during the back pay period, a brief part-time job with Sohio in January, 1977, where he earned only $20.00 and then a full-time position with Consolidated Mold and Die, starting February, 1977, where he earned $6,691.36 in 1977 and $4,834.03 in 1978. Prior to obtaining employment, Mr. Busch made an extensive search for work. The evidence indicates that during 1976 he sought employment from at least 10 different named employers. The claimant also suffered two periods of disability during 1976, an appendectomy in September which kept him out of the job market for six weeks, and an auto accident immediately thereafter in October, 1977, which required a few months of recuperation. Thus, commencing in early September, 1977, through the end of the year, the claimant was not seeking employment. His gross back pay figures were calculated to be as follows: $5,851.27 for 1976, $10,525.73 for 1977, and $5,277.49 for 1978 (total, $21,654.49). His total interim earnings were $11,545.39. The claimant received $1,600.00 in Union assistance.

13. JANE CARLTON, 58, was unable to obtain interim employment during the back pay period, although the record indicates that she did make attempts at seeking work. The claimant testified that she looked for work once or twice a week during the time she maintained her registration for unemployment compensation, although it is unclear in the record when that period began or ended. In her testimony before the Special Master, the claimant said that she "looked for work all the time" until 1978. She applied for positions at Wolfe Grinding, Rogers Manufacturing and Logan Machine, and also sought reemployment with the Company. She received $4,545.00 in Union assistance. Mrs. Carlton participated in the 1977 economic strike activity, commencing on June 23, 1977, when her name appears on Mr. Lange's list. Three Company witnesses testified to seeing the claimant participating in the strike activity, and the claimant admits such activity in her deposition testimony. The claimant's gross

back pay figures have been calculated as follows: $5,418.50 in 1976, $9,100.45 in 1977, and $4,712.63 in 1978.

14. JANET CARR, 31, was employed from September, 1976 through the end of the back pay period. She first obtained a part-time position with the Quik Shop in Canal Fulton, where she earned $667.80 for some seven weeks' work, and then left this employment to take more suitable employment with the Canal Fulton Public Library, where she earned $407.00 in 1976, $2,377.20 in 1977, and $1,287.00 in 1978. The position with the Library was also on a part-time basis, but the claimant continued to seek full-time employment, applying at the Akron, Cuyahoga Falls, Stow and Barberton Public Libraries and with the Federal Bureau of Investigation. She received $3,810.00 in Union assistance, $285.00 in welfare and $120.00 in food stamp assistance. The Union paid $816.25 in insurance premiums for the claimant. Her gross back pay calculations are as follows: $4,750.77 for 1976, $8,356.13 for 1977, and $3,947.93 for 1978. The claimant participated in the 1977 economic strike in June of that year by her own admission in her deposition testimony and in her testimony at the hearing before the Special Master.

15. VICTOR CARUSO, 65, was employed by the Company for 46 years prior to his discharge in 1975. During the back pay period he was able to obtain only one job, with Heepe Florists, which lasted from September, 1977 until January, 1978, when the claimant quit because, according to his testimony, the job interfered with his picketing activities. He earned $1,500.00 in this interim employment. Mr. Caruso received $5,320.00 in Union assistance and the Union paid $850.25 in insurance premiums for the claimant. His gross back pay calculations are as follows: $5,158.73 for 1976, $8,893.92 for 1977, and $4,802.39 for 1978. Mr. Caruso searched for work during the back pay period, but found that his age was a severe disability in obtaining employment. The claimant was also physically handicapped; a serious injury to his hand resulted from an industrial accident at the Company years before. The evidence shows that the claim-ant sought work with Forest City Precast and Custom Mold in Kent. With the help of his sons, he looked for work with employers in the Akron area. As he testified, he would "walk in the place—they just look at you: 'No help wanted. Goodbye'". (Dep. p. 14) After he left Heepe Florists in 1978, he did not seek further employment. Mr. Caruso by his own admission participated in the 1977 economic strike activity. His name first appears on Mr. Lange's lists as of June 17, 1977. Three Company witnesses testified to the claimant's strike participation.

16. CLARENCE CHADWELL did not complete an affidavit containing information concerning actual earnings during the back pay period as required by the Court's Order of September 18, 1978; nor did he appear at his deposition properly noticed by the Company; nor did he reply to interrogatories which were properly served by the Company. Thus, the claimant has totally failed to supply the information essential to the determination of a damage amount.

17. ANTHONY CIARALLO, was immediately rehired by the Company in September, 1975 as a "new" employee without seniority, and went on strike on June 10, 1977. If the Company had complied with the Arbitrator's Award and reinstated the claimant's seniority, he would have received vacation pay of $663.53 in 1976, $594.40 in 1977, and $463.20 in 1978. He received a total of $161.60 in vacation pay as a new employee. In addition, Mr. Ciarallo's prorated Christmas bonuses are $53.71 for 1976 and $42.00 for 1977. He received a single bonus of $10.00 as a new employee.

18. JAMES CLEMENTE, 58, was employed by Melch Foods Products, Inc. from the last week of October, 1976, through the end of the back pay period. He earned $2,299.37 in 1976, $9,443.91 in 1977, and $4,492.05 in 1978. Prior to obtaining this position with Melch Foods, the claimant did not seek work. He received $1,700.00 in unemployment compensation during 1976. His gross back pay figures are as follows: $7,748.50 for 1976, $14,096.89 for 1977, and

$6,978.69 for 1978. Company witnesses testified to seeing the claimant participating in the 1977 economic strike activity, but the claimant's name does not appear on Mr. Lange's lists. Mr. Lange testified that he saw the claimant there "occasionally", without specifying when he began participating during the June-December, 1977 period.

19. JERRY CONNER was immediately rehired by the Company in September, 1975 as a "new" employee without seniority, and went on strike on June 10, 1977. If the Company had complied with the Arbitrator's Award and reinstated the claimant's seniority, he would have received vacation pay of $97.31 in 1976 but no vacation pay for 1977 or 1978 because he did not meet the threshold work eligibility requirement. He received no vacation pay from the Company. Mr. Conner would not have received Christmas bonuses for either 1976 or 1977, although he actually received a bonus of $10.00 from the Company, apparently in error.

20. ROBERT CREEK was immediately rehired by the Company in September, 1975 as a "new" employee without seniority, and went on strike on June 10, 1977. If the Company had complied with the Arbitrator's Award and reinstated the claimant's seniority, he would have received vacation pay of $163.61 in 1976, $276.77 in 1977, and $199.33 in 1978. He received a total of $186.80 in vacation pay as a new employee. In addition, Mr. Creek's pro-rated Christmas bonuses are $14.03 for 1976 and $10.40 for 1977. He received a single bonus of $10.00 as a new employee. Mr. Creek would also have received 15 cents per hour leader pay which amounts to $273.01.

21. CHRISTOPHER CRIM was immediately rehired by the Company in September, 1975 as a "new" employee without seniority, and went on strike on June 10, 1977. If the Company had complied with the Arbitrator's Award and reinstated the claimant's seniority, he would have received vacation pay of $340.46 in 1976, $480.02 in 1977, and $361.21 in 1978. He received a total of $207.60 in vacation pay as a new employee. In addition, the claimant's pro-

rated Christmas bonuses are $53.86 for 1976 and $41.25 for 1977. He received a single bonus of $10.00 as a new employee.

22. DANIEL CRIM was immediately rehired by the Company in September, 1975 as a "new" employee without seniority, and went on strike on June 10, 1977. If the Company had complied with the Arbitrator's Award and reinstated the claimant's seniority, he would have received vacation pay of $353.97 in 1976, $319.71 in 1977, and $353.76 in 1978. He received a total of $205.20 in vacation pay as a new employee. In addition, the claimant's pro-rated Christmas bonuses are $14.69 for 1976 and $11.00 for 1977. He received a single bonus of $10.00 as a new employee.

23. ANDREW CSONKA, 22, supplied only the barest amount of information regarding his interim employment activities by way of a single-page affidavit. He did not appear at his noticed deposition, nor did he file Answers to the Interrogatories. During the hearings, this claimant was in California and thus was unavailable to testify. Nonetheless, certain facts are in the record and they demonstrate, at least up until October, 1977, a continuous record of employment at various employers in Lisbon and Akron, Ohio. While the claimant supplied only his hourly rates of pay, it can be estimated that in the period June, 1976 until October, 1977, he earned $10,796.00. His post-October, 1977 efforts or successes in obtaining employment are unknown since the claimant totally failed to respond to the Company's other discovery attempts. Apparently, Mr. Csonka (a 22-year-old young man) took Mr. Greeley's advice and "went West". (His affidavit was signed in Nevada.) The gross back pay figures for this claimant are $3,510.42 for 1976, $6,271.45 for 1977, and $3,111.85 in 1978 (total $12,893.72).

24. TIMOTHY CURTIS, 22, was employed continuously throughout the back pay period, and the Company acknowledges that the claimant mitigated his damages. He was employed at Kayo Oil in 1976, where it can be estimated he earned $2,650.00. From November 30, 1976 until

February 1, 1978, the claimant worked for Staubs Trucking, earning an estimated $472.50 in 1976, $5,460.00 in 1977, and $420.00 in 1978. In 1978 he was employed at the Rex Humbard Foundation (earning $1,082.64) and Ascot Machine (earning $899.16). The claimant's gross back pay figures are as follows: $3,646.92 for 1976, $6,501.69 for 1977, and $3,229.88 for 1978. Mr. Curtis participated in the 1977 economic strike activity. Two Company witnesses testified to his participation and his name appears on Mr. Lange's first list of June 17, 1977, as participating at 5:45 a. m.

25. DOROTHY DALE, 55, is one of two employees entitled to back pay dating from October 1, 1975, because she was reinstated *with* back pay under the Award of the Arbitrator, later enforced by the District Court. The claimant would have earned $18,986.84 in gross back pay during her extended back pay period, and the Union paid $724.25 in insurance premiums for the claimant. The claimant held two jobs during the back pay period: at Columbus Bus Service International, where she earned $176.55 in 1975 and $518.70 in 1976 (when she was fired for an alleged theft); at Ford Motor Company, where she earned $4,979.90 in 1976 and $13,679.26 in 1977. She was employed at Ford through the end of the back pay period; although her exact earnings during 1978 were not ascertained, her deposition indicated that her rate was over $7.00 an hour, substantially higher than her rate would have been at the Company during 1978. Using as a reasonable estimation a rate of $7.25 an hour, her interim earnings during the back pay period in 1978 amount to $6,670.00. Thus, her total interim earnings amounted to $26,024.41. She received $280.00 in Union assistance.

26. MARTHA DeCHURCH, 59, unsuccessfully sought interim employment. She applied for employment with at least eight companies, often on more than one occasion. Her gross back pay figures are as follows: $6,888.13 for 1976, $11,300.92 for 1977, and $5,965.86 for 1978. The Union paid $850.25 in insurance premiums for the claimant. The claimant received $4,226.00 in Union assistance. She admitted participating in

the 1977 economic strike activity, beginning in December of that year. However, four Company witnesses placed her on the strike line much earlier, and her name appears on Mr. Lange's list of June 23, 1977.

27. ANDREW DeRITA was immediately rehired by the Company in September, 1975 as a "new" employee without seniority, and went on strike June 10, 1977. If the Company had complied with the Arbitrator's Award and reinstated the claimant's seniority, he would have received vacation pay of $1,078.00 in 1976 and $989.71 in 1977. He received a total of $215.60 in vacation pay as a new employee. In addition, the claimant's pro-rated Christmas bonus is $64.21 for 1976. He received a single bonus of $10.00 as a new employee. The claimant would have received leader pay of 15 cents per hour, amounting to $296.97.

28. DAVID DeRITA, 54, was employed by Chrysler Corporation as of August 9, 1976 and from then on through the back pay period. He earned substantial sums in his interim employment: $9,881.72 in 1976, $30,302.57 in 1977, and $8,769.80 in 1978. He received $405.00 in Union assistance. The Company did not submit gross back pay figures on this claimant, arguing that precise calculations were unnecessary due to the fact that the claimant clearly earned more in interim employment than his gross back pay from the Company. In its initial calculation sheet submitted to the Court in 1978 which used a "very best case" approach to calculating back pay—and not the method later agreed to by the parties—the Union claimed $37,596.56 was a "grand total" for this claimant. While this estimate is clearly too high, this claimant in fact earned $48,954.09 in interim employment, over $10,000.00 more than this inflated gross back pay figure. There was some evidence that this claimant participated in the 1977 economic strike activity, but his name does not appear on Mr. Lange's lists.

29. DOROTHY DeRITA, 54, was unable to obtain interim employment during the back pay period. The evidence indicates that she sought employment from numer-

ous companies, including Logan Machine Company, Gay-En Corporation, M & J Company, Reichold Chemical Company, Sun Plastic Company, and other places whose names she could not recall. She received $4,635.00 in Union assistance, and the Union paid $850.25 in insurance premiums on her behalf. Her gross back pay figures are as follows: $4,505.18 for 1976, $6,994.99 for 1977, and $3,973.58 for 1978. By her own admission, she began picketing as of December, 1977, but three Company witnesses place her at the strike line much earlier. The claimant's name appears on Mr. Lange's list of June 17, 1977, shortly after the economic strike began.

30. JOHN DIMMICK, 52, was briefly employed during the back pay period. He worked for Leisure Time, Inc. during October, 1976, where he earned $77.83 and for the Village of Munroe Falls in November and December, 1976, where he earned $268.50. He was laid off from Leisure Time when it closed at the end of the season, and he left his job with Munroe Falls because he was physically unable to do the walking to read the water meters which the job required. In January, 1977, Mr. Dimmick moved to Florida for health reasons and stopped seeking employment. (Mr. Dimmick later started a campground in Florida, but his testimony indicates that this activity occurred after the end of the back pay period.) In addition to the two jobs which the claimant held, he also sought employment at Rogers Manufacturing and Hamlin Steel Products. The claimant received $3,245.00 in Union assistance. The claimant's gross back pay figures are as follows: $4,746.89 for 1976, $8,213.34 for 1977, and $4,154.49 for 1978. Three Company witnesses testified that Mr. Dimmick participated in the 1977 economic strike. The claimant's name appears on Mr. Lange's list of June 10, 1977, and is also noted on the July 14, 1977 list.

31. CLEOPHUS DIXON, 31, was employed throughout the back pay period beginning August 20, 1976, by Consolidated Freight where he earned $7,412.10 in 1976, $18,575.65 in 1977, and $8,138.26 in 1978 (total, $34,126.01). The Company, in its submission on this claimant, did not supply gross back pay figures, arguing that it is clear that Mr. Dixon earned more in his interim employment than he would have earned with the Company. However, the computer sheets earlier submitted by the Company do allow for a calculation of gross back pay. (There was an error in the calculation of the projected number of hours the claimant would have worked during the back pay period. His average number of projected hours of work per year should be 1,569.09 and not 1,297.7 as indicated on the printout.) The claimant would have earned $4,600.38 in 1976, $7,897.38 in 1977, and $3,903.33 in 1978 (total, $16,401.09). Mr. Dixon received $250.00 in Union assistance.

32. JOSEPH DOLGAS, 56, stopped applying for jobs in December, 1976 when he went on welfare. In 1976 he was briefly employed at a few jobs, then held a position at Fairlawn Chateau from November 15, 1976 until he was discharged on December 17, 1976. His total actual interim earnings in 1976 were $1,432.47. When offered reinstatement by the Company in June, 1978, the claimant returned to work. The claimant's gross back pay figures are $5,048.66 for 1976, $9,245.37 for 1977, and $4,613.92 for 1978 (total, $18,907.95). He received $2,025.00 in Union assistance, $1,131.00 in welfare payments, and the Union paid $720.74 in insurance premiums for the claimant. In 1976, during periods when the claimant was not employed, he actively sought work, filing applications with a number of employers, including Suffield Publishing, L-K Restaurant, St. Thomas Hospital, and Akron University. After his discharge from Fairlawn Chateau, Mr. Dolgas ceased looking for work. The claimant was not in good health during the back pay period, although he did testify that his health did not interfere with his search for work. Two Company witnesses testified that Mr. Dolgas participated in the 1977 economic strike at least at some time during the period June–December, 1977. However, in his deposition testimony, the claimant flatly denied participation and said he did not picket because he would have lost

his welfare. He was not asked about his strike participation during his testimony before the Special Master.

33. JOHN DOSHAK, 35, was employed throughout the back pay period by Logan Metal Stampings, Inc. He earned $16,-695.93 in this interim employment. (The Company calculates a higher figure by pro-rating the claimant's W–2 earnings. However, the record includes a letter from the claimant's employer indicating precisely what amounts were earned between the relevant back pay period dates. Earnings may vary from week to week based on various factors, e. g. hours worked, incentive, and thus, the more precise employer's figures are better evidence of actual earnings than pro-rated W–2 figures.) The claimant's total gross back pay from the Company was calculated to be $23,820.56. Although one Company witness testified to seeing the claimant participating in the strike, the Company has apparently abandoned that claim in its submission to the Special Master concerning the claimant.

34. KENNETH DOUGLAS, 25, was employed throughout the back pay period by McDonald's in Akron, where he earned a total of $16,314.42. His gross back pay for the entire period has been calculated to be $22,617.46. The claimant held a part-time position at McDonald's since 1972, and the Union estimates that while working part-time the claimant was earning about $1,500.00 a year. After his discharge from the Company, the claimant assumed full-time status with McDonald's.

35. STEVEN EDWARDS, 22, filed only a "bare bones" affidavit in this proceeding which makes the calculation of an award of damages virtually impossible. The claimant was employed by Canteen Corporation during some part of 1976 and 1977, where he earned a total of $2,504.35. In March, 1977, Mr. Edwards entered active duty with the Armed Forces, where he remained through the end of the back pay period. He was unavailable to the Company for testimony either by way of deposition or at the Special Master's hearings. He did not file his Answers to the Company's Interrog-

atories. He received $650.00 in Union assistance. The Company calculates that Mr. Edwards' gross back pay prior to his entry into active duty amounts to $7,425.37.

36. ROBERT ELLIS, 29, did not seek interim employment during the back pay period. For some time during the two-year period, Mr. Ellis was incarcerated in the Columbus Correctional Facility and thus, he was out of the job market. He received $4,000.00 in Union assistance.

37. ERNEST FARR, 56, was employed throughout the back pay period by Akron University, where he earned $3,054.40 in 1976, $7,225.60 in 1977, and $5,701.48 in 1978 (total, $15,981.48). The claimant's gross back pay figures are as follows: $5,811.76 for 1976, $10,160.29 for 1977, and $5,111.76 for 1978 (total, $21,083.81).

38. NORMAN FEARS, 32, was unsuccessful in obtaining interim employment until January, 1978, when he began work for the City of Akron through the C.E.T.A. program. He earned $5,768.86 in that job in 1978. In his search for work, the claimant applied at Osborne Machine, Mohawk Tire, General Tire, Firestone, Goodyear, Chrysler, Ford and B & W. As he testified in his deposition, he applied "all over town". The Company would have the Special Master discredit the claimant's deposition testimony because he was merely naming "obvious employers", and when pressed to supply other names, he responded by saying, "How many do I need?" However, the Company did not call the claimant as a witness in the hearings before the Special Master to further explore what it claims now was a fabricated story of a job search. While Mr. Fears appears to have been somewhat adversarial in his deposition, there was no inconsistency in his testimony and, of course, the Special Master cannot assess witness demeanor from the bare pages of a deposition. The claimant received $4,350.00 in Union assistance, and the Union paid $2,308.22 in insurance premiums for the claimant. In his deposition, the claimant admitted participating in the picketing at the Company in 1977 during the economic strike. He acknowledged picketing when

the strike began on a once-a-week basis for about six months.

39. WILLIAM FEARS, 36, was employed by O'Neil's from September, 1976 through the end of the back pay period. He earned $1,472.00 in 1976, computed on the basis of his wage rate of $2.30 per hour at 40 hours per week for 17 weeks. His W–2 form for 1977 indicates earnings of $6,018.60 and his affidavit indicates earnings for 1978 of $3,014.38. Mr. Fears received $4,000.00 in assistance from the International Union. The evidence shows that the claimant sought employment at Firestone, Goodyear, Chrysler, Rockwell in Barberton, and B & W, but there is a question as to when these attempts to find work were made. In his deposition, the claimant clearly and repeatedly asserted that these searches for work occurred *after* he was employed by O'Neil's apparently seeking to better his employment opportunity. Although in his testimony before the Special Master he altered his prior testimony concerning the timing of this search for employment, the Special Master does not credit the new version. Mr. Fears would have earned from the Company the following amounts during the back pay period: $4,682.35 in 1976; $8,417.42 in 1977; and $4,271.67 in 1978 (total, $17,371.44).

40. RUSSELL FOTI was immediately rehired by the Company in September, 1975 as a "new" employee without seniority, and went on strike on June 10, 1977. If the Company had complied with the Arbitrator's Award and reinstated the claimant's seniority, he would have received vacation pay of $889.38 in 1976, $727.97 in 1977, and $480.64 in 1978. He received a total of $182.40 in vacation pay as a new employee. In addition, the claimant's pro-rated Christmas bonuses are $60.26 for 1976 and $38.25 in 1977. He received a single bonus of $10.00 as a new employee.

41. GERALDINE FULTON, 60, who served with the Company for 35 years prior to her discharge, made extensive efforts to obtain interim employment during the back pay period. Her efforts at seeking work did not begin until August 7, 1976, when her records indicate she applied for a position with Acme-Click. Her Answers to the Company's Interrogatories list 11 places where she applied for employment in 1976 and 1977, and in her testimony she referred to other places where she sought work. She was only successful in obtaining a job in February, 1978, with Acme Machine Co., where she earned $1,885.24 before the end of the back pay period. Ms. Fulton admitted participating in the economic strike starting in December, 1977. In January 1978, the claimant was hospitalized for a two-week period. Her gross back pay has been calculated as follows: $4,337.68 for 1976, $6,553.51 for 1977, and $3,659.23 for 1978. She received $3,470.00 in Union assistance, and the Union paid $2,125.62 in insurance premium payments for the claimant.

42. RICHARD GINN, 51, maintained employment throughout the back pay period. He held a security position with the Cathedral of Tomorrow on a part-time basis during 1976 (earning $1,159.50), and on a full-time basis during 1977 (earning $5,762.25) and 1978 (earning $4,142.25). On July 27, 1976, the claimant obtained a full-time position with Phillips Machine, where he earned $2,411.99 during 1976 and $1,646.75 in 1977, until he left the position on April 8, 1977. Thus, during the first 14 weeks of 1977, the claimant held *two* full-time jobs. During three weeks in April, 1978, the claimant also worked for Manpower, earning $142.11. The claimant received $150.00 in Union assistance and $180.00 in welfare aid, although it is unclear whether this latter benefit was received prior to or during the back pay period. In addition to the positions held by the claimant, he also sought employment from Akron Selle, Chrysler Stamping, and Massey-Ferguson. The claimant's gross back pay figures are as follows: $7,827.83 for 1976, $13,580.46 for 1977, and $6,933.97 for 1978. Mr. Ginn participated in the 1977 economic strike activity. All four Company witnesses testified to seeing the claimant participating, and his name appears on Mr. Lange's list of June 21, 1977.

43. WENONA GREEN, 54, was employed throughout the back pay period. She held a position at Phillips Machine until August 26, 1977, where she earned $3,514,35 in 1976 and $4,189.09 in 1977. She was then employed by Heritage Fireplace Equipment Company, where she earned $2,982.87 in 1977 and $3,627.69 in 1978. Ms. Green paid her own premiums to continue her insurance coverage during the back pay period, and the record includes copies of her checks tendering payment to the insurance carriers. The premium amounts expended were $238.56 in 1976, $408.96 in 1977, and $170.40 in 1978 (total, $817.92). (Ms. Green was the only claimant to submit such records.) The claimant's gross back pay figures are as follows: $4,978.95 for 1976, $8,463.95 for 1977, and $4,548.04 for 1978. There was some evidence concerning the claimant's participation in the 1977 economic strike activity. Two Company witnesses testified to seeing the claimant participating on an irregular basis. The claimant's name does not appear on Mr. Lange's lists. When the claimant testified before the Special Master, she was not asked any questions concerning any possible strike activity. The record is devoid of any evidence to establish a date when the claimant commenced participation.

44. WILLIAM GWEEN, 28, obtained three jobs during the back pay period. He worked for Manpower, earning $3,162.12 in 1976. The claimant was then employed by Salem's Potato Chips, where he earned $1,630.15 in 1977. Finally, beginning in June, 1977, and lasting through the end of the back pay period, the claimant was employed by Logan Machine Company, where he earned $4,413.08 in 1977 and $4,029.57 in 1978. The Company does not claim that Mr. Gween failed to use reasonable efforts to obtain interim employment and the record shows he made application to numerous places of employment in addition to the employers where he was able to find work. The claimant would have earned the following amounts in gross back pay: $5,410.35 in 1976, $9,716.02 in 1977, and $4,806.66 in 1978 (total, $19,933.03).

45. THOMAS HEFFERNAN, 43, was President of the Local Union until December 9, 1977, when he resigned to take a full-time position with Retail Grocery Inventory Service (R.G.I.S.). The claimant had worked for R.G.I.S. on a part-time basis briefly in 1976 (earnings, $27.70) and during 1977 (part-time earnings, $1,392.08). The claimant's full-time earnings in December, 1977 amounted to $750.00, and he earned $5,750.00 in 1978. The claimant's deposition indicates that he made numerous attempts to find employment, looking at Hamlin Steel, Crown Industries, Boise-Cascade, Ford, Chrysler, Terex, the Akron rubber shops, Massey-Ferguson, General Tire, Rogers Manufacturing and others, before he was successful in obtaining full-time employment with R.G.I.S. He testified that he looked for work throughout the back pay period, and the evidence supports that claim. The claimant received $3,250.00 in Union assistance, and the Union paid $100.80 in insurance premiums for the claimant. He received $1,144.00 in unemployment compensation during 1977. The claimant's gross back pay figures are as follows: $6,792.93 for 1976, $11,621.62 for 1977, and $6,020.30 for 1978. Mr. Heffernan participated in the 1977 economic strike activity. His official duties brought him to the strike line twice or three times a week. All four Company witnesses testified that the claimant participated, and the claimant admitted his presence on the picket line. The claimant's name appears on Mr. Lange's list of June 22, 1977.

46. GREGORY HENDERSON, 24, did not obtain interim employment during the back pay period until November, 1977, when he began work with Forest City Dillon Precast Systems, where he earned a total of $7,290.09 through the end of the back pay period. Prior to obtaining employment, the claimant applied for positions with Chrysler and Ken-Tool (and McNeil Machine Shop in 1975 before the back pay period began). He obtained the job at Forest City with the aid of his younger brother who worked there. The claimant received $2,920.00 in Union assistance. The claimant's gross back pay figures are as follows:

$2,437.37 for 1976, $4,462.89 for 1977, and $2,202.88 for 1978. The Union paid $680.20 in insurance premiums for the claimant. During his deposition the claimant wavered in his response to inquiries whether he participated in the 1977 economic strike activity, but finally admitted to picketing on two occasions. No Company witness identified Mr. Henderson as being among the strike participants, and his name does not appear on Mr. Lange's lists.

47. STEVEN HENDERSON, 27, moved to California shortly after his discharge by the Company in 1975. He did not obtain a job, however, until July 11, 1977, when he was employed by C B C Industries. He held this position through the end of the back pay period, earning $4,293.55 in 1977 and an estimated $3,726.00 in 1978. The evidence in the record indicates that during his year and one-half in California prior to obtaining employment (13 months of which fell within the back pay period), the claimant applied to Rockwell International and Northrup Corporation for positions. While it is, of course, possible that he looked elsewhere as well, the claimant in his deposition could recall the names of no other places where he sought work. The claimant's back pay figures are as follows: $3,499.19 for 1976, $6,230.50 for 1977, and $3,098.57 for 1978.

48. ROBERT HUTCHINSON, 28, held six different jobs during the back pay period. The evidence in the record indicates that at some time in the back pay period, Mr. Hutchinson also made application for employment to Hamlin Steel, Logan Machine, Galehouse Lumber, and numerous gas stations. His only extended period of unemployment began after he quit Diemer's Exxon in January, 1977. He was next employed six months later. There is no evidence in the record which justifies the claimant's quitting his employment in January, 1977. On other occasions during the back pay period when the claimant quit employment he was able to immediately obtain new employment and thus, mitigate his loss. However, the January, 1977 quit from Diemer's was followed by a six-month period of unemployment. Had he kept the job at Diemer's he would have earned an additional $1,455.20. The claimant's gross back pay figures are as follows: $3,757.75 in 1976, $6,442.34 in 1977, and $3,189.21 in 1978 (total, $13,389.30). His actual interim earnings were $2,311.88 for 1976, $4,682.39 for 1977, and $5,292.00 for 1978 (total, $12,286.27). He received $750.00 in Union assistance. Company witnesses testified that they saw this claimant participating in the 1977 economic strike activity. The claimant in his testimony before the Special Master denied any such participation. The Company has offered no evidence fixing the date when any strike participation began. The claimant's name does not appear on Mr. Lange's lists.

49. LEE JACKSON, 31, did not obtain interim employment until July, 1977, when almost simultaneously he found two jobs, one with the C.E.T.A. program (where it can be estimated he earned a total of $120.00) and another with Bearfoot Corporation, where he remained employed through the end of the back period. He earned $400.56 from Bearfoot in 1977, and at least an equivalent amount for 1978. (The record does not include the claimant's actual earnings for 1978, but he testified that he worked at Bearfoot until he left to return to the Company in June, 1978, and his rate of pay substantially increased in 1978 over his rate in 1977.) The claimant was discharged from the C.E.T.A. job for tardiness. The claimant received $5,220.00 in Union assistance and an estimated $650.00 in welfare payments. While Mr. Jackson's deposition testimony is somewhat circuitous, it can be determined that after receiving welfare aid beginning in January, 1977, and prior to obtaining work in July, 1977, the claimant did not look for work. The claimant's gross back pay figures are as follows: $4,121.90 for 1976, $7,187.54 for 1977, and $3,420.03 for 1978. The Union paid $850.25 in insurance premium payments for the claimant.

There is much evidence in the record concerning the claimant's participation in the 1977 economic strike activity. During his deposition, the claimant was asked, "Did

you do any picketing in June, 1977 on the economic picket line, the legal strike?" He responded, "I would have to say yes to that." While there may be some ambiguity in this exchange as to when the claimant's participation began, the timing is made clear when he was later asked whether he *continued* to picket after he "went to Bearfoot". The answer again was "Yes". Since the claimant began at Bearfoot in July, 1977, he began picketing (as the answer to the earlier question suggests) prior to July, 1977. During his testimony before the Special Master, the claimant flatly denied any participation in the 1977 economic strike. In light of the extensive discussion of this issue in his deposition and his repeated acknowledgement of strike participation, this retraction cannot be credited.

50. WILLIAM JORDAN, 30, earned a total of $303.60 during the entire back pay period, working Christmas time, 1977 at Little Tykes. He received welfare assistance for about a year (although the record does not indicate the amount) and $4,703.00 in Union assistance. In his deposition, the claimant stated that he could not name one place where he applied for employment during the back pay period. He did use the Ohio Bureau of Employment Services in Akron and Canton and recalls going to some kind of steel company in Canton. The claimant's gross back pay figures are as follows: $4,159.06 for 1976, $7,616.73 for 1977, and $3,687.77 for 1978. During his deposition testimony, the claimant admitted picketing during the 1977 economic strike on a weekly basis from June, 1977 until June, 1978. (Dep. p. 6) Two Company witnesses also testified to Mr. Jordan's strike participation.

51. LOUIS KARAMAS, 29, was employed throughout most of the back pay period. In 1976 he worked for A & H Drywall Company, where he earned $4,412.91. He was laid off from that position and received approximately $1,200.00 in unemployment compensation. The claimant next worked for E. S. Worthington Company, where he earned $5,635.76 in 1977 and $2,492.96 in 1978. In addition to holding the two positions, the claimant applied for work at Hamlin Steel, B & C Machine, East Ohio Gas, Akron Sandblasting, Sun Plastic, City Machine and Wheel, Castle Apartments, and Kestler Bakery. Mr. Karamas was encumbered in his search for work by the fact that he can neither read nor write. The claimant's total gross back pay for the entire period amounts to $18,793.20.

52. GLEN KELLY, 26, held three jobs during the back pay period. In October and November, 1976, he was employed at an L–K Restaurant, where he earned $349.36. He quit because, as he testified, he was never paid on time. He then drove a cab on the 2:00 p. m. to 1:00 a. m. shift for City Yellow Cab, where he earned $419.25 in 1976 and $848.78 in 1977. He quit this job in March, 1977, because, as he testified at his deposition, the position was too dangerous. (One of his fellow workers driving the same shift had been shot on the job.) The quit was certainly justified based upon these working conditions. Between March and July, 1977, Mr. Kelly searched for work, using the assistance of employment agencies and even going through the telephone book to find names of employers where he might apply. Among other places, he applied to Massey-Ferguson, Phillips Machine and Logan Machine during this period. Finally, he obtained a position at Phillips Machine in July, 1977, where he worked through the end of the back pay period. He earned $2,877.40 in 1977 and $2,859.22 in 1978 while working at Phillips Machine. The claimant's gross back pay figures have been computed as follows: $2,948.90 for 1976, $5,421.36 for 1977, and $2,687.08 for 1978 (total, $11,057.34).

53. FOY KING, 66, retired prior to June 8, 1976, and he began receiving his pension from the Company on April 1, 1976. He also received social security payments, starting in January, 1976. Mr. King did not seek employment during the back pay period.

54. JOHN KING, 38, held two jobs during the back pay period. He worked for about a month during the summer of 1976

for Spring Hill Apartments, earning $460.00 until he was laid off. The claimant received welfare payments amounting to some $1,800.00 during 1976 prior to and after his job. In January, 1977 he obtained unemployment compensation of $352.00. In February, 1977 the claimant began work for the First National Bank of Akron, where he was employed throughout the rest of the back pay period. He earned $4,951.28 in 1977 and $3,412.51 in 1978. During the six months or so when he was not employed, the claimant made considerable effort at seeking employment, applying for positions at Acro Tool & Die, Rogers Manufacturing, a number of Holiday Inns, and at rubber and machine shops in the Akron area. He also examined newspaper help wanted ads in his search for work. The claimant's gross back pay figures are as follows: $6,229.86 for 1976, $10,887.86 for 1977, and $5,455.95 for 1978.

55. FRANCIS KOSLIK, 36, was employed continuously by Flaherty Potato Chip Company from February, 1976 through the end of the back pay period. She earned $6,040.56 in 1976, $6,830.44 in 1977, and $3,659.19 in 1978. Ms. Koslik did not look for work prior to February, 1976 because she was hoping to get her job back with the Company. The claimant participated in the 1977 economic strike activity. Three Company witnesses testified that she participated, and her name appears on Mr. Lange's list of June 22, 1977. Under the Court's Order, Ms. Koslik's back pay period commences October 1, 1975, since she was ordered reinstated *with* back pay by the Arbitrator. The claimant's gross back pay from October 1, 1975 until her strike participation was calculated to be $14,101.52.

56. JOHN LATCHAW did not complete an affidavit containing information concerning actual earnings during the back pay period as required by the Court's Order of September 18, 1978; nor did he appear at his deposition properly noticed by the Company; nor did he reply to interrogatories which were properly served by the Company. Thus, the claimant has totally failed to supply the information essential to the determination of a damage amount.

57. BERNARD LAWSON, 30, was employed throughout the back pay period by Packaging Corporation of America. He earned $4,284.33 in 1976, $8,582.59 in 1977, and $3,627.70 in 1978 (total, $16,494.05). His total gross back pay figure is $14,115.85.

58. ALFRED LEE, 41, was unsuccessful in obtaining interim employment during the back pay period, although the record indicates that he made many efforts at seeking employment. He applied to Phillips Machinery and Tool, Logan Metal Stamping, Hamlin Steel Products, Alside, Teledyne, Massey-Ferguson, and Gentzler Tool and Die. He was also referred by the Bureau of Employment Services to a job in Massillon and also applied for a clean-up type job with a machine company. Mr. Lee checked newspaper help-wanted ads in his search for work. (With regard to some of these efforts, it is difficult to determine precisely when the claimant made the attempt to seek employment. He did testify in his deposition that he looked at two or three places a week. Even if some of the named employers were visited only in 1978, the entire record of the claimant's efforts, evidences that a continuous effort was made.) The claimant testified that he had great difficulty obtaining employment because of his prior employment with the Company. The claimant received $4,186.00 in Union assistance. The claimant's gross back pay figures are as follows: $4,920.47 in 1976, $8,687.93 in 1977, and $4,345.58 in 1978. The claimant admitted picketing as part of the 1977 economic strike activity. His name does not appear on Mr. Lange's list and does not appear on the notes made by picket captain Graham until February and March, 1978. The claimant admitted picketing as of December, 1977.

59. LARRY LEMON did not complete an affidavit containing information concerning actual earnings during the back pay period as required by the Court's Order of September 18, 1978; nor did he appear at his deposition properly noticed by the Company; nor did he reply to interrogatories

which were properly served by the Company. Thus, the claimant has totally failed to supply the information essential to the determination of a damage amount.

60. ROSELLA LEWIS, 46, was unable to obtain interim employment during the back pay period. She applied for positions with Lawson's, Rogers Manufacturing, Wright Tool and Forge, Anderson Rubber Company, Connie Shop and many other places in the Barberton area. Mrs. Lewis lost her husband in March, 1976. She testified in her deposition that she started looking for work a few months after her husband's death, which would place the commencement of her search at about the beginning of the back pay period. The claimant received $4,186.00 in Union assistance. Mrs. Lewis was not working on a full-time basis for the Company in the year after hiring into the Company and prior to her discharge. Thus, because her projected hours of work during the back pay period are low, her gross back pay figures are low. The figures are as follows: $839.03 for 1976, $1,798.27 for 1977, and $724.96 for 1978. The Union paid $850.24 in insurance premiums for this claimant. The claimant admitted participating in the 1977 economic strike activity. Two Company witnesses testified to her participation, and her name appears on Mr. Lange's list of June 21, 1977.

61. HUBERT MANN, 35, was employed throughout the back pay period by Packaging Corporation of America. The claimant failed to file an affidavit, as required by an Order of the Court, setting forth his interim earnings, nor did he respond to the Company's Interrogatories. Thus, his precise interim earnings are not stated in the record. It can be inferred, however, that the claimant's continuous employment as a stock handler and press operator would have resulted in interim earnings in excess of $16,000.00 (assuming a rate of $4.00 an hour). In his deposition, moreover, the claimant indicated that he was only interested in receiving his vacation and holiday pay, again suggesting he obtained high interim income. The claimant's gross back pay figure (which, of course, includes the vacation and holiday pay) is calculated to be $15,799.20.

62. DAVID MARSH was employed in six different jobs throughout the back pay period. In 1976, he worked for Kayo Oil ($592.25 earnings), Hamlin Steel ($182.91 earnings), Demak Chinese Food Store ($30.63 earnings), and Manpower ($128.20 earnings). In 1977, he was employed by Thermo-Rite ($866.83 earnings). In 1978, he worked for Standard Oil ($1,213.94 earnings). His total interim earnings were $3,014.76. The Union paid $2,024.40 in insurance premiums for the claimant. The claimant's gross back pay figures are as follows: $5,376.69 for 1976, $9,494.17 for 1977, and $4,795.50 for 1978 (total $19,666.36). Mr. Lange testified that the claimant participated in the 1977 economic strike as of June-July, 1977. He fixed the date based upon his recollection of a conversation he had with Jim Gish concerning the claimant's working as a wheel welder at Hamlin Steel. Based upon the coincident conversation, the date of the claimant's strike participation can be established.

63. RAY MARZELLA did not complete an affidavit containing information concerning actual earnings during the back pay period as required by the Court's Order of September 18, 1978; nor did he appear at his deposition properly noticed by the Company; nor did he reply to Interrogatories which were properly served by the Company. Thus, the claimant has totally failed to supply the information essential to the determination of a damage amount.

64. WILLIAM MARKS did not complete an affidavit containing information concerning actual earnings during the back pay period as required by the Court's Order of September 18, 1978; nor did he appear at his deposition properly noticed by the Company; nor did he reply to Interrogatories which were properly served by the Company. Thus, the claimant has totally failed to supply the information essential to the determination of a damage amount.

65. THOMAS MAUL, 22, held four jobs during the back pay period. In addition, he

applied for work with nine other named employers. He received $582.00 in unemployment compensation. The Company does not claim that Mr. Maul failed to use reasonable efforts in seeking to mitigate his damage, and the Company's concession is amply supported by the record. The claimant was employed by Stow Star Market in 1976 and 1977, Duff Truck Lines in 1977, Roadway Express in 1977 and 1978 and Spector Freight in 1978. He earned $3,350.75 in 1976, $4,171.73 in 1977, and $8,657.80 in 1978 (total, $16,180.38). The Company's computer printout erroneously calculates Mr. Maul's projected yearly hours during the back pay period at 1,740.1. The correct figure is 1,708.45 hours per year. Thus, the claimant's gross back pay calculation for the entire period is not $16,930.66, but rather $16,622.72.

66. JUSTIN MAXWELL, 27, was employed continuously by Amoco Plastic Products Company from August 26, 1976 through the end of the back pay period. He earned $1,983.04 from Amoco in 1976, $8,559.36 in 1977, and $4,279.50 in 1978. Prior to his employment at Amoco, the claimant worked one day at Falls Electric, earning $28.19. He searched for work with various employers, including Alside, Terex and others. The claimant's total gross back pay figure is $15,592.34.

67. JOHN MILAN, 36, held three jobs during 1977. He was employed by May Company in January, 1977 (earning $243.80), but left to take a better position with Roadway Express. He only earned $594.40 with Roadway Express before he was laid off. He then received some $500.00 in unemployment compensation. The claimant was next employed by Karman Rubber Company during the summer of 1977, where he earned $295.71. The claimant quit his job with Karman Rubber because the job required the handling of very hot molds. Prior to obtaining these three interim positions, the claimant searched for work in 1976 with B. F. Goodrich, Chevrolet, Children's Hospital and General Motors in Lordstown. Prior to the commencement of the back pay period, the claimant had also looked for work with B &

W, Ford, Chrysler, Sieberling Rubber and General Tire. In 1977, after his layoff from Roadway Express, the claimant looked for jobs with a number of car washes and at least two shoe stores. The claimant suffered from alcoholism during the back pay period and testified in his deposition that he was disabled by this condition as of December, 1977. He testified that after December, 1977 he was mostly ill and unable to work, suffering from blackout spells. For at least a two-week period in March-April, 1978, the claimant was hospitalized for his condition. The claimant received $3,425.00 in Union assistance and $2,088.00 in welfare assistance. His gross back pay figures are as follows: $4,591.83 for 1976, $7,989.15 for 1977, and $3,792.95 for 1978.

68. ANTHONY MILLER, 26, obtained employment at four different establishments during the back pay period. At the beginning of the back pay period he was holding two jobs: a full-time position at Logan Metal Stampings (where he earned $4,149.99 during the back pay period portion of calendar year 1976) and a part-time job at Cardinal Maintenance, Inc. (where he earned $891.92 during the same period). After he was laid off from the full-time position around November, 1976, he continued to hold the part-time job until recalled to Logan Metal in May, 1977. His 1977 interim earnings were $6,137.67 at Logan Metal and $998.75 at Cardinal Maintenance (where he worked until May, 1977). He was laid off at Logan Metal again in February, 1978 and held two other jobs in 1978, at Stolitzka & Sons ($539.51 earnings) and K–Mart ($1,091.28 earnings). The claimant's gross back pay figures are: $5,780.92 for 1976, $10,282.10 for 1977, and $5,119.50 for 1978. He was not called by the Company to testify either by deposition or at the hearing. The claimant participated in the 1977 economic strike activity, and the Company has made a clear showing to that effect as of July 7, 1977 when "Tony" Miller's name appears on Mr. Lange's list of strike participants.

69. CHARLES MILLER, 28, held a job with O'Neil's from January 11, 1977 until

March 3, 1977, earning $772.80. He quit his employment because the pay was too low. Prior to obtaining this employment, the claimant sought work from Alside (and at Terex and Chevrolet prior to the beginning of the back pay period). After leaving O'Neil's, the claimant stated that he looked for work, but he could only recall the name of one employer (Brown-Graves) where he sought employment during the remaining one year and three months of the back pay period. He received $4,450.00 in Union assistance, and the Union paid $2,429.28 in insurance premiums for the claimant. His gross back pay figures are as follows: $4,046.94 for 1976, $7,618.58 for 1977, and $3,694.77 for 1978. Mr. Miller admitted participating in the 1977 economic strike activity, but the date when he began picketing is uncertain. Only one Company witness testified to the claimant's strike participation.

70. LEE MILLER, 51, presents a very complex fact situation. He held two jobs during the back pay period and during portions of 1976 and 1977, he held both jobs at the same time. He was employed in a part-time job at Harmon and Reudy Motors during 1976 ($6,869.00 earnings) and 1977 ($5,128.15 earnings). The claimant had been working for this employer on a part-time, but continuous, basis since 1962, working around 35–36 hours a week. (Dep. p. 8) While the claimant looked for other employment in 1975, he did not search for a supplement to his substantial part-time employment during the June-September, 1976 period. In October, 1976, the claimant obtained a full-time position at Hamlin Steel, where he earned $430.76 in 1976, $12,465.33 in 1977, and $5,670.10 in 1978. On November 22, 1976, after working 30 days for Hamlin Steel, the claimant decided to have an operation for a double hernia condition which he had had for many years. He did not return to Hamlin Steel until around February 1, 1977, although he did work some three weeks for Harmon and Reudy Motors, apparently in January, 1977. The claimant would have received the following amounts in gross back pay: $8,430.86 in 1976, $14,692.17 in 1977, and $7,490.84 in 1978. The claimant participated in the economic strike of 1977 as of June 21, 1977, when his name appears on Mr. Lange's list. The claimant's name also appears on the list of July 14, 1977.

71. CLARENCE MITCHELL did not complete an affidavit containing information concerning actual earnings during the back pay period as required by the Court's Order of September 18, 1978; nor did he appear at his deposition properly noticed by the Company; nor did he reply to Interrogatories which were properly served by the Company. Thus, the claimant has totally failed to supply the information essential to the determination of a damage amount.

72. ROBERT MONTGOMERY, 37, was not employed during the back pay period. The evidence shows that he sought work at Goodyear Aerospace, Hamlin Metal, Perkins Diesel, Massey-Ferguson, Chrysler, Ford, General Tire and an electrical concern. The intensity of the claimant's search is evidenced by his testimony concerning an all-night wait at General Tire in 1977 to be among the first 100 to receive an application. Like his other efforts, this venture proved unsuccessful. Mr. Montgomery is divorced from his first wife, and during the back pay period he was required to make alimony payments to her of almost $50.00 a week. Mr. Montgomery testified that he could not take a low paying job, meet the alimony payment and live at the same time. (The Company has submitted in evidence an Order of the Common Pleas Court of Ohio, Domestic Relations Division, ordering the Company to make any and all back pay payments due Mr. Montgomery directly to the Court.) His gross back pay figures are as follows: $5,747.53 for 1976, $10,296.99 for 1977, and $4,913.16 for 1978. He received $4,450.00 in Union assistance. Mr. Montgomery admitted participating in the 1977 economic strike activity as of December, 1977.

73. PAUL MOYER, 64, worked for the C.E.T.A. program from before the beginning of the back pay period through January, 1977. He earned $4,485.04 in 1976 and $314.40 in 1977. After he was laid off from

that job, he received unemployment compensation of $1,704.00 and applied for social security retirement benefits of $264.00 per month, which he received through the end of the back pay period. While Mr. Moyer technically "retired", he continuously searched for work throughout the rest of the back pay period, applying for positions with Oak Rubber, Colonial Rubber, Enduro Rubber, White Rubber, Jet Rubber, Crest Rubber, Hamilton Kent Company and various supermarkets. All these efforts proved unsuccessful. The claimant's gross back pay figures are as follows: $6,034.39 for 1976, $10,883.44 for 1977, and $5,409.69 for 1978. Mr. Moyer participated in the 1977 economic strike activity. Three Company witnesses testified to his participation, and the claimant's name appears on Mr. Lange's list of June 17, 1977.

74. FERENE NEMETH did not complete an affidavit containing information concerning actual earnings during the back pay period as required by the Court's Order of September, 1978; nor did he appear at his deposition properly noticed by the Company; nor did he reply to Interrogatories which were properly served by the Company. Thus, the claimant has totally failed to supply the information essential to the determination of a damage amount.

75. GEORGE ORAVECZ was immediately rehired by the Company in September, 1975 as a "new" employee without seniority, and went on strike on June 10, 1977. If the Company had complied with the Arbitrator's Award and reinstated the claimant's seniority, he would have received vacation pay of $890.65 in 1976, $716.44 in 1977, and $540.11 in 1978. He received a total of $184.40 in vacation pay as a new employee. In addition, Mr. Oravecz's prorated Christmas bonuses are $59.05 for 1976 and $44.25 for 1977. He received a single bonus of $10.00 as a new employee.

76. JACK PANTON, 41, was not employed during the back pay period. The Company argues, "If there ever was a case of willful idleness, Mr. Panton exemplifies it." The record amply supports the Company's characterization of this claimant's lack of efforts at seeking interim employment. During a major portion of the back pay period, the claimant was able to live on monies received by his girlfriend from welfare and a settlement from her car accident. He testified in his deposition "at the time I really didn't need to go to work . . . we just kind of made it" on these amounts. While he apparently did make a few applications in the two-year period, he would do so, according to his deposition, only when he "would get the ambition to go out and look . . . ." The claimant's gross back pay figure for the entire back pay period is $14,948.43.

77. BEN PARTIN, 22, was employed throughout the back pay period by Dinner Bell Foods, Inc., where he earned $7,360.67 in 1976, $8,014.69 in 1977, and $7,034.63 in 1978. His precise gross back pay figure was not calculated by the Company, but was said to be "less than $20,000.00". The evidence in the record, including the claimant's base wage rates, supports a finding that the claimant's total gross back pay figure is less than $20,000.00.

78. CASPER PHILLIPS, 55, lost the sight in his right eye in 1976. He did not seek employment during the back pay period. The claimant had a hernia operation and eye surgery in 1978. Although the claimant failed to make any effort to look for work during the back pay period, he did return to work at the Company on a full-time basis when reinstated in June, 1978. His gross back pay figures are as follows: $7,526.74 for 1976, $13,048.56 for 1977, and $6,668.28 for 1978. There was some testimony concerning the claimant's participation in the 1977 economic strike activity, but his name does not appear on Mr. Lange's lists. The claimant denied any participation.

79. EDWARD PIECZYNSKI, 66, retired in early 1976 prior to the commencement of the back pay period, and he received social security payments throughout the period. The evidence shows that he made one attempt to find part-time employment in a dishwashing job. The claimant's back pay figures are as follows: $5,942.99

for 1976, $10,195.51 for 1977, and $5,410.10 for 1978. The Union paid $2,530.50 in insurance premium payments for the claimant. He also received $5,220.00 in Union assistance. The claimant admitted participating in the 1977 economic strike activity, and three Company witnesses testified to that participation. The claimant's name appears on Mr. Lange's list as of June 21, 1977.

80. RICHARD POWELL, 34, was continuously employed by Chemtrol Adhesives, Inc. throughout the back pay period. He actually earned $6,500.21 in 1976, $12,914.65 in 1977, and $6,474.33 in 1978 (total, $25,889.19). From the Company, the claimant would have earned $5,976.40 in 1976, $10,736.82 in 1977, and $5,373.90 in 1978 (total, $22,087.12).

81. WILLIAM REES was immediately rehired by the Company in September, 1975 as a "new" employee without seniority, and went on strike on June 10, 1977. If the Company had complied with the Arbitrator's Award and reinstated the claimant's seniority, he would have received vacation pay of $362.80 in 1976, $309.00 in 1977, and $313.13 in 1978. He received a total of $206.40 in vacation pay as a new employee. In addition, Mr. Rees' pro-rated Christmas bonuses are $25.22 for 1976 and $39.00 for 1977. He received a single bonus of $10.00 as a new employee.

82. ARMOND RICCHIUTO, 61, was unable to obtain interim employment, but it was not for lack of trying. Mr. Ricchiuto had been employed by the Company for 36 years prior to his discharge. The evidence shows that the claimant sought work with J & M on State Road, F & C Machine, Forte Machine, Ace Machine, Chrysler, Massey-Ferguson, Independent, Logan Machine, an elastic company in Cuyahoga Falls, and other employers. His gross back pay figures are as follows: $7,222.81 for 1976, $12,350.22 for 1977, and $6,524.56 for 1978. He received $4,266.00 in Union assistance, and the Union paid $95.76 in insurance premiums for the claimant. The claimant admitted participating in the 1977 economic strike activity, but would place the commencement of that activity on December 8, 1977. Three Company witnesses would place the commencement of the participation at an earlier date, and the claimant's name appears on Mr. Lange's list of June 20, 1977.

83. GILBERT RICE, 30, was employed throughout the back pay period by Eastern Central Motor Carriers, where he earned $3,736.65 in 1976 ($128.85 per week for 29 weeks), $9,800.39 in 1977, and $7,341.68 in 1978 (total, $20,878.72). His calculated gross back pay is as follows: $6,077.79 in 1976, $10,633.52 in 1977, and $5,259.78 in 1978 (total, $21,971.09). Although Mr. Rice was a Union official during the back pay period, only one of the four Company witnesses testified that this claimant participated in the 1977 economic strike, and his name did not appear on Mr. Lange's lists.

84. JOHN ROBERTS, 25, was not employed during the back pay period. His gross back pay calculates to $4,740.87 in 1976, $8,442.74 in 1977, and $4,263.04 in 1978. Mr. Roberts testified that he began picketing in the economic strike activity in December, 1977. None of the four Company witnesses who testified concerning strike participation placed this claimant on the picket line prior to December, 1977. While his deposition testimony is somewhat ambiguous as to when he began picketing, it does not contradict his later hearing testimony. During his deposition the claimant was never asked to state precisely when he commenced picketing. According to his Answers to the Interrogatories, Mr. Roberts' unsuccessful efforts to obtain interim employment included application at two places: Malco Company, where he applied in 1978 shortly before the end of the back pay period, and Wilkerson Machine Shop, where he apparently sought employment three months earlier, again in 1978. Mr. Roberts had some vague recollections of seeking employment elsewhere, although it is unclear when these few other ventures were made. He received $5,160.00 in Union assistance and $236.00 per month in welfare payments (totaling $5,664.00 over the two-year back pay period). The Union also paid

$2,530.50 in insurance premium payments for the claimant.

85. JOSEPH ROBINSON, 62, was employed throughout the back pay period at the University Club in Akron as a dishwasher. He earned $2,987.73 in 1976, $3,910.12 in 1977, and $1,833.03 in 1978. He received $3,110.00 in Union assistance. The claimant's gross back pay figures are as follows: $4,993.34 for 1976, $8,744.63 for 1977, and $4,402.31 for 1978. Mr. Robinson admitted participating in the 1977 economic strike activity. Two Company witnesses testified to his participation, and the claimant's name appears on Mr. Lange's list of June 17, 1977.

86. BETTY RUCKER, 45, unsuccessfully searched for work during the back pay period. The record concerning Mrs. Rucker includes the names of 16 different places where she applied for work. The Company does not claim that she failed to use reasonable diligence in mitigating her damage. The claimant's gross back pay figures are as follows: $4,307.23 for 1976, $7,570.44 for 1977, and $3,853.35 for 1978. She received $5,320.00 in Union assistance. Mrs. Rucker admitted participating in the 1977 economic strike activity as of December, 1977, but three Company witnesses place her participation as beginning at an earlier date. The claimant's name appears on Mr. Lange's list of June 17, 1977.

87. ROBERT SALATA did not complete an affidavit containing information concerning actual earnings during the back pay period as required by the Court's Order of September 18, 1978; nor did he appear at his deposition properly noticed by the Company; nor did he reply to Interrogatories which were properly served by the Company. Thus, the claimant has totally failed to supply the information essential to the determination of a damage amount.

88. WILLIAM SANTANGELO was immediately rehired by the Company in September, 1975 as a "new" employee without seniority, and went on strike on June 10, 1977. If the Company had complied with the Arbitrator's Award and reinstated the claimant's seniority, he would have received vacation pay of $757.23 in 1976, $619.94 in 1977, and $515.28 in 1978. He received a total of $181.60 in vacation pay as a new employee. In addition, Mr. Santangelo's pro-rated Christmas bonuses are $49.99 for 1976 and $40.50 for 1977. He received a single bonus of $10.00 as a new employee.

89. MICHAEL SEHIKA, 28, was employed at two positions during the back pay period. He was first employed by City Yellow Cab Company from November, 1976 to October, 1977 and earned $413.92 in 1976 and $2,219.24 in 1977. (The Company would add 15% to these figures as estimated tips. However, the claimant clearly testified in his deposition that he reported tips to his employer, and they were included in his W-2 earnings. The claimant's income figures are those reported on the W-2 forms.) The claimant was next employed by Shott Metal Products, where he earned $1,622.70 in 1977 and $1,221.90 in 1978. The claimant received unemployment compensation in 1976 of $66.00 per week, although the record is unclear as to precisely when these benefits commenced and how long they lasted. The claimant's total gross back pay figure is $19,035.64, and the Union paid $1,923.60 in insurance premiums payments for the claimant.

90. ROGER SEYMOUR, 29, was employed continuously throughout the back pay period. In 1976 he earned $3,619.13 in interim employment at M H E Corporation and Waltco Truck Equipment Company. At Waltco in 1977 he earned $10,639.22 and in 1978, $5,024.49. The claimant underwent surgery of an unspecified nature in August, 1977, and the Company claims that it should be entitled to "at least" two months set-off in back pay because of this fact. There is no evidence at all in the record that this surgery interfered with the claimant's interim employment at that time with Waltco, and the Company did not seek further evidence by way of deposition and/or hearing testimony. Apparently there was a strike at Waltco in December, 1976, and the claimant received $35.00 in strike benefits from the Teamsters Union. He received no assistance from the International Union in-

volved in the present proceeding. Mr. Seymour's gross back pay figures are as follows: $6,112.88 in 1976, $11,033.67 in 1977, and $5,436.05 in 1978 (total, $22,582.60).

91. BARRY SHAFFER, 42, held two positions during the back pay period. During the latter part of 1976 he worked at Young's Restaurant, earning $2,544.00. He worked at Young's for six weeks in 1977, earning an estimated $636.00. In 1977, he worked at the Elks Club in Massillon, earning $4,200.24. He continued his employment with the Elks through the end of the back pay period, earning an estimated $2,608.20 during 1978. While not employed, Mr. Shaffer, although hampered by lack of education, searched for work with Polsky's in the Canton Mall, Timken Mercy Hospital (on several occasions), Green Cross Hospital, St. Thomas Hospital, Market Street Hospital, the Summit Mall and a machine shop on Kenmore Boulevard. The claimant received $1,640.00 in Union assistance, and the Union paid $578.17 in insurance premiums for the claimant. The claimant's total gross back pay figure is $16,967.08.

92. DONALD SHOWMAN, 36, was employed throughout the back pay period by Hamlin Steel Products, where he earned $6,875.16 in 1976, $11,886.06 in 1977, and $4,922.78 in 1978 (total, $23,684.00). His gross back pay from the Company has been calculated to be $6,969.57 for 1976, $12,044.52 for 1977, and $6,058.24 for 1978 (total, $25,072.33). Two witnesses for the Company testified that they saw Mr. Showman on the picket line sometime between June and December of 1977; another witness, however, stated clearly that he did *not* see the claimant participate in strike activity. Mr. Showman's name does not appear on Mr. Lange's lists.

93. LLEWELLYN SIMMONS, 35, was employed by Edward DeBartolo Corporation, beginning July 16, 1976 through the end of the back pay period. Prior to obtaining this position, the claimant searched for employment with Kent Machine, Massey-Ferguson, and Logan Metal. He earned $3,286.47 in 1976, $8,155.86 in 1977, and $4,444.40 in 1978. The claimant was also employed for two days in 1977 with Cornwell, earning $35.92. The claimant's gross back pay figures are as follows: $6,307.38 for 1976, $11,137.95 for 1977, and $5,616.25 for 1978. The claimant received $200.00 in Union assistance. Two Company witnesses testified to seeing Mr. Simmons participating in the 1977 economic strike activity. His name does not appear on Mr. Lange's lists. The Company argues that Mr. Simmons never denied participating. Mr. Simmons was never asked.

94. BERNARD SLIDER, 28, held three jobs during the back pay period. His first position was with Arby's working full-time starting October 16, 1976. He earned $1,003.92 in this position in 1976. Prior to obtaining this position, the claimant searched for work with Rogers Manufacturing, Alside, Weather-Tite, General Hospital, Green Cross Hospital, Austin Machine, Ewart-Ohlson, T. J. Karg, and a number of small machine shops. In January, 1977, the claimant obtained a full-time position with Austin Machine, where he worked until August of that year, earning $3,935.50. At the same time, he continued working part-time on weekends with Arby's, earning $263.36 in 1977. From August, 1977 through the end of the back pay period, the claimant was employed by Pneumatic Parts, earning $3,278.44 in 1977 and an estimated $3,680.00 in 1978. The claimant's gross back pay figures are as follows: $3,019.77 in 1976, $5,535.30 in 1977, and $2,740.70 in 1978. The Union paid $2,024.00 in insurance premiums for the claimant, and he received $1,350.00 in Union assistance.

95. JOSEPH SPALDING, 56, did not find employment during the back pay period. He searched for work mainly with the aid of the Ohio Bureau of Employment, applying at Dietz Marine and Warner's as a boat motor mechanic, the line of work he was in prior to hiring into the Company in 1965. He also applied at several Goodrich plants, and sought any work which was available at Sears, Roebuck and Clicks. The claimant received $4,266.00 in Union assistance, and the Union paid $724.55 in

insurance premiums for the claimant. The claimant's gross back pay figures are as follows: $6,986.84 in 1976, $12,194.21 for 1977, and $6,102.88 for 1978. Mr. Spalding participated in the 1977 economic strike activity by his own admission. Three Company witnesses testified to that participation, and the claimant's name appears on Mr. Lange's list of June 20, 1977.

96. MARIE SPRAGUE was discharged from the Company in September, 1975, but the evidence shows that she died prior to the issuance of the Award of the Arbitrator.

97. NED STALLWORTH, 28, held two jobs during the back pay period. He was employed in a part-time position in July and August, 1977 by the Community Action Council, where he earned $530.40. He was next employed by the Brown Derby, starting October 10, 1977, where he earned $1,075.00 in 1977 and an estimated $1,160.00 in 1978. Mr. Stallworth made an extensive search for employment during the back pay period. Although he acknowledged that his efforts were "on and off", he did look for work with Montgomery Ward, O'Neil's, Fazio's, Pat's Rubber, numerous filling stations, City Laundry and Dry Cleaning, Terex, P P & G, Kroger's, Polsky's, General Motors, Best Products, the United States Post Office, the City of Akron Police Department, and the City of Akron Service Department. The claimant also testified in his deposition that he would return to many of these employers on several occasions looking for work. The claimant's gross back pay figures are as follows: $3,914.70 for 1976, $7,201.92 for 1977, and $3,496.35 for 1978. He received $5,270.00 in Union assistance, and the Union paid $2,404.50 in insurance premiums for the claimant. Mr. Stallworth admitted participating in the 1977 economic strike activity from the time the picket lines went up. (Dep. p. 9) Three Company witnesses testified to his participation, and his name appears on Mr. Lange's list of June 20, 1977.

98. STEVEN STARKS, 30, was not employed during the back pay period until May 15, 1978, when he began work for City of Akron Water Pollution Control. He earned $760.84 in this job, which he obtained through the C.E.T.A. program. During the two-year period prior to his obtaining this position, the claimant applied for work at Children's Hospital, O'Neil's, a factory in Medina, and Roadway Express. The claimant received $3,860.00 in Union assistance. The claimant's gross back pay figures are as follows: $4,020.90 for 1976, $7,143.85 for 1977, and $3,454.35 for 1978. The claimant admitted participating in the 1977 economic strike activity, but the Company acknowledges that his testimony is ambiguous as to when the participation began. No Company witness testified that Mr. Starks participated in the strike, and his name does not appear on Mr. Lange's lists.

99. HOWARD STRICKER did not complete an affidavit containing information concerning actual earnings during the back pay period as required by the Court's Order of September 18, 1978; nor did he appear at his deposition properly noticed by the Company; nor did he reply to Interrogatories which were properly served by the Company. Thus, the claimant has totally failed to supply the information essential to the determination of a damage amount.

100. DINO TAMBINI was immediately rehired by the Company in September, 1975 as a "new" employee without seniority, and went on strike on June 10, 1977. If the Company had complied with the Arbitrator's Award and reinstated the claimant's seniority, he would have received vacation pay of $1,010.00 in 1976, $803.10 in 1977, and $565.78 in 1978. He received a total of $202.00 in vacation pay as a new employee. In addition, Mr. Tambini's pro-rated Christmas bonuses are $59.99 for 1976 and $40.50 for 1977. He received a single bonus of $10.00 as a new employee. The claimant would have received 15 cents per hour leader pay amounting to $299.52.

101. STEVE TATAR was immediately rehired by the Company in September, 1975 as a "new" employee without seniority, and went on strike on June 10, 1977. If the Company had complied with the Arbitrator's Award and reinstated the claimant's

seniority, he would have received vacation pay of $364.54 in 1976, $360.57 in 1977, and $251.38 in 1978. He received a total of $205.20 in vacation pay as a new employee. In addition, Mr. Tatar's pro-rated Christmas bonuses are $15.87 for 1976 and $11.20 for 1977. He received a single bonus of $10.00 as a new employee.

102. DEAN TITTLE did not complete an affidavit containing information concerning actual earnings during the back pay period as required by the Court's Order of September 18, 1978; nor did he appear at his deposition properly noticed by the Company; nor did he reply to Interrogatories which were properly served by the Company. Thus, the claimant has totally failed to supply the information essential to the determination of a damage amount.

103. CHARLES TREVASKIS, 27, unsuccessfully sought employment during the back pay period until November 1, 1977, when he obtained a job with Hamad Tire Company. He earned $977.50 in 1977 and $2,594.50 in 1978. Prior to the commencement of the back pay period, the claimant briefly held a position with Dermak Chinese Foods. The record indicates that he was unjustly discharged from that position after two days. Mr. Trevaskis sought employment with Akron Welding & Spring Company, Central Welding, Waltco Tailgate Company, Hut Manufacturing, and James C. Herrot Company prior to the commencement of the back pay period. After June, 1976, he searched for work with gas stations (a trained welder, Mr. Trevaskis testified that he was getting desperate), a welding company on Arlington and Johnston Streets, Wadsworth Machine, Akron Standard Mold, and General Tire. The claimant acknowledged spending a great deal of time working on his old Volvo during 1976 and 1977. At the end of his deposition the claimant offered to supply further names of employers where he sought work during the back pay period if he could be given another 10 or 15 minutes to think. The Company's attorney responded: "I think if we think we need some more, we can call you back." The Company did not call the claimant back for further deposition testimony, nor was he called to testify before the Special Master. The claimant received $4,226.00 in Union assistance. The claimant's gross back pay figures are as follows: $4,523.47 for 1976, $8,318.29 for 1977, and $4,011.14 for 1978. Mr. Trevaskis admitted participating in the 1977 economic strike activity. All four Company witnesses testified to his participation, and the claimant's name appears on Mr. Lange's list of June 17, 1977.

104. JAMES WALDRON did not complete an affidavit containing information concerning actual earnings during the back pay period as required by the Court's Order of September 18, 1978; nor did he appear at his deposition properly noticed by the Company; nor did he reply to Interrogatories which were properly served by the Company. Thus, the claimant has totally failed to supply the information essential to the determination of a damage amount.

105. WILLIAM WATTS, 35, was successful in obtaining employment during the back pay period as a trackman with Conrail, where it is estimated he earned $1,800.00 in 1976 and $2,200.00 in 1978. He was first employed at Conrail from September to November, 1976, when he was laid off. His second tour with Conrail began in April, 1978 and continued through the end of the back pay period. He also worked for a construction company in 1977, where he earned $1,200.00 and did odd jobs for relatives and neighbors (painting, cutting grass), earning some $300.00 in 1977. His total interim earnings for the back pay period were $5,500.00. During his periods of unemployment, this claimant made numerous attempts at finding employment: at car lots (Cavalier Olds, Thompson Chevrolet, Buick on Exchange Street); at Conrail; he looked throughout the period for additional odd jobs in the neighborhood; applied at a car wash on Maple Street; applied to Manpower (and obtained a brief job at a warehouse); applied at Ford Motor Company. He also worked on a trash truck for a few days in 1978. The claimant received $600.00 in Union assistance and $600.00 in unemployment compensation.

Mr. Watts was disabled by a non-work-related ankle injury and was unable to seek employment from December, 1977 until April, 1978, during which time he would have earned $2,261.44 from the Company had he been reinstated in accordance with the Award of the Arbitrator. The claimant's total gross back pay amounts to $13,232.30: $3,564.76 in 1976, $6,433.40 in 1977, and $3,234.14 in 1978. The Union paid $2,024.40 in insurance premiums for the claimant.

106. MARY WHITE, 49, was Vice President of the Local Union until December, 1977, when she assumed the duties of President. She was employed from before the beginning of the back pay period until November 1976 by Columbus Cleaning, earning $1,762.50. She was ordered by her physician to leave the job because it required heavy lifting, but she immediately began a thorough search for suitable employment. She sought work at Pioneer Machine, H & H Machine, Terex, Ford, Massey-Ferguson, Summit Plastic, Cardinal Maintenance, Rogers Manufacturing, Hamlin Steel, a pizza shop near her home, and other places. The claimant received unemployment compensation, although the record is unclear as to the amount received. She received $2,820.00 in Union assistance, and the Union paid $126.00 in insurance premiums. In addition, the claimant paid medical insurance premiums through the Company amounting to $936.00 to Prudential Insurance during the back pay period. The claimant's gross back pay figures are as follows: $6,422.94 for 1976, $11,025.30 for 1977, and $5,799.98 for 1978. Mrs. White participated in the 1977 economic strike activity. Three Company witnesses testified to her participation, and the claimant's name appears on Mr. Lange's list of June 23, 1977.

107. TERRANCE WHITE, 28, began work at Hamlin Steel Products on September 9, 1976, and worked there continuously through the end of the back pay period. His interim earnings were $3,006.68 for 1976, $14,069.00 for 1977, and $6,550.77 for 1978 (total, $23,626.45). His gross back pay was calculated by the Company to be $3,602.06 for 1976, $5,605.11 for 1977, and $2,847.70 for 1978 (total, $12,054.87). This calculation seriously underestimates Mr. White's projected gross back pay. Although his base rates for the calendar years of the back pay period were comparatively high ($4.59, $4.75, and $4.91), the Company's projected hours of work for the claimant are markedly low. The supporting data submitted by the Company indicate that Mr. White worked no hours for the Company in 1973, 942.6 hours in 1974, and 1,488.55 hours in the nine months in 1975 prior to discharge. From this data the Company then projects the claimant's average hours at 884.0 per year (2,431.1 ÷ 2.75). This seriously underestimates the number of hours the claimant would have worked during the back pay period. Mr. White was working at least a 37-hour week with the Company when he was discharged. The lower number of hours worked in 1974 and the zero hours worked in 1973 suggests that the claimant was not working regularly for the Company until mid-year, 1974. Thus, his gross back pay figures must be modified to eliminate the distortion caused by including the non-working time of the claimant prior to mid-1974 in the projected hours calculation. The Company projection is that the claimant would have worked 884 hours in a calendar year during the back pay period; his 1975 experience (1,488.55 hours until the September discharge) indicates that he would have worked 1,984.73 hours during a calendar year, 2.25 times the Company figure (using the Company's method of considering actual hours worked in 1975 as .75 of a year). Readjusting the claimant's gross back pay figures using the correct hour projections (multiplying times 2.25) gives the following results: $8,068.61 for 1976, $12,555.44 for 1977, and $6,378.84 for 1978 (total, $27,002.89). The claimant received $250.00 in Union assistance, and the Union paid $2,024.40 in insurance premiums for the claimant. Prior to successfully obtaining employment at Hamlin Steel, the claimant sought employment at numerous places: Carport in Macdeonia, Terex Company, W. G. Lockhart Construction Compa-

ny, J & T Bearing in Solon, and a drafting company in Solon. One Company witness testified that he saw Mr. White participating at some time in the 1977 economic strike. The claimant's name does not appear on Mr. Lange's lists.

108. DON WILLIAMS did not complete an affidavit containing information concerning actual earnings during the back pay period as required by the Court's Order of September 18, 1978; nor did he appear at his deposition properly noticed by the Company; nor did he reply to Interrogatories which were properly served by the Company. Thus, the claimant has totally failed to supply the information essential to the determination of a damage amount.

109. WILLIAM WOLFE, 30, sought work from the beginning of the back pay period and was finally successful in obtaining part-time employment from April until August, 1977 with Hatten Corporation, where he earned $1,340.50. The claimant searched for work with Chrysler, Ford, Goodyear, the City of Akron, Wilkerson Company, Apple Creek Mental Hospital, Hawthornden State Hospital, Massey-Ferguson, the AFL–CIO, the Urban League, and others. The Company does not claim that Mr. Wolfe failed to mitigate his damage. The claimant received $4,146.00 in Union assistance, and the Union paid $724.25 in insurance premiums for the claimant. The claimant's gross back pay figures are as follows: $3,997.68 for 1976, $7,466.74 for 1977, and $3,817.20 for 1978. Mr. Wolfe admitted participating in the 1977 economic strike activity, although he would place the commencement of his participation around Christmas, 1977. Three Company witnesses testified to the claimant's participation at an earlier date, and the claimant's name appears on Mr. Lange's list of July 7, 1977.

110. BERNARD WYNE, 32, was employed throughout the back pay period, first at Hamlin Steel Products and then at Seiberling Rubber Company. His total gross back pay figure is $31,598.36. His actual earnings from the two interim jobs were $45,135.13.

## III. CONCLUSIONS OF LAW

### A. Sources of Law

The parties have done a thorough job of canvassing the relevant federal and state decisions in this area. While they have not come up empty-handed, the grains of directly applicable precedent are few indeed. There are numerous reported decisions at all federal levels reviewing arbitration awards providing for back pay, but as the Supreme Court has plainly stated in the *Steelworkers' Union v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1968), the scope of review of such awards is narrow indeed. Thus, while this precedent might give some guidance as to what is *permissible* for an arbitrator to do, it does not specify what is required of a district court (or, as in this case, a special master) in situations where the arbitration process is not employed to make the initial determination as to back pay.

In its germinal decision in *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456–457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957), the Supreme Court, through Justice Douglas, stated the general principles which should guide the search for the applicable law in a case such as the present action involving an alleged breach of a collective bargaining agreement. The substantive law to be applied in suits of this kind should be

federal law, which the courts must fashion from the policy of our national labor laws. . . . The Labor Management Relations Act expressly furnishes some substantive law. . . . Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem.

State law may also be looked to to find the rule that will best effectuate the federal

policy. *Id.* Thus, the teaching of *Lincoln Mills* is that the search for sources of law must be conducted both in the body and the spirit of federal labor statutes, as well as in any useful state precedent. While it is apparent that *Lincoln Mills* left much to the creative discretion of district courts, such discretionary choices are not left to a court's "inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *United States v. Burr*, 25 F.Cas. 30, 35 (C.C.Va.1807) (No. 14, 692d) (Marshall, C. J.).

The major source of federal labor law experience on the issue of calculating back pay is the Labor Board's practice under the National Labor Relations Act, 29 U.S.C. § 141, 160(c) (1974). The Labor Board has dealt with these types of issues for almost 45 years. It is, of course, correct that the Labor Board seeks to "vindicate public, not private rights," *Va. Elect. & Power Co. v. N.L.R.B.*, 319 U.S. 533, 543, 63 S.Ct. 1214, 1220, 87 L.Ed. 1568 (1943), but it does so not by imposing fines or other penalties, but rather by seeking to make discriminatees whole, precisely the same goal that guides this action. The Labor Board over the years has dealt with every corner of the back pay problem, and it would be illogical to ignore the Board's acquired knowledge and experience in developing "sound legal principles" to adjudicate the present action, as long as the reasoning of the Board is sound and the standards it applies effectuate the goals of the present proceeding.[13]

Other more recent experience under Title VII of the Civil Rights Act of 1964 may also be a useful source of law. Federal courts increasingly have had to wrestle with difficult damages questions, and the product of their work should not be ignored, if the principles they have developed will effectuate the purposes of this action. Again, the goals of this proceeding and a Title VII proceeding are coincident. "It is also the purpose of Title VII to make persons whole for injuries suffered . . . ." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975).[14] Common law precedent will also be examined, where applicable. While the Supreme Court has plainly stated that "a collective bargaining agreement is not an ordinary contract," *John Wiley & Sons v. Livingston*, 376 U.S. 543, 550, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964), *Lincoln Mills* allows for resort to state law which will effectuate the purposes of national labor policy. Thus, traditional principles which guide damage determinations in a common law employment contract action will also provide assistance.

---

13. The Company is correct when it argues that the decisions of the Board are not "binding" upon the Special Master. This is not a Board proceeding. On the other hand, it is a case involving a breach of a collective bargaining agreement, negotiated by the parties pursuant to the National Labor Relations Act, and unquestionably *Lincoln Mills* mandates resort to the primary federal statute regulating labor-management relations as a source for substantive law. The Special Master has some difficulty following an additional argument made by the Company in this regard in its Supplemental Memorandum. Apparently an individual filed an unfair labor practice charge against the Company on September 22, 1975, alleging the discharges of the claimants to be illegal. The charge was withdrawn a month later. The Company devines from this event a Labor Board decision to deny "certification" of this case and thus Board law is rendered inapplicable. The term "certification" which is used by the Company ordinarily concerns representation status which is not involved here, and a Board refusal to issue a complaint does not suggest that Board law and practice in computing back pay should be erased from the legal equation. Illegal motivation may have been lacking from the Company's action, but the Arbitrator and the Court have held there to have been a breach of contract, for which damages must be calculated. In that task, Labor Board practice is a useful guide.

14. Under *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) lower courts in a Title VII action are to look to Labor Board practice for guidance in back pay determination. See, e. g., *DiSalvo v. Chamber of Commerce*, 568 F.2d 593, 597 (8th Cir. 1978). The Sixth Circuit has cited *Albemarle*, a Title VII action, in reviewing a Labor Board back pay determination. *McCann Steel Co. v. N.L.R.B.*, 570 F.2d 652, 654 (6th Cir. 1978). Thus, a circle of uniform practice is developing under Title VII, the National Labor Relations Act, and in court suits involving alleged breaches of collective bargaining agreements.

Finally, a potential source of applicable principles lies in the reported opinions of labor arbitrators. While the parties here have stipulated to the Court's jurisdiction to determine the remedy issues in this action, ordinarily that task would fall to an arbitrator if the parties were unable to resolve the back pay issue privately. While the Supreme Court has stated that the "ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed," *Steelworkers' Union v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960), there is a good reason for a special master (or a court) to seek what guidance is available in arbitral jurisprudence in order "to locate 'a just result' in light of the circumstances peculiar to the case." *Langnes v. Green*, 282 U.S. 531, 541, 51 S.Ct. 243, 247, 75 L.Ed. 520 (1931).

### B. *Gross Back Pay*

Under the Order of the Court, each claimant is to receive "back pay and fringe benefits" from which interim earnings are to be deducted.[15] Gross back pay for each claimant is the projected amount the claimant would have earned from the Company during the period June 8, 1976 through June 8, 1978 (the "back pay period") had the Company complied with the Award of the Arbitrator and reinstated the claimant.[16] The process of calculating gross back pay is labyrinthine; the Company compensated employees in various ways, through a base hourly wage system, plus an incentive system, with Christmas bonuses, shift differentials, overtime premium pay, and earned vacation pay. All forms of compensation are, of course, to be included in computation of gross back pay. See, e. g., *Meadows v. Ford Motor Co.*, 510 F.2d 939, 948 (6th Cir. 1975). The parties are in agreement, in large measure, as to the method to be used in this process.[17] The objective in ascertaining a gross back pay figure for each claimant was to make as fair an estimation as was reasonably possible of the amount the claimant would have earned in the back pay period. "Unrealistic exactitude is not required." *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 260 (5th Cir. 1974). As the Sixth Circuit said in *Meadows v. Ford Motor Co., supra*, at 948, a court must ascertain back pay "within the realm of

15. As was discussed above in the Introduction and is further explicated below, the Special Master concludes that the "make whole" principle which guided the District Court's determination should also require a further set-off from back pay, if the Company has met its burden of proof that claimants have failed to use reasonable efforts in mitigating their damages.

16. For claimants Koslik and Dale, the back pay period runs from October 1, 1975 until June 8, 1978, since they were reinstated *with* back pay under the Arbitrator's Award as enforced by the Court.

17. Briefly, the computation of gross back pay involved the calculation of the various elements of compensation (incentive, vacation, etc.) on an hourly basis, by first examining the work experience of each claimant over the approximately two-year, nine-month period prior to the claimant's discharge, i. e. the three calendar years 1973, 1974, and 1975. (Calendar year 1975 is foreshortened to approximately nine months because of the discharge of the claimants during September of that year). The "base wage rate" for each claimant during each calendar year of the back pay period (1976, 1977, and 1978) was obtained from the provisions of the collective bargaining agreement. Since the hourly rates of compensation other than base rate (e. g., incentive, vacation, etc.) would also have increased in proportion with the increase in the base rate, these increased rates were then determined.

The next computation involved the projection of the number of hours each claimant would have worked during the back pay period. Again, the average experience of each claimant during the two-year, nine-month period prior to discharge was ascertained, and an average number of hours projection was made for each calendar year of the back pay period. (Note that the back pay period in calendar year 1976 commenced only on June 8th of that year and the back pay period in calendar year 1978 closed on June 8th of that year). These projected figures were then multiplied times each of the appropriate rates of pay for each calendar year, the products were added and a gross back pay figure for each claimant was obtained for each of the three calendar years. By comparison to the challenging complexities of this process of calculation, Odysseus' trip was a guided tour.

reasonable probability (and no more can be asked here)."

The Company made use of a computer to calculate the amount of gross back pay for each claimant and the Union raised no objection to most of the results achieved. The calculations did include some errors, and the Special Master has resolved any computational discrepancies in accordance with the agreed-to method of calculation. Under the Court's Order, the claimants are also to receive all "fringe benefits" they would have earned during the back pay period. All but one of these fringe benefits have been included in the gross back pay equation. The remaining benefit to which the claimants are entitled is health and life insurance. "Frequently the employee's fringe benefits are of great importance, and such benefits as life insurance . . . have a worth that can be valued and for which damages can be awarded if proof is sufficient." D. Dobbs, *Remedies*, 927. The Labor Board and Title VII courts have included such benefits in back pay awards. See, e. g., *Willett v. Emory & Henry College*, 427 F.Supp. 631, 636 (W.D.Va.1977) aff'd 569 F.2d 212 (4th Cir. 1978). The evidence showed that during the back pay period the International Union offered to make insurance premium payments on behalf of any claimant in need of such assistance so as to continue the same coverage they had had when employed by the Company. Thirty claimants received this Union

assistance. Thus, there is evidence in the record as to the cost of the insurance for these 30 claimants, and the proof concerning the value of the fringe benefit they lost is sufficient. With regard to those claimants who chose not to have the International Union pick up their insurance premium, proof is lacking as to the value of the lost fringe benefit. The collective bargaining agreement does not specify the value of this fringe benefit and no other evidence was proffered which would enable the Special Master to estimate the value of this contractual benefit. Where such evidence is absent, the Special Master will not speculate as to the amount of damage suffered, and no award can be made as to this fringe benefit.[18]

Certain claimants were rehired by the Company as new employees immediately after their discharge in September, 1975. The parties are in agreement that these claimants are not entitled to back pay, but they are owed certain damages. These persons were rehired as new employees without their accumulated seniority. Under the Award of the Arbitrator, these persons were to be reinstated with seniority. Thus, in this proceeding they are entitled to recover the vacation pay, Christmas bonuses and, in three instances, the leader pay they would have received had the Company reinstated their full seniority in accordance with the Arbitrator's Award.[19]

18. In one instance, a claimant continued her insurance coverage by making her own payments directly to the carriers. Her cancelled checks were placed in the record, and thus the value of her lost fringe benefit can be determined. Likewise, another claimant was able to continue her coverage by making payments through the Company. (Her husband was still employed by the Company during the back pay period.) Since the amounts paid are in the record, the Special Master is able to value this lost fringe benefit. In all other instances, the amounts which each claimant would have received from the Company during the back pay period in insurance premium payments made on their behalf under the Company's insurance plans cannot be determined based upon the present record. As will be discussed below, the burden of producing evidence of the amount each claimant would have received from the Company during the back pay period

had the Company complied with the Award of the Arbitrator is imposed on the Union. While it would be mere conjecture to select an arbitrary figure as an estimate of the value of this lost fringe benefit—and the Special Master will not do so—it should be noted that the final net amounts owed many of the claimants as determined below, undoubtedly underestimates their actual loss since it does not include this fringe benefit. However, in a case of this complexity it has been clear from the very beginning that one must practice the "art of the possible," and, within the bounds of the evidence present in the record, seek to make the claimants whole.

19. Compared with the computation process for fixing gross back pay, the calculation of vacation pay, bonuses and leader pay may seem like child's play. However, the process is rather intricate. Vacation pay is earned by an em-

## C. *Actual Interim Earnings*

Under the Order of the Court, gross back pay "must be diminished by the amount actually earned elsewhere" during the back pay period. It is well established that actual interim earnings should be deducted from each claimant's damages. In a common law action for breach of an employment contract, a claimant's "damage claims are reduced by what he makes in his new job." D. Dobbs, *Remedies*, 925 (1973). Since its earliest days, the Labor Board has deducted actual interim earnings from back pay awards. *Phelps Dodge Corp. v. N.L.R.B.*, 313 U.S. 177, 197–198, 61 S.Ct. 845, 853–854, 85 L.Ed. 1271 (1941); *Matter of Pusey, Maynes & Breish Co.*, 1 N.L.R.B. 482, 488 (1936), and labor arbitrators likewise set off interim earnings. See, e. g., *Universal Producing Co.*, 57 LA 1072 (Arb. Sembower, 1971). Under the express language of Title VII of the Civil Rights Act of 1964, "[i]nterim earnings . . . shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e–5(g) (1970). While in some instances the information supplied by claimants concerning interim earnings was inexact, for example, including only wage rates and length of interim employment, effort has been made to reconstruct each claimant's employment history during the back pay period using the available evidence.

A major issue concerning the method of computing deductions of actual interim earnings is raised by the Company. The parties had agreed at their first meeting with the Special Master that deductions from gross back pay would be made on a calendar-year basis, i. e. 1976, 1977 and 1978. Thus, 1976 interim earnings of a claimant (after June 8, 1976) would be deducted from the gross back pay that the claimant would have received from the Company during the same period; likewise, the same method would be used for the full year 1977 and the 23 weeks of 1978 which fall within the back pay period. Using this calendar-year method of calculation, an employee who earned more in interim employment during a calendar year than his computed gross back pay during the same year would be entitled to no back pay from the Company for that calendar year. However,

ployee in the calendar year prior to the year in which the vacation pay is received. Under the collective bargaining agreement, as interpreted by a prior arbitration decision which was submitted into evidence, a claimant is eligible for full vacation pay if he worked 1,500 hours in the prior year. Vacation pay is pro-rated if the claimant has worked a minimum of 750 hours in the prior year. The number of weeks vacation pay received is based upon the claimant's years of employment with the Company (e. g., one to two years equals one week; two to five years equals two weeks; five to ten years equals three weeks). Thus, the number of hours actually worked by a claimant prior to discharge in 1975 is used to calculate the vacation pay due for 1976. The number of hours actually worked from the date of the Arbitrator's Award (when seniority was to be restored) until the end of 1976 is used to determine vacation pay due for 1977. The number of hours actually worked prior to the commencement of the 1977 economic strike (when all the rehired claimants went on strike) is used to determine the amount of vacation pay due for 1978. In any instance where the number of hours was less than 750, no vacation pay is due. If more than 750 hours but less than 1,500 hours was worked, vacation pay is pro-rated. The rate of vacation pay is based upon the average earned rate experience of the claimant during the prior calendar year. Final-

ly, amounts already received by the claimants in vacation pay are deducted.

Similarly, Christmas bonuses must be pro-rated for 1976 based upon hours worked after the Arbitrator's Award, with the bonus already received deducted. Unlike vacation pay, Christmas bonus is earned in the year in which it is received based upon the number of hours worked, if at least 750 hours; full bonus is received for 1,500 hours worked. The Company claims that no bonus is due for 1977 because of the claimants participation in the 1977 economic strike as of June, 1977. However, a pro-rated Christmas bonus would have been earned prior to June if a claimant worked at least 750 hours in the 1977 calendar year. There is no requirement under the collective bargaining agreement that a person be actually employed by the Company when the bonus is due at Christmas time. The company's position is also inconsistent with its stance on vacation pay where it acknowledges amounts are owed in 1978 based on 1977 hours worked. Thus, Christmas bonus may be owed for 1977 as well.

Leader pay of 15 cents an hour for three claimants is calculated on the basis of the actual hours worked after the Arbitrator's Award in 1976 and prior to the economic strike in 1977.

the surplus earnings over and above the gross back pay figure would not be carried over and deducted from the gross back pay due in any other calendar year.

The Company argues that this method of calculation unfairly penalizes the Company since certain claimants obtained high-paying jobs during 1977 or 1978 and, in fact, in some instances earned more during the back pay period considered as a whole than they would have earned from the Company; nonetheless, under the calendar-year method of calculation they would be entitled to additional back pay. The Company makes a persuasive argument that the back pay period should be considered as a whole and, upon reflection, the Special Master has decided to accept the Company's position. The central goal of this proceeding is to make the claimants whole: nothing more and nothing less. The Court's Order requires that gross back pay be diminished by actual interim earnings and not just part of actual interim earnings.

It is true that Labor Board practice since 1950 has been to calculate back pay on a calendar-quarter basis under the *Woolworth* formula, *F. W. Woolworth Co.*, 90 N.L.R.B. 289 (1950), and the Supreme Court found the Board's approach permissible in *N.L.R.B. v. Seven-Up Bottling Co.*, 344 U.S. 344, 348, 73 S.Ct. 287, 289, 97 L.Ed. 377 (1953). Before 1950 the Labor Board calculated loss of earnings over the entire back pay period. The Board found, however, that employers delayed offering reinstatement to dischargees they knew had obtained other high-paying employment, since the monies earned at a higher rate would reduce the amounts owed by the offending employer in back pay. See, Fuchs, Kelleher, and Pye, "Back Pay Revisited", 15 *B.C. Ind. & Comm.L.Rev.* 227, 258 (1973). The *Woolworth* formula has been challenged as being punitive, and not a purely remedial sanction. *Id.* at 259. In any case, the policy of discouraging delay reinstatement offers to discriminees which underlies the Labor Board's shift to a quarterly basis for computation is inapposite to the present proceeding. The Company here offered reinstatement to all the claimants over three months prior to the Court's Order of September 18, 1978. There is not the slightest indication in the record that the Company delayed reinstatement so as to reduce the amounts it owed claimants in back pay because those claimants had belatedly obtained high-paying positions.

While the Special Master is troubled that an earlier arrangement on methodology is altered, there is good reason to do so. It appears clearly at this writing, now that gross back pay and interim earnings have been calculated, that under the make-whole principle, a claimant who did in fact earn more in interim employment than he or she would have earned from the Company during the back pay period has suffered no loss of pay and is entitled to no award of damages. Further, excess actual earnings during one calendar year should be considered to reduce any gross back pay owed by the Company in any other calendar year. Thus, in calculating the amount owed each claimant, total interim earnings will be deducted from total gross back pay.

Another issue is raised by the Union with regard to the deduction of actual earnings that a few claimants obtained in part-time employment during the back pay period. The practice of the Labor Board is not to deduct earnings from a part-time job if the claimant had held that job prior to his discharge. *N.L.R.B. v. Miami Coca-Cola Bottling Co.*, 360 F.2d 569, 573 (5th Cir. 1966). The problem with this approach is that the holding of the part-time job is often the only evidence of reasonable efforts to mitigate damages by a claimant. (See discussion below.) In such instances, while maintaining the part-time job will constitute reasonable mitigation efforts, the amounts received in part-time earnings should be deducted from gross back pay. The Board's practice when a full-time and a part-time job are held simultaneously is to only deduct earnings received from the full-time position. *Id.* The Special Master will follow that practice, since such a claimant could have held the part-time job at the same time he was being employed by the Company during the back pay period.

## D. Burden of Persuasion

In the first instance, the Union in this action bears the burden to prove the amount each claimant would have earned from the Company during the back pay period, but did not earn as a result of the failure of the Company to comply with the Award of the Arbitrator. The evidence in the record of this proceeding is sufficient to allow for the calculation of this amount with reasonable probability. However, the burden of persuasion lies with the Company when it seeks to reduce the amount it owes a claimant by reason of actual interim earnings by a claimant or the failure of a claimant to mitigate his loss. "If the employee has obtained a substitute job, or could have obtained one by reasonable effort, he is chargeable with the income he obtains or could reasonably obtain in this fashion, but only if the employer sustains the burden of proving these facts." D. Dobbs, *Remedies*, 925 (1973); see, e. g. *McAleer v. McNally Pittsburgh Mfg. Co.*, 329 F.2d 273 (3d Cir. 1964). In *Taylor v. Tulsa Tribune Co.*, 136 F.2d 981, 983 (1943), a case relied on by the Company in its Memorandum, the Tenth Circuit stated "the burden rests [up]on the employer to show the amount received or which might have been received with reasonable diligence". The practice of the Labor Board and under Title VII is much the same. See, e. g. *McCann Steel Co. v. N.L.R.B.*, 570 F.2d 652, 655, ft. 4 (6th Cir. 1978); *DiSalvo v. Chamber of Commerce*, 568 F.2d 593, 598 (8th Cir. 1978). The burden is on the employer "to establish facts which would negative the existence of liability to a given employee or which would mitigate that liability." *N.L.R.B. v. Brown & Root, Inc.*, 311 F.2d 447, 454 (8th Cir. 1963).

The record contains sufficient evidence of actual interim earnings, e. g. I.R.S. W–2 forms and tax returns, to allow for the computation of actual interim earnings to be deducted from gross back pay. The focus of a good portion of the testimony received in this proceeding has been on the issue of mitigation of damages. Forty-three claimants were called to testify; 95 affidavits and 85 Answers to Interrogatories were filed containing information concerning mitigation. The Company argues that it cannot bear the burden of proving a failure to mitigate because the relevant facts "are peculiarly within the knowledge" of the claimants. This argument must fail. The Company was given every opportunity to obtain any and all facts it needed to meet its burden and to explore every facet of the "knowledge" of the claimants.

In certain instances, however, claimants totally failed to respond to discovery measures. In an Interim Report of June 26, 1979, the Special Master recognized that these claimants have forfeited any entitlement to back pay by virtue of their total non-cooperation: they failed to complete affidavits containing information concerning interim earnings as required by the Order of the Court of September 18, 1978; they did not appear at depositions properly noticed by the Company; they did not reply to Interrogatories properly served by the Company. This outright failure to afford discovery made it impossible for the Company to bear its burden of persuasion on mitigation. Their failure to cooperate in any way in this proceeding forfeits any entitlement to damages. Cf. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *Milewski v. Schneider Transportation Co.*, 238 F.2d 397 (6th Cir. 1956).[20] On the other hand, with regard to the other claimants where mitigation is in issue, the Company has had the fullest opportunity to meet its burden. It is not disadvantaged by being obligated to prove those facts which diminish the damages which flowed from its breach of contract.

The Company further contends that some claimants responded to inquiries as to their efforts in seeking interim employment by stating that they had in fact sought such employment, but they could not remember

---

**20.** In the Interim Report, the Special Master also determined that one claimant, Marie Sprague, died prior to the commencement of the back pay period and, therefore, was not entitled to back pay.

where.[21] While it is very likely that a person would not remember every place where he sought employment two or three years after the fact, it is difficult to forget *all* the places where one sought employment. Thus, the blanket assertion by a claimant that, "I looked for work" is subject to question. Where such a vague response as to efforts to seek employment is not credited, the opposite inference of a lack of reasonable diligence is warranted and the Company has met its burden. On the other hand, the scales of credibility resolution are tipped in one direction or the other by a multitude of subtle factors, and the adequacy of efforts to mitigate are not to be judged by a mechanical test. "In such a situation as this there is no shorthand formula or magic phrase that can be applied to find the answer . . . ." *N.L.R.B. v. United Insurance Co.*, 390 U.S. 254, 256, 258, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). A trier of facts must take care to find out what did, in fact, occur. If it is resolved that a claimant did actively seek interim employment, but cannot remember more than a few of the names of the places where work was sought, then a failure to mitigate has not been shown by the Company.

The Company also claims unfairness in those situations where claimants have failed to respond completely to inquiries regarding mitigation. It was incumbent upon the Company in those situations to seek further evidence on the issue of mitigation from available witnesses. A large portion of the group of claimants was called to testify and did so testify concerning mitigation. It was open to the Company to subpoena any additional witnesses it thought necessary to make its defense.[22] If in the absence of certain facts the Company has not shown that reasonable efforts to seek other employment were not made by a claimant and the Company had the opportunity to seek such information and did not, the Company has failed to meet its burden. "[T]he risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 251, 75 L.Ed. 544 (1931), cited in *Meadows v. Ford Motor Co.*, 510 F.2d 939, 943 (6th Cir.), *cert. denied*, 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1975), as applicable to back pay awards under the "make-whole principle".[23] See also, *Hairston v. McClean Trucking Co.*, 520 F.2d 226, 233 (4th Cir. 1975) (Title VII action); *Southern Household Products Co., Inc.*, 203 N.L.R.B. 881 (1973). The issue of mitigation and the facts required to prove the defense were not hidden in this proceeding, later to be sprung unfairly upon the Company; they were the hub around which this proceeding revolved from the beginning.

### E. *Mitigation: Willful Idleness and Illness*

By not reinstating the claimants in accordance with the Award of the Arbitrator, the Company caused certain damage to the claimants, and they are to be made whole.

21. With regard to a few claimants, the Company also attacks their attitude and lack of cooperation in giving testimony. As Chief Judge Coffin has recently reminded us, "[T]empers and patience run short in extensive, hard fought labor-management hearings." *Texas Instruments, Inc. v. N.L.R.B.*, 599 F.2d 1067, 1071, ft. 4 (1st Cir. 1979). The Company was not deterred or prejudiced in its extensive discovery activities by the understandable attitudes of a few claimants who were embittered by the events which led to this litigation.

22. For example, the Company complains that certain claimants did not deliver to the Company the records of job applications that they kept for the Ohio Bureau of Employment Services. This evidence could have been sought through a motion to produce, but none was made by the Company. At the conclusion of the testimony of claimants, the Special Master inquired of both parties as to whether they wished to present any further testimony from the claimants. Both sides agreed to rest with the evidence in the record.

23. The Company argues in its Memorandum of Law that it should not be considered a "wrongdoer". The Special Master will not enter into the sophistical fray of whether a party who breaches a contract should be characterized as a "wrongdoer" or not. It suffices to say that a legal wrong has been committed for which compensation is afforded the injured parties. The Company owes damages to the claimants not because it committed an act *malum in se*, but rather because it failed to abide by its contractual undertaking.

It is important in deciding what deductions, in addition to actual interim earnings, should be made from gross back pay to determine the precise nature of the injury the Company has caused the claimants to suffer. It is for that injury that the claimants are to be made whole.[24] The Company caused the claimants a potential loss of pay, a loss of the opportunity for continued employment with the Company during the back pay period when compensation could be earned for work performed. The damages which flow from the Company's breach of the contract are those which result from the disruption of the employment relationship. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 413, 95 S.Ct. 2362, 2369, 45 L.Ed.2d 280 (1975) ("a loss of wage opportunities"); *Central Appalachian Coal Co.*, 64 LA 787, 791 (Arb. Hunter, 1975) ("loss of work opportunity"). When the Company interfered with this legally protected interest, it also thereby "allowed" the claimants the opportunity to seek other full-time employment. D. Dobbs, *Remedies*, 925. Thus, where the evidence shows that, in whole or in part, the particular loss was not suffered, since a claimant took advantage of the opportunity and obtained interim employment, or the consequences could have been avoided through the use of reasonable efforts in seeking interim employment, deductions from gross back pay must be made.[25]

The parties are in absolute agreement on the basic principle that each claimant bore a duty to seek to avoid the consequences of the Company's breach of contract through the use of reasonably diligent efforts to seek other employment.[26] Failure to use

---

24. While undoubtedly certain claimants suffered physically and emotionally from the actions of the Company, those losses are not compensable in this proceeding. Nor are other collateral losses to be compensated, such as the value of a car or house which might have been lost because an out of work claimant could no longer meet the payments; nor are the costs of moving because of an eviction for failure to pay rent to be compensated. *Florence Printing Co. v. N.L.R.B.*, 376 F.2d 216, 220 (4th Cir.) *cert. denied*, 389 U.S. 840, 88 S.Ct. 68, 19 L.Ed.2d 104 (1967). The make-whole principle must be applied with circumspection, so that focusing on the precise wrong done, the "injured party [is placed] in the position such [a] party would have been in had the contract been fully performed." *Baer Bros. Land & Cattle Co. v. Palmer*, 158 F.2d 278 (10th Cir. 1946). The Company terms this the "actual damage" principle and would subtract from the amount of money a claimant would have earned from the Company any and all monies he did, in fact, receive during the back pay period, whether from the State of Ohio or from the International Union. This approach misconceives the loss the Company caused the claimants. (See discussion, *infra*.)

25. The Supreme Court in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 419, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975), relied upon *Wicker v. Hoppock*, 6 Wall. 94, 99, 18 L.Ed. 752 (1867), as the guiding principle for a damage determination when the legal injury suffered "is of an economic nature":

> The general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. The latter is the standard by which the former is to be measured. The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed.

Here, as explained above, the particular injury is to the claimants' opportunity to earn compensation for work performed. The failure to reinstate the claimants, of course, did not necessarily destroy their ability to earn compensation for work performed; the Company's action, however, did injure the claimants in that regard. As *Wicker* holds, the "compensation" each claimant is to receive is measured by the extent of the "injury". Those who obtained interim employment suffered less injury as a result of the Company's "wrong"; those who failed to seek employment with reasonable diligence brought injury upon themselves and for that injury the Company is not responsible. It is a longstanding and "universal rule that a person injured by the act of another is bound to use ordinary diligence to make the damage as light as may be . . . ." *James v. Allen County*, 44 Ohio St. 226, 233, 6 N.E. 246, 250 (1886).

26. In its early years, the Labor Board deducted actual interim earnings but not possible earnings obtainable through reasonable diligence. The Supreme Court, in *Phelps Dodge Corp. v. N.L.R.B.*, 313 U.S. 177, 198, 61 S.Ct. 845, 854, 85 L.Ed. 1271 (1941), rejected the Board's claim that considering these "abstractly just" deductions would be "too burdensome for effective administration."

> [T]he advantages of a simple rule must be balanced against the importance of taking fair account, in a civilized legal system, of every socially desirable factor in the final judgment.

such efforts is willful idleness, a breach of the duty to mitigate, and "the community's notions of fair compensation to an injured [party] do not include wounds which in a practical sense are self-inflicted." *Ellerman Lines, Ltd. v. The President Harding*, 288 F.2d 288, 290 (2d Cir. 1961). The parties part company, however, in defining what efforts are sufficient to meet this duty and in deciding whether the personal characteristics of each claimant must be considered in making that determination. The Company argues, for example, that a person's age is irrelevant in determining whether the obligation to mitigate has been met. It would appear, however, that if a claimant's conduct is to be measured in terms of "reasonableness" account must be taken of individual characteristics of a claimant which might excuse what would otherwise seem to be a lack of diligence in another claimant's situation. At common law the duty of an injured party to avoid further injury is "limited by the rules of common sense and fair dealing." 25 C.J.S. Damages § 33, at 702. See, *James v. Allen County*, 44 Ohio St. 226, 6 N.E. 246 (1886). In *N.L.R.B. v. Madison Courier*, 153 U.S. App.D.C. 232, 472 F.2d 1307 (D.C.Cir.1972), the Court, in reviewing a Labor Board back pay proceeding, held that each particular claimant must be treated separately; "[t]he particular facts concerning *each separate individual* must be considered . . . . The merit of an individualized approach in a judicial matter is self-evident." *Id.*, 153 U.S.App.D.C. 243, 472 F.2d 1318. The facts in this action indicate that certain claimants, who were in their late fifties and sixties, failed to exert as much effort in seeking interim employment as used by other younger claimants. As long as their efforts can be considered reasonable in the circumstances, they should not be held to have defaulted in their obligation to mitigate.[27] "The law does not attempt to equalize fortune, opportunities or abilities." *I.C.C. v. Diffenbaugh*, 222 U.S. 42, 46, 32 S.Ct. 22, 24, 56 L.Ed. 83 (1911) (Holmes, J.). What is required of all the claimants was "reasonable exertions in this regard, not the highest standard of diligence." *N.L.R.B. v. Arduini Mfg. Co.*, 394 F.2d 420, 423 (1st Cir. 1968). On the other hand, a failure to use *any* effort at all to seek employment, for example, by not making any applications for work, would certainly constitute a failure to use reasonable diligence. In such a situation, a claimant has not "really looked for another job." *Allegheny Airlines, Inc.*, 48 LA 734, 739 (Arb. Kelliher, 1965). Likewise, merely registering with the state employment agency is "hardly persuasive evidence of a diligent effort to find work." *N.L.R.B. v. Madison Courier*, 164 U.S.App. D.C. 284, 296, 505 F.2d 391, 403 (D.C.Cir. 1974).

The Labor Board imposes upon a claimant a duty to make an honest, good faith effort to obtain interim employment. In *Mastro Plastics Corp.*, 136 N.L.R.B. 1342, 1350 (1953), enf'd in part, 354 F.2d 170 (2d Cir. 1965), *cert. denied*, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966), the Trial Examiner explained the duty as follows:

[I]t can be said that in broad terms a good-faith effort requires conduct consistent with an inclination to work and to be self-supporting and that such inclination is best evidenced not by a purely mechanical examination of the number or kind of applications for work which have been made, but rather by the sincerity and reasonableness of the efforts made by an individual in his circumstances to relieve his unemployment.

This appears to the Special Master to be a most useful formulation of the approach to be taken in evaluating whether each claimant in this proceeding did use reasonable diligence in seeking interim employment.

---

The "socially desirable factor" to be accounted, according to the Court, was "the healthy policy of promoting production and employment." Since this early reversal of its practice, the Board has regularly deducted from back pay amounts discriminatees failed to earn through lack of diligent search.

**27.** Labor arbitrators have considered a grievant's age in measuring whether there has been ordinary diligence in mitigation. See, e. g., *Standard Transformer Co.*, 51 LA 1110, 1113 (Arb. Gibson, 1968).

The findings of fact reported above include a number of recurring fact situations which warrant specific analysis. Certain claimants retired during the back pay period and, when offered reinstatement by the Company in June, 1978, returned to full-time employment. The Union argues that these persons should not lose their back pay during their period of retirement. To the contrary, the retirement of a claimant indicates on its face that the individual has withdrawn from the job market and is no longer actively seeking employment. While less effort may be required of a senior person than a junior person, some good-faith effort is nonetheless required. The return to work at the Company, if anything, indicates that the person was at least physically capable of seeking employment during the time of retirement. The issue is not whether a claimant would have been successful in obtaining employment, but rather whether the effort was made to avoid further damages.[28]

The evidence presented to the Special Master also indicated that certain claimants were ill or physically disabled during certain portions of the back pay period. It can be assumed that had the Company reinstated these claimants in accordance with the Arbitrator's Award in June, 1976, these illnesses would have occurred in any case. The illnesses made the claimant unavailable for work, and thus back pay should be disallowed for those periods where it has been shown that illness or physical disability prevented a claimant from mitigating his loss of pay. This in general is the Labor Board's practice in back pay determinations. See, e. g., *American Mfg. Co.*, 167 N.L.R.B. 520, 522 (1967). Other claimants were unavailable for work because they joined the Armed Services. In accordance with Labor Board practice, a set-off must be made for this period out of the job market. *Clearfield Cheese Co.*, 106 N.L.R.B. 417 (1953). The evidence also showed that certain claimants quit or were discharged from interim jobs. If the quitting

of employment was unjustified or the discharge for cause, the claimant's subsequent unemployment constitutes willful idleness which warrants a deduction from the back pay owed by the Company. *DiSalvo v. Chamber of Commerce, supra* at 597–8; *L. B. Hosiery*, 99 N.L.R.B. 630, 631 (1952). In addition, one claimant was incarcerated during the back pay period. While the "idleness" may not have been "voluntary", the incarceration made the claimant unavailable for work. *Bell Helicopter Textron*, 78–2 ARB ¶ 8500 (Arb. Johannes, 1978).

The Union contends that claimants had difficulty obtaining employment because of what might be termed the "Falls Stamping stigma", i. e. potential employers would not consider claimants for employment because they had been discharged from the Company for participating in the 1975 "wildcat" strike and/or because, if offered reinstatement at the Company, the claimant would leave their interim jobs. It should be emphasized that the test of adequate mitigation is not the success achieved, but the efforts made. There was little if any evidence to the effect that claimants were deterred from filing additional applications with employers because of the "stigma", and the alleged existence of this "stigma" cannot act as a blanket excuse for failure to use reasonable means to seek employment.

The Union has presented evidence of the extremely high rate of unemployment in the Akron area during the back pay period. While such evidence may explain why many claimants were unsuccessful in obtaining employment despite extensive efforts, it is not directly pertinent to the question at hand, i. e. whether reasonable efforts were made to obtain employment. "With such diligence lacking, the circumstance of a scarcity of work and the possibility that none would have been found even with the use of diligence is irrelevant." *American Bottling Co.*, 116 N.L.R.B. 1303, 1307 (1956). No evidence was presented that the general high rate of unemployment deterred indi-

---

**28.** Compare the different efforts made by three retirees, Paul Moyer, Foy King, and Edward Piescznski. Moyer, although formally retired, continued to search for work so as to mitigate his damage; King and Piescznski did not.

vidual claimants from seeking out what jobs were available.

The Company claims that with regard to the mitigation issue it bears only the burden of establishing an "inference" that reasonable diligence on the part of a discharged employee would have resulted in alternative employment, and that its burden is met by the presence in the record of clear evidence that numerous claimants did, in fact, locate continuous, substantial employment. This evidence, according to the Company, establishes the "inference" that reasonable efforts would have resulted in interim employment for *all* the claimants and thus, since they were unemployed, they must not have used reasonable efforts. The Company would then have the burden shift to the claimants to prove that no employment opportunities existed or that they each used reasonable efforts.

The initial difficulty with the Company's argument is that it rests on a faulty premise. Merely because some persons in a *job market obtain work, does not establish an inference that other employment opportunities are there merely for the asking.* The record in this action does not establish the availability of employment during the relevant period. The evidence is replete with testimony and documents which show that extensive efforts were made by numerous claimants in a futile effort to obtain interim employment. Following the Company's reasoning, this evidence would sup-

port the contrary conclusion that no interim employment opportunities were available in the general Akron area during the back pay period.[29]

Even assuming that one could conclude that employment opportunities were available, it still does not follow that the inference should be drawn, as the Company would have it, that the claimants who were not employed did not use reasonable diligence in seeking employment.[30] The Company "inference" argument measures the sufficiency of the search made by each claimant by whether the search was successful. However, in numerous instances in its individual submissions to the Special Master, the Company has acknowledged that a claimant made a diligent search for work and fully mitigated his loss *without* successfully finding employment for extended periods of time. The key to the mitigation issue lies in an examination of the efforts made by each claimant, not in proof of success or failure in seeking employment and not in the proof of the availability or unavailability of work. If there was little work available, a claimant is not excused from the duty to seek out work, with reasonable diligence, so as to mitigate his loss. If there was work available, a claimant's duty to find it is neither increased nor decreased; he must exercise "reasonable diligence". The fact that he did not find work does not mean that the efforts he employed in searching for work were not reasonable, but only that they were not successful. Reasonable efforts are

---

29. Over two weeks after the end of the testimony in this proceeding, the Company requested a further hearing to take evidence from three witnesses concerning the availability of jobs in the Akron area during the back pay period. The Special Master was agreeable to receipt of this evidence either in further hearings or by way of deposition. The Company did *not* pursue the matter further, and the Special Master has received no additional evidence concerning the availability of employment during the relevant time period.

30. The Company's "inference" argument with a resultant shift in the burden of proof is not unlike the argument made by the respondent in *N.L.R.B. v. Miami Coca-Cola Bottling Co.*, 360 F.2d 569, 575 (5th Cir. 1966). In that case, the company suggested that the "incredibly low"

interim earnings of two dischargees "makes a prima facie case of their willfully incurring losses during the back pay period" and then invited the Court's "adoption of a rule" that this evidence shifts the burden of going forward to the opposing party to show that the discriminatees did use reasonable efforts to find interim employment. Judge Wisdom, writing for the panel, decided to "decline the invitation" to shift the burden. *Id.* Labor Board practice is to reject any such "inference" of insufficient efforts to mitigate: "The fact that other claimants may have been more successful than [a particular claimant] is not evidence of a lack of diligence on [that claimant's] part." *International Trailer Co., Inc.*, 150 N.L. R.B. 1205, 1218 (1965).

not always successful. It is the efforts actually employed by each claimant that must be individually evaluated, and, as discussed above, the Company had every opportunity to explore the relevant facts concerning the claimants' actual efforts. On a case-by-case basis, the line must be drawn between meritorious diligence and meretricious indolence. "However difficult the drawing of lines more nice than obvious," the Court's reference to the Special Master "compels the task." *Local 761, Electrical Workers v. N.L.R.B.*, 366 U.S. 667, 674, 81 S.Ct. 1285, 1290, 6 L.Ed.2d 592 (1961) (Frankfurter, J.).

### F. *Union Benefits*

During the back pay period, the International Union made substantial payments in varying amounts to 50 claimants totaling over $150,000.00. One major matter in dispute in this action is whether amounts received by these claimants from the Union during the back pay period are to be deducted from their gross back pay. The Union claims that these amounts, which vary from a few hundred dollars to many thousands of dollars, were tendered as loans on the basis of the need of the claimants, with repayment to be made by the claim-

ants upon receipt of back pay from the Company. The Company, however, refers to the testimony of "many" claimants that the payments were received in consideration for participation in strike activity directed at the Company from June, 1977 until June, 1978.[31]

The central thrust of the Company's argument on this issue is directed elsewhere, however. The Company strongly argues that the Special Master cannot decide the question whether the assistance paid to the claimants should be set off from gross back pay. The Company contends that the nature of the payments, as a loan or not a loan, "can only be made when the monies are actually called due and paid back". (Memorandum, p. 4) Presumably the Company would have this proceeding held in abeyance until some later litigation is commenced, pursued and completed, or until voluntary repayment is made by the claimants. But the evidence is clear that repayment is not due until *after* the claimants have received the back pay they are owed by the Company. The Company's circular argument would require the Union to try to collect a loan which by its terms is not due. The interests of justice do not require the Special Master to wait for Godot.[32]

---

**31.** Adopting the position that the benefits were compensation for picketing might have the unexpected effect of increasing the Company's liability. If the payments received from the International Union were in return for picketing duty by the claimants and were held to constitute compensation for work performed, this would indicate that those claimants made reasonable efforts in mitigation by seeking and obtaining interim employment, i. e. they were "employed" by their Union. These amounts would then be deducted from gross back pay. However, the payments received by the claimants from the Union were substantially less than their projected gross back pay. Elsewhere the Company has claimed that some of these same claimants did not seek interim employment (and the Special Master has found that to be the case in some instances and has concluded that no back pay is due). But if these claimants were "employed" by their Union, they would be entitled to some increment of damages from the Company. In any case, as is discussed in the text, the Union assistance was not compensation for picketing, and benefits the claimants received are collateral to the damage caused by the Company. Thus the

payments should not be set off from gross back pay.

**32.** As noted above in the Introduction, the Company filed a motion with the District Court on August 8, 1979, seeking the dismissal of the Union's counterclaim for money damages, asserting that the Union lacks standing to claim damages on behalf of the individual claimants. In its written argument to the Special Master, submitted prior to its motion to the Court, the Company maintained that "the nature and adequacy of the representation of the class of effected [sic] employees" by the Union prevents the Special Master from making any determination as to whether the payments received by individual claimants were loans or non-loan assistance. The Court denied the Company's motion on the merits (as well as on grounds of laches), and thus the question of the "adequacy of the representation of the class" has been resolved. In any case, as will be discussed, the characterization of the payments made to individual claimants as loan or loan assistance is not relevant to the issue before the Special Master, i. e. whether the payments should constitute a set off from back pay.

There is abundant evidence in the record to support the position that the payments made by the International Union to the individual claimants were on a loan basis. Numerous claimants testified that the amount received had to be repaid; the cards signed by the claimants clearly indicated that "I will repay this loan . . ." While there was some testimony by claimants to the effect that picketing was required, no claimant suggested that the payments received would not have to be repaid. The uncontradicted fact that these benefits were received by claimants a full year *prior* to the 1977 economic strike indicates that they were not originally tendered in exchange for participation in picketing activity. Assistance was not cut off for those claimants who did not participate in the 1977 economic strike. Some claimants participated in the strike and did *not* receive Union assistance. The benefits were emergency payments made on a need basis to those claimants who did not obtain interim employment.[33] However, careful study of this issue suggests to the Special Master that the characterization of these amounts as loans or benefits or gifts is essentially irrelevant to the question of whether they should be deducted from gross back pay.

The amounts received by individual claimants from the International Union were not compensation for work performed; the assistance was not pay for substitute interim employment. Thus, these monies are not related to the injury to *employment opportunity* caused by the Company's failure to reinstate the claimants in accordance with the Award of the Arbitrator. Claimants did not have to perform picket duty in order to be entitled to these payments. No service was required to be rendered in exchange for receiving the amounts. The Union payments are collateral benefits.[34]

The Union's assistance to the claimants may be analogized to an insurance payout. The claimants, as Union members, had long made contributions to their Union from whence these monies came in their time of need. Viewed in this perspective, it is clear that the Company should not benefit from a deduction of the amounts received from the International Union, amounts which, in effect, the claimants themselves had paid for through their Union dues.[35]

33. The Company expresses its concern that a finding that these amounts were loans based on a "self-serving characterization" by the Union would later bind the claimants to repayment. The Company "encourages the Special Master to make an independent decision in this case". The Special Master has attempted to do that on this and every other issue. (It should be noted in passing that the recipients of Union assistance would not be collaterally estopped by any finding in this case in any later suit brought by the Union to collect the "loans".)

34. The assistance can be likened to the amount an individual claimant might have received during the back pay period as a bequest under a will, or a windfall obtained from a winning ticket for the Ohio Lottery. If during the back pay period a claimant had received monies from friends or family in order to tide him over during a difficult time of financial strain, it would be perfectly clear that these amounts should not be deducted from gross back pay. Likewise here, the claimant's "friend or family" was his Union, supplying certain amounts to meet an emergency.

35. In *Florence Printing Co. v. N.L.R.B.*, 376 F.2d 216 (4th Cir.), *cert. denied*, 389 U.S. 840, 88 S.Ct. 68, 19 L.Ed.2d 104 (1967), the Fourth Circuit addressed at length the question whether strike benefits should be set off against back pay. The facts there showed that strikers were required to report daily to their local union official, the union characterized the benefits to the I.R.S. as "income", and picketing was required daily unless the strikers had other employment. The Circuit Court could "find no factual bases to conclude that strike benefits were paid as a condition precedent to or in compensation for, picketing". *Id.* at 218. Since the payments were not earnings, the Court reasoned they should not be deducted from the earnings which the employees lost as a result of their wrongful discharge. Moreover, "the strike benefits were financed solely by an assessment on the employees. Employees receiving strike benefits received back only their own contributions and those of fellow-employees". Id. at 220. *Accord, N.L.R.B. v. Rice Lake Creamery Co.*, 124 U.S.App.D.C. 355, 360, 365 F.2d 888, 893 (D.C.Cir.1966).

The facts in the present action show that the International Union's assistance was based upon the need of individual claimants, much like the sums received by the strikers in *N.L.R.B. v. Laidlaw Corp.*, 507 F.2d 1381, 1383 (1974), where the Seventh Circuit upheld the Labor Board's refusal to deduct these amounts from back pay:

The Company contends that the amounts of Union assistance must be deducted, since "but for" the breach of contract by the Company, these Union benefits would not have been received by the claimants, and thus a failure to deduct these amounts constitutes "unjust enrichment". What this argument ignores is that, while receipt of money from the Union—or from a friend or a bank—may reduce the hardship suffered by a claimant during the back pay period, the only amounts which the Company should be entitled to set off against back pay are those which relate to the legal injury done by the Company. That loss or injury was to each claimant's earning opportunity during the back pay period. Thus, actual and possible earnings for work performed, or for work which could have been performed had the claimant exercised reasonable diligence in finding it, are to be deducted. Other monies received by a claimant by way of grants or loans from any source, which made life more tolerable for the claimants but were not compensation for work performed, are collateral to the injury done by the Company.[36]

The claimants bore a duty to mitigate the damage they suffered, and it should be emphasized that the fact that they received Union assistance during the back pay period in no way relieved them of their continuing obligation to seek interim employment. If claimants failed to seek work because the Union assistance alleviated their immediate need for employment, they have failed to mitigate. *Florence Printing Co. v. N.L. R.B., supra*, at 218–220.

> The record shows . . . that monies disbursed by the union were not contingent on picketing time, but were in fact based on need and family situation.
> The Court found it clear that "the benefits received during the strike were not earnings . . . ." *Id.*

**36.** The same analysis applies to the assistance rendered to many claimants by the International Union in making insurance premium payments on their behalf. While the evidence is unclear as to whether these amounts should be considered as loans or non-loan assistance, again that characterization is not relevant to whether the amounts should be deducted from

## G. Unemployment Compensation, Welfare and Social Security Payments

During the back pay period some claimants received unemployment compensation, welfare or social security payments. The Company contends that these amounts must also be deducted from gross back pay. The above discussion with regard to the nondeductibility of collateral Union assistance is applicable here as well. Unemployment compensation, welfare and social security are not part of a claimant's interim earnings.[37] See, *Marshall Field & Co. v. N.L. R.B.*, 318 U.S. 253, 63 S.Ct. 585, 87 L.Ed. 744 (1943).

In *N.L.R.B. v. Gullett Gin Co.*, 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951), the Supreme Court addressed the question whether the Labor Board must deduct amounts received in unemployment compensation from back pay awards. The argument made by respondent in that case parallels a portion of the argument made by the Company in this action, i. e. to fail to deduct these benefits would make claimants "more than whole". The Court rejected the assertion that employees would be made more than whole and ruled that the amounts need not be deducted: "Since no consideration has been given or should be given to collateral *losses* in framing an order to reimburse employees for their lost earnings, manifestly no consideration need be given to collateral benefits which employees may have received." *Id.* at 364, 71 S.Ct. at 339 (emphasis in original). The respondent in *Gullett Gin* also argued that the benefits paid by the state were direct

gross back pay. The monies were not tendered in exchange for services rendered to the Union; they do not constitute compensation for work performed. The benefits were collateral to the injury caused by the Company, the loss of wage opportunities.

**37.** A further reason why unemployment compensation payments should not be set off from back pay is that these amounts are subject to recoupment by the State of Ohio under R.C. 4141.35(B)(1) as an overpayment, once back pay is received from the Company. Cf. *Parks v. Gaines*, 49 Ohio St.2d 251, 361 N.E.2d 1057 (1977). See, D. Dobbs, *Remedies*, 925–26.

benefits to the dischargees from the employer, since the employer was compelled by law to have earlier contributed to the state fund. The Court responded:

> Payments of unemployment compensation were not made to the employees by respondent but by the state out of state funds derived from taxation. True, these taxes were paid by employer, and thus to some extent respondent helped to create the fund. However, the payments to the employees were not made to discharge any liability or obligation of respondent, but to carry out a policy of social betterment for the benefit of the entire state. . . . We think these facts plainly show the benefits to be collateral. *Id.*[38]

The reasoning of *Gullett Gin* should apply as well to welfare and social security payments received by some claimants here. These benefits too "[were] made . . . to carry out a policy of social betterment for the benefit of the entire state." *Id.* These benefits were also "plainly . . . collateral". *Id.* They should not be deducted from gross back pay.

### H. *Participation in the Economic Strike of 1977*

The District Court on two occasions in this action has ruled concerning the termination of damages due those claimants who actually participated in the economic strike

at the Company which commenced on June 10, 1977. The Court has made plain that the burden is upon the Company to clearly show that a claimant did participate in the strike. Back pay to claimants who are shown to have participated "in any manner" in the strike is terminated as of the day upon which they actually participated.[39] There was much testimony presented at the hearings in these proceedings directed to the issue of strike participation. In addition, deposition testimony was entered into evidence regarding this matter. The evidence showed that neither the claimants nor apparently anyone else participated in the strike in a conventional picketing format, by carrying signs and walking back and forth in front of the Company gates. That fact is immaterial. The Court's Orders, of course, do not require the demonstration of traditional picketing in order to terminate back pay. A "clear showing" of participation "in any manner" is sufficient.[40]

The Company claims that over 50 claimants participated at one time or another in the economic strike of 1977–78. The Union protests that with regard to many of these claimants the Company's evidence was vague and contradicted by Union witnesses. However, with regard to over 30 claimants, the Company did present in evidence the handwritten notes of the President of the Company, Mr. Ernest Lange, Jr. The lists

---

**38.** Title VII courts have varied in their practice with regard to deducting unemployment compensation, usually with little discussion directed to the issue. Under Title VII a trial court has discretion to allow back pay in whole or in part, and the Sixth Circuit has affirmed as a valid exercise of this discretion the deduction of unemployment compensation, *Satty v. Nashville Gas Co.*, 522 F.2d 850, 855 (1975), *aff'd in part, rev'd in part on other grounds*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977); and the refusal to deduct unemployment compensation, *Mabin v. Lear Siegler, Inc.*, 457 F.2d 806 (1972), affirming 4 CCH EPD ¶ 7768 (D.Mich. 1971). See also, *Marshall v. Goodyear Tire and Rubber Co.*, 554 F.2d 730, 736 (5th Cir. 1977). It would appear that any uncertainty as to whether unemployment compensation should be deducted has now been laid to rest with *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) which directs the attention of the Title VII trial court to the "NLRA model". That "model" is

clear and was approved in *Gullett Gin* ; unemployment compensation should not be deducted from back pay.

**39.** Back pay for such a claimant will be reduced to that amount which would have been received in 1977 prior to actual strike participation. The term "total adjusted gross back pay" will be used to denote the amount which would have been received by the claimant from the commencement of the back pay period (June 8, 1976) until the date of strike participation.

**40.** The Union, in a supplemental Memorandum on Evidence of Strike Participation, characterizes some of the visits to the strike line as "kibbitzing" among old friends. The Court's Orders talk only of strike "participation". The history of union concerted activity also suggests that "kibbitzing" lies at the very heart of traditional strike behavior. In any case, it lies within the parameters of the Court's Order.

specify precise dates and times when certain claimants did in fact participate in strike activity. This evidence suffices to meet the Court's burden of proof of a "clear showing" of when certain claimants participated. With regard to most of the other claimants, however, the evidence is uncertain as to when they did participate. Some claimants admitted in their own testimony at the hearing or by deposition that they participated in the economic strike during December, 1977. Others admitted picketing, but did not indicate when their picketing began, because they were not asked. Company witnesses would place many of these claimants as participants in the strike at some time between June and December, 1977. With regard to these individuals, the Company has failed to make the requisite "clear showing" as to when they actually participated in the economic strike. It would be mere speculation to suggest that they began picketing on July 1, or September 1, or November 1.[41] In light of the evidentiary burden placed on the Company by the Court's Orders in this regard, back pay will be terminated in December, 1977 for those claimants who admitted participation as of that date. For others, where the Company has not made a clear showing of the date of the commencement of strike participation,[42] the Special Master will not speculate as to when the participation began and, in accordance with the Orders of the Court, back pay will not be terminated.

## IV. DETERMINATION OF DAMAGES

Applying the conclusions of law to the findings of fact, the Special Master reaches the following determinations with regard to the specific amount of back pay and fringe benefits owed each individual claimant:

1. MOLLY ANDERSON used reasonable efforts to mitigate her damages by seeking and holding interim employment during the back pay period. Quitting the job at Empire Manufacturing Company for lack of transportation was justified and she continued to diligently search for work. The Company has made a clear showing that the claimant participated in the economic strike as of June 17, 1977, and her back pay shall be cut off as of that date in accordance with the Orders of the Court. Prior to June 17, the claimant would have earned $3,508.46 in gross back pay from the Company in 1977. The claimant is entitled to her gross back pay for 1976 and the first 24 weeks of 1977 (total, $7,630.74), reduced by her actual interim earnings during the same period ($1,452.65). Unemployment compensation and welfare benefits should not be deducted. The claimant is entitled to $6,178.09.

2. GREG BALMER is entitled to no damages because of his total failure to afford discovery to the Company and to cooperate in any way in these proceedings.

3. BOBBY BELL used reasonable diligence in seeking and finally obtaining interim employment prior to and following his active duty. However, during the time the claimant served in the Armed Forces, he was unavailable for work. While his income during that period ($2,220.90) will not be deducted from his gross back pay, the 16-week period when the claimant was out of the job market must be used to adjust the back pay owed. (Such a reduction in back pay is in accordance with the consistent practice of the Labor Board on this issue.) Thus, the gross back pay owed for 1976 is reduced from $5,215.00 to $2,294.60 (total adjusted gross back pay, $16,205.34). His interim earnings in 1977 and 1978 (total, $10,524.80) should be deducted, but Union assistance should not be deducted. The claimant is owed $5,680.54.

4. JUANITA BIERLAIR used diligent efforts to mitigate her damages by seeking and holding employment throughout the

---

41. The Company also argues that certain claimants "must" have participated since they were Union officials during the strike. Such evidence hardly constitutes a "clear showing" of "actual" strike participation.

42. With regard to a few claimants whose names do not appear on Mr. Lange's lists, but who did admit picketing, e. g., Norman Fears, Lee Jackson, the evidence in the record suffices to determine with some certainty when the claimants' strike participation began.

back pay period. The claimant cannot be considered to have failed to mitigate by quitting her employment with Kent Industries after she received an actual offer of a better job opportunity. (She later lost that opportunity, apparently because of her prior employment with the Company involved in this action.) In any case, the quit was not unjustified, and she should not be charged with willful idleness, based on the facts in the record. The claimant's back pay, however, is terminated as of June 17, 1977; the Company has made a clear showing of her strike participation as of that date. She would have received $3,990.22 in gross back pay in 1977 as of that date. Ms. Bierlair is entitled to her total gross back pay prior to strike participation ($8,999.36) and insurance premiums prior to strike participation ($303.66), reduced by her actual interim earnings prior to June 17, 1977 ($1,147.28). Union assistance should not be deducted. The claimant is owed $8,115.74.

5. HARRY BLAKNEY failed to use reasonable efforts in mitigating his damages. The evidence concerning his search for employment does not indicate that an earnest effort was made during the period in question. A man of Mr. Blakney's age is certainly required to exercise more diligence in his search for work over a two-year period. His effort pales in comparison with his fellow claimants, including those many years his senior. While the duty to mitigate does not require super-human effort, it does require more than the claimant exhibited here. The claimant is entitled to no award of back pay.

6. PAUL BOXLER is entitled to the difference between the vacation pay and bonuses he did receive and the vacation pay and bonuses he would have received had his seniority been restored. This amounts to a net vacation pay due of $1,369.27 and a net bonus of $95.98. This claimant is owed a total of $1,465.25.

7. HOWARD BROCKMAN earned almost twice as much from his interim employment as he would have earned from the Company during the same period. He is entitled to no award of back pay.

8. RONALD BROUSE, having used diligent efforts in seeking interim employment prior to obtaining a job, is entitled to the difference between his total gross back pay ($22,111.66) and his actual interim earnings ($8,316.00). Union assistance should not be deducted. The amount owed is $13,795.66.

9. JOYCE BULLARD mitigated her damages by diligently seeking and maintaining employment during the back pay period. The Company does not contend that this claimant failed to mitigate. However, Ms. Bullard did participate in the 1977 economic strike as of July 7, 1977, and her back pay must be terminated as of that date. Her total gross back pay for 1976 and 1977 prior to her strike participation ($11,906.36) should be reduced by her actual interim earnings prior to July 7, 1977 ($3,659.49). The claimant is owed $8,246.87.

10. BOBBY BULLARD used reasonable diligence in seeking interim employment during the back pay period, and the Company admits that to have been the case. While there was some evidence of his participation in the 1977 economic strike, the evidence falls short of the clear showing required by the Orders of the Court. Furthermore, no clear showing was made as to the date on which any strike participation commenced. Interim earnings of $6,286.79 should be deducted from total gross back pay owed of $17,391.96. Union assistance should not be deducted. The amount owed is $11,105.17.

11. STEPHAN BUNNER left two positions during the back pay period. He claims that he quit the positions because the demands of the family required more money. Assuming that to be true, it is difficult to characterize as justified the quitting of lower paying jobs many weeks before the higher paying jobs were to become available. If the claimant had continued to hold the position at Sohio until he began work at Little Tykes, he would have earned an additional $397.50. If he had held the position at Little Tykes until the C & C Machine job opened up, he would have earned an additional $508.80. Because the quits were not justified, the resultant time out of work

should be considered willful idleness. He should be charged with the amount of money ($906.30) he could have earned had he kept those positions until moving to the new ones. Other than those periods of willful idleness, Mr. Bunner was employed throughout the back pay period. He is owed the difference between his gross pay ($18,279.06) and his actual interim earnings ($14,113.77), with the $906.30 amount of possible earnings deducted as well. The claimant is owed $3,258.99.

12. BASIL BUSCH used reasonable diligence in seeking interim employment prior to September, 1976, and was fully employed in 1977 and 1978. However, he was disabled for four months during 1976, which requires an adjustment in 1976 gross back pay. The Union argues that the claimant would have received disability benefits in lieu of wages had he been employed during 1976 by the Company and thus there should be no set-off. There is no evidence in the record as to the amount of disability benefits Mr. Busch would have received from the Company, nor does the Union request these amounts. During a four-month period in 1976, Mr. Busch was out of the job market and was not mitigating his loss. The claimant's gross back pay ($21,654.49) should be reduced by the amount he would have earned from the Company during a four-month period in 1976 ($3,393.73). The claimant's total adjusted gross back pay ($18,260.76) should be reduced by his actual interim earnings ($11,545.39). Union assistance should not be deducted. The claimant is owed $6,715.37.

13. JANE CARLTON used reasonable diligence in seeking interim employment considering her age. The Company bears the burden of persuasion with regard to failure to mitigate and even assuming the facts lie in equipoise, the defense must be held to have been unproven by a preponderance of the evidence. The claimant indicated in her Answers to the Company's Interrogatories that the places where she sought employment were listed with the Bureau of Employment Services. The Company made no further effort to seek out that information so as to support its argument that the only efforts which were made in seeking interim work occurred prior to the commencement of the back pay period. However, the Company has made the requisite clear showing that Mrs. Carlton participated in the 1977 economic strike activity as of June 23, 1977, and her back pay should be cut off as of that date. Prior to that date, the claimant would have earned a total of $9,786.72 from the Company. Union assistance should not be deducted. Since the claimant did not have any interim earnings, she is owed $9,786.72.

14. JANET CARR used reasonable diligence in mitigating her damages by seeking and holding interim employment during the back pay period. The Company argues that the claimant should be charged with a deduction from gross back pay based upon her leaving her employment with the Quik Shop. The library position was certainly more suitable employment for this claimant based upon her six years of prior experience in that type of work, and the record indicates that she took the position with some expectation that the work would be increased to full-time. Her starting rate of pay at the library was lower than her rate with the Quik Shop by some 25 cents an hour, but neither job was full-time and the claimant's rate of pay with the library increased by 20 cents an hour within two months after she began to work. There is no indication in the record that her rate of pay at Quik would have likewise increased. In sum, the claimant's actions in leaving her employment with the Quik Shop must be considered reasonable in the particular circumstances of her case and do not constitute a failure to mitigate. Because of her admitted strike participation, the claimant's back pay is terminated as of the commencement of the 1977 economic strike. As of that date she would have earned a total of $8,618.64 from the Company, which must be reduced by her actual interim earnings to that date of $1,074.80 in 1976 and $1,093.52 in 1977. Union assistance, welfare and food stamp assistance should not be deducted. The claimant is owed $6,450.32.

15. VICTOR CARUSO used reasonable efforts to mitigate his damages, considering his age and his physical disability. While the efforts used may not have been sufficient for a person 40 years his junior, Mr. Caruso's activities were sufficient to constitute an earnest effort and evidence an inclination to work. His quitting employment with The Heep Company in order to picket would not be considered justified. However, his back pay will be terminated prior to his leaving this job because of the clear showing of his strike participation. The Company has made the requisite showing that the claimant participated in the strike as of June 17, 1977. Prior to his strike participation, the claimant's total gross back pay amounts to $9,414.72, and his insurance premiums amount to $433.63. No actual interim earnings were received prior to his strike participation, and therefore none are to be deducted from back pay. Union assistance should not be deducted. The claimant is entitled to $9,848.35.

16. CLARENCE CHADWELL is entitled to no damages, because of his total failure to afford discovery to the Company and to cooperate in any way in these proceedings.

17. ANTHONY CIARALLO is entitled to the difference between the vacation pay and bonuses he did receive and the vacation pay and bonuses he would have received had his seniority been restored. This amounts to a net vacation pay due of $1,559.53 and a net bonus of $85.71. This claimant is owed a total of $1,645.24.

18. JAMES CLEMENTE used reasonable efforts to mitigate his loss after he obtained his job with Melch Food at the end of October, 1976. Prior to obtaining that job, the claimant made no effort to seek employment during the back pay period. Thus, his gross back pay for 1976 should be reduced from $7,748.50 to $2,711.98. The Company has failed to make a clear showing as to when Mr. Clemente participated in the 1977 economic strike activity. While the Company witnesses testified that the claimant did participate, there was no clear showing as to precisely when that participation began, and the claimant's name did not appear on Mr. Lange's lists. (The record also contains contrary evidence by Union witnesses, who indicated that no claimants participated in the strike activity until December, 1977 at the earliest.) The claimant's total adjusted gross back pay ($23,-787.56) should be reduced by his total interim earnings ($16,235.33). The claimant is owed $7,552.23.

19. JERRY CONNER is entitled to the vacation pay of $97.31 he would have received had his seniority been restored. He is entitled to no Christmas bonuses, because of his failure to meet the threshold work eligibility requirements. This claimant is owed a total of $97.31.

20. ROBERT CREEK is entitled to the difference between the vacation pay and bonuses he did receive and the vacation pay, bonuses, and leader pay he would have received had his seniority been restored. This amounts to a net vacation pay due of $452.91, a net bonus of $14.43 and leader pay of $273.01. This claimant is owed a total of $740.35.

21. CHRISTOPHER CRIM is entitled to the difference between the vacation pay and bonuses he did receive and the vacation pay and bonuses he would have received had his seniority been restored. This amounts to a net vacation pay due of $974.09 and a net bonus of $85.11. This claimant is owed a total of $1,059.20.

22. DANIEL CRIM is entitled to the difference between the vacation pay and bonuses he did receive and the vacation pay and bonuses he would have received had his seniority been restored. This amounts to a net vacation pay due of $822.24 and a net bonus of $25.69. This claimant is owed a total of $837.93.

23. ANDREW CSONKA earned more in interim employment in 1976 and 1977 than he would have earned from employment with the Company during that period. His failure to supply information other than a sketchy affidavit prevented the calculation of his 1978 earnings. He was unavailable to the Company for further discovery. Based upon his record of continuous em-

ployment in 1976 and 1977, it may be inferred that he obtained employment in California after October, 1977, and that during the final eight months of the back pay period he earned more than $2,097.72. Thus, his interim earnings would have equaled his gross back pay. This claimant is entitled to no award of back pay.

24. TIMOTHY CURTIS used reasonable diligence to mitigate his loss by maintaining almost constant employment throughout the back pay period. The Company has made a clear showing of strike participation, and thus back pay shall be terminated as of the first day of that participation, June 17, 1977, in accordance with the Orders of the Court. The claimant's total gross back pay for 1976 and the period prior to his strike participation in 1977 amounts to $6,432.84. Deduction should be made for actual interim earnings prior to that date ($5,695.00). The claimant is entitled to $737.84.

25. DOROTHY DALE received more in interim earnings than she would have received had she been reinstated with full back pay in accordance with the Arbitrator's Award. She is entitled to no award of damages.

26. MARTHA DeCHURCH used reasonable diligence in seeking interim employment so as to mitigate the damage she suffered. The Company argues that the claimant's Answer to its Interrogatories stating that she applied to eight different employers is "unsupported". In addition to the fact that the Answers are made under oath, there is nothing in the record to suggest that the claimant's response was anything but the whole truth. Her deposition testimony was fully consistent with her Answers to the Interrogatories. The Company also argues, in effect, that when assaying reasonable diligence, one must count the precise number of applications made, and "eight is not enough". Such a mechanical approach misstates the duty imposed upon a claimant. The essential inquiry is whether an earnest effort was made, evidencing an inclination to seek employment. With regard to this claimant, the Company has not shown a failure to mitigate.

Mrs. DeChurch did participate in the 1977 economic strike activity, and the Company has made the requisite clear showing that such participation began as of June 23, 1977. Her gross back pay for 1977 should be reduced to $5,740.50. Her total adjusted gross back pay is thus $12,628.63, to which should be added the amount of insurance premiums she would have received prior to her strike participation ($442.13). Union assistance should not be deducted. The claimant is owed $13,070.76.

27. ANDREW DeRITA is entitled to the difference between the vacation pay and bonuses he did receive and the vacation pay, bonus, and leader pay he would have received had his seniority been restored. This amounts to a net vacation pay due of $1,852.11, a net bonus of $54.21, and leader pay of $296.97. This claimant is owed a total of $2,203.29.

28. DAVID DeRITA earned more in his interim employment than he would have earned from the Company had he been reinstated in accordance with the Arbitrator's Award. The claimant is entitled to no award of back pay.

29. DOROTHY DeRITA used reasonable efforts, considering her age, in seeking interim employment during the back pay period. The Company again makes a "numbers" argument; listing the names of only a few employers must mean that the claimant's efforts were less than diligent. However, the evidence indicates that the claimant also sought employment from other employers whose names she could not recall, and many employers did not take formal applications. (The Company also claims that Ms. DeRita "promised" to supply her unemployment record book, but the Company made no mention of the "promise" when the claimant testified before the Special Master, and no effort was made to formally request production of the document.) The Company has made the requisite clear showing of strike participation as of June 17, 1977, and the claimant's back pay shall be terminated as of that date. Her gross back pay for 1977 should be reduced to

$3,287.65; her total adjusted gross back pay is therefore $7,792.83. Union assistance should not be deducted. Insurance premiums which she would have received prior to her strike participation should be added to her damages ($433.63). The claimant is owed $8,226.46.

30. JOHN DIMMICK used reasonable efforts in 1976 to mitigate his damages, considering his age and health. Seeking a number of jobs and obtaining two positions constitutes reasonable diligence. However, once he moved to Florida in January, 1977, he took himself out of the job market. He no longer sought employment. Whether this idleness was caused by illness or by conscious choice matters not. The claimant was out of the job market and his damages should be reduced accordingly. (The evidence also clearly indicates that the claimant began his strike participation as of June 20, 1977, and thus back pay would be terminated as of that date in any case.) The claimant is entitled to his gross back pay for 1976 ($4,746.89) with interim earnings of $346.33 deducted. No deduction should be made for Union assistance. The claimant is owed $4,400.56.

31. CLEOPHUS DIXON earned substantially more in interim employment than he would have earned from the Company during the back pay period. He is entitled to no award of back pay.

32. JOSEPH DOLGAS used reasonable efforts in seeking employment during 1976, but after going on welfare following his discharge from Fairlawn Chateau, he ceased looking for work and took himself out of the job market. Thus, the claimant failed to mitigate his damage after January 1, 1977. He should receive no back pay for the 1977 and 1978 calendar years. While it is true that Mr. Dolgas was not in the best of health and is a senior person, he had demonstrated tenacity in seeking and obtaining employment during 1976. He apparently was able to work. (He came back to work full-time with the Company in June of 1978.) Recognizing that the individual characteristics of a claimant must be taken into account in determining what consti-

tutes reasonable diligence, it is still apparent that *some* efforts must be made during the course of a period lasting one and one-half years. His gross back pay for 1976 is $5,048.66; insurance premiums for the 29 weeks of 1976 amount to $194.59. Actual interim earnings of $1,432.47 must be deducted. No deduction is to be made for Union assistance or welfare benefits. The amount owed this claimant is $3,810.78.

33. JOHN DOSHAK fully mitigated his damages by holding employment throughout the back pay period, and the Company does not claim to the contrary. He is entitled to the difference between his gross back pay ($23,820.56) and his actual interim earnings ($16,695.93). The claimant is owed $7,124.63.

34. KENNETH DOUGLAS used reasonable efforts to mitigate his loss by holding a full-time position at McDonald's during the back pay period. The Union argues that since the claimant had held this position on a part-time basis since 1972, he should be charged by way of set-off only with the increase in income which resulted from his going on a full-time basis. The Union's claim, that Mr. Douglas was making $1,500.00 as a part-time worker and this amount should be deducted from the claimant's actual interim earnings in each calendar year, is not based on any evidence in the record. [In any case, one would think that $1,500.00 should not be deducted from *each* of the calendar years, as the Union contends, since the portions of the calendar years within the back pay period vary in length from 23 weeks (1976) to 52 weeks (1977) to 29 weeks (1978).] In the absence of such evidence, it would be mere speculation to guess at an amount to be deducted. Since the evidence does show the claimant to have earnings of $16,314.42 from interim employment, this amount should be deducted from his total gross back pay of $22,617.46. The claimant is owed $6,303.04.

35. STEVEN EDWARDS, by his failure to supply the Company or the Court with sufficient information by which to evaluate his efforts at mitigation, should not be entitled to an award of back pay. In any case,

once the claimant entered into active duty in March, 1977, he became unavailable for work. This claimant's case does not present a situation where the Company could have sought to meet its burden of persuasion by further questioning of the claimant; he was unavailable and did not even respond to the Interrogatories. His 1976 work activity indicates much less than full-time employment, but there is no way one can speculate as to what efforts he did, in fact, use to seek employment. The claimant is entitled to no award of back pay.

36. ROBERT ELLIS did not use reasonable efforts to mitigate his loss, and for some period he was unavailable for work because of his incarceration. He is entitled to no award of back pay.

37. ERNEST FARR mitigated his loss by holding interim employment throughout the back pay period. He is entitled to his total gross back pay ($21,083.81) reduced by his actual interim earnings ($15,981.48). The claimant is owed $5,102.33.

38. NORMAN FEARS used reasonable efforts to seek and maintain interim employment during the back pay period. The Company has not met its burden of persuasion with regard to a claimed failure to mitigate, and the record included evidence of an earnest search for work. The Company, however, has made the requisite showing of strike participation and the evidence is sufficient to fix the commencement of that participation at the beginning of the economic strike in June, 1977. The claimant's gross back pay will be adjusted accordingly. The claimant's total gross back pay prior to his strike participation is $8,624.83. Union assistance should not be deducted, but insurance premium payments prior to the strike participation ($1,177.20) must be added to the gross back pay. The claimant is owed $9,802.03.

39. WILLIAM FEARS failed to use reasonable efforts to seek employment prior to obtaining employment in September, 1976. Thus, he is owed no back pay for the first 13 weeks of the back pay period ($2,028.86 to be deducted). His total interim earnings amounted to $10,504.98; total gross back pay before set-offs amounts to $17,371.44. Union assistance is not to be deducted. The amount to which this claimant is entitled is $4,837.60.

40. RUSSELL FOTI is entitled to the difference between the vacation pay and bonuses he did receive and the vacation pay and bonuses he would have received had his seniority been restored. This amounts to a net vacation pay due of $1,915.59 and a net bonus of $88.51. This claimant is owed a total of $2,004.10.

41. GERALDINE FULTON should receive no back pay for the period June 8, 1976, until August 7, 1976, during which time she made no effort to seek employment. She should receive no back pay after she began participating in the 1977 economic strike in December of 1977. In the interim, although she was unsuccessful in obtaining employment, she demonstrated perseverance in her search for work. She has mitigated her damages. Her gross back pay of $4,337.68 for 1976 should be reduced to $3,166.51 because of her failure to look for work prior to August 7, 1976. Her gross back pay for 1977 ($6,553.51) should be reduced to $6,356.91, because of her admitted strike participation. Thus, her total gross back pay is $9,523.42. Union assistance should not be deducted. Insurance premiums for the period of August, 1976-December, 1977 ($1,445.42) should be added to gross back pay. No deduction of actual interim earnings should be made, since the claimant's back pay is terminated prior to the earning of any amount. The claimant is owed $10,968.84.

42. RICHARD GINN successfully mitigated his damages by maintaining employment throughout the back pay period; the Company does not contend that any amount should be set off for failure to mitigate. During a portion of the back pay period, the claimant held two positions. Since it is reasonable to assume that he would have been able to hold one of the two positions while working at the Company (if he had been reinstated in accordance with the Arbitrator's Award), the claimant's gross back pay should only be reduced by the amounts

actually earned in his major employment position. During 1976, the amounts earned at the Cathedral of Tomorrow from the beginning of the back pay period until he obtained his full-time job with Phillips Machine on July 27th should be deducted (six weeks, $243.50). His 1976 interim earnings at Phillips in the full-time position ($2,411.99) should be deducted, but not the amount he earned by working part-time on Saturdays and Sundays at the Cathedral of Tomorrow. Likewise in 1977, the earnings at Phillips Machine ($1,646.75) should be deducted, but not the amounts received from the Cathedral of Tomorrow until April 8th of that year. Interim earnings at the Cathedral of Tomorrow from April 8 until June 21, 1977 ($1,152.45) should be deducted. The Company has made a clear showing that the claimant participated in the 1977 economic strike activity as of June 21, 1977, and his back pay should be cut off as of that date. The claimant's gross back pay for 1977 must be adjusted downward because of his strike participation. His total adjusted gross back pay ($14,390.97) must be reduced by certain of his earnings as discussed above ($5,454.69). Union assistance and welfare benefits are not to be deducted. The claimant is owed $8,936.28.

43. WENONA GREEN used reasonable diligence in mitigating her loss by maintaining employment throughout the back pay period. The Company has not made the requisite clear showing of strike participation by the claimant. She is entitled to her gross back pay ($17,990.94) plus the amounts she would have received in insurance premiums ($817.92), reduced by her actual interim earnings ($14,314.00). This claimant is owed $4,494.86.

44. WILLIAM GWEEN used reasonable efforts to mitigate his damage. He should receive the difference between his gross back pay ($19,933.03) and his actual interim earnings ($13,234.92). The claimant is owed $6,698.11.

45. THOMAS HEFFERNAN used reasonable diligence in seeking to mitigate his damages during the back pay period. The evidence in the record indicates that an earnest effort was made to find interim employment, and that he held part-time and full-time employment during portions of the back pay period. The claimant's back pay should be cut off as of June 22, 1977. As of that date, the Company has made a clear showing of strike participation. The Union argues that the claimant's appearances at the strike line were only in his official capacity. The Court's Orders do not mandate an inquiry into a claimant's reasons for participating. Mr. Heffernan certainly did participate "in any manner", and, accordingly, his gross back pay figure for 1977 should be reduced to that accruing prior to his strike participation ($5,626.87). Interim earnings in his part-time position with R.G.I.S. ($723.74) should be deducted. The claimant's total gross back pay and insurance premiums prior to his strike participation ($6,792.93 + $5,626.87 + $52.42 − $12,472.22) should be reduced by his interim earnings. No deduction should be made for Union assistance or unemployment compensation. The claimant is owed $11,748.48.

46. GREGORY HENDERSON did not use reasonable diligence to find interim employment so as to mitigate his damage prior to November, 1977. He did not make an earnest effort in seeking out job opportunities. After November, 1977, however, the claimant did mitigate his damage by maintaining his employment with Forest City Dillon Precast Systems. The evidence concerning the claimant's strike participation is mixed. While during his deposition he did acknowledge participation, it is unclear when that participation began. In any case, the claimant's actual interim earnings after November, 1977 exceed his gross back pay figure plus insurance premiums for both 1977 and 1978 combined. Prior to November, 1977, he failed to adequately mitigate his damage. Thus, whether the claimant participated in the 1977 economic strike or not, he is entitled to no award of damages.

47. STEVEN HENDERSON did not use reasonable diligence in seeking interim employment so as to mitigate his loss prior to July, 1977, when he obtained work. Merely

because the claimant could not name many places where he sought work does not necessarily mean he did not diligently search, but the record concerning this claimant considered as a whole evidences a failure to make an earnest effort to mitigate. The Company could not further explore the mitigation issue in testimony before the Special Master because the claimant was unavailable. The Company argues that since the claimant permanently moved to California in October, 1975, he was unavailable for work (apparently, that is, unavailable for work with the Company), and that that fact alone should vitiate any award. Since the Company did not reinstate the claimants in June, 1976 in accordance with the Arbitrator's Award, the fact that the claimant was out of the jurisdiction at the time appears immaterial. (He did return to Ohio in December, 1978, when his deposition was taken, and he testified that he might move back to Ohio at some time.) It would certainly be adequate mitigation for a claimant to relocate to another area of the country where greater employment opportunities might be available in order to seek out those opportunities. This claimant failed to mitigate prior to July, 1977, not because he moved to California, but because once he arrived he did not use reasonable diligence in looking for work. The claimant earned $8,019.55 in his interim employment after July 11, 1977, which exceeds his gross back pay figure for the same period of time ($6,089.21). Thus, the claimant is entitled to no award of damages.

48. ROBERT HUTCHINSON used reasonable diligence in mitigating his loss during the back pay period, except for the six-month period after he quit his employment with Diemer's Exxon. The record does not indicate that this quit was justified. Thus, the amount he could have earned had he not quit ($1,455.20) must be deducted from gross back pay. The Company has not clearly shown if, or when, the claimant participated in the 1977 economic strike. Union assistance should not be deducted. The claimant is entitled to his total gross back pay ($13,389.30) minus the amount he actually earned ($12,286.27) or could have earned had he not quit his interim employment ($1,455.20). The deductions from gross back pay due this claimant exceed the gross back pay figure. The claimant is entitled to no award of damages.

49. LEE JACKSON did not use reasonable efforts to mitigate his damages until July, 1977, when he sought and obtained interim employment. The evidence indicates that after obtaining welfare in early 1976, the claimant made no effort at all to seek work. An earnest effort was not made. The Company has also made a clear showing of strike participation by the claimant based upon his own admissions during his deposition testimony. Upon review of the entire record with regard to this claimant, the Special Master is convinced that the claimant did participate prior to July, 1977. The claimant's back pay is therefore terminated prior to July, 1977. Since Mr. Jackson did not seek to mitigate his loss prior to his strike participation, the claimant is entitled to no award of damages.

50. WILLIAM JORDAN failed to use reasonable diligence in seeking interim employment during the back pay period so as to mitigate his loss. While the claimant did make some effort, the search for work could hardly be characterized as reasonable diligence for a person of his age. There is also evidence in the record to support a finding of strike participation on the part of the claimant based upon his own deposition admission. It is unnecessary, however, to base a denial of recovery on strike participation, since the evidence indicates a failure to adequately mitigate. Thus, the claimant is entitled to no award of damages.

51. LOUIS KARAMAS used reasonable diligence in mitigating his loss by seeking and holding interim employment throughout the back pay period. The company does not claim that any amounts should be deducted for a failure to mitigate. Unemployment compensation should not be deducted from back pay. The claimant is entitled to the difference between his gross back pay ($18,793.20) and his actual interim earnings ($12,541.63). The claimant is owed $6,251.57.

52. GLEN KELLY used reasonable diligence in seeking and holding interim employment throughout the back pay period. The Company only raises a failure to mitigate argument with regard to the period following the claimant's voluntary quit from the City Yellow Cab. Based on the evidence presented in his deposition, Mr. Kelly was justified in quitting that employment based on the dangerous nature of the position; his actions were reasonable in quitting and were immediately followed by a diligent search for employment. He should not be found to have failed to mitigate because of leaving this employment. The claimant is thus entitled to the difference between his gross back pay ($11,057.34) and his actual interim earnings ($7,354.01). The claimant is owed $3,703.33.

53. FOY KING retired prior to the beginning of the back pay period. Recognizing his physical infirmity and his advanced age, it is still clear that the claimant took himself out of the job market and did not use any effort to seek interim employment. He is entitled to no award of back pay.

54. JOHN KING used reasonable diligence in mitigating his damage by seeking and maintaining employment throughout the back pay period. The record indicates a clear inclination to work and an earnest effort in seeking employment. No deduction should be made for welfare and unemployment compensation received. The claimant is entitled to his gross back pay ($22,573.67) reduced by his actual interim earnings ($8,823.79). The claimant is owed $13,749.88.

55. FRANCIS KISLIK did not seek employment until February, 1976, because she was hoping to return to work with the Company. The claimant's gross back pay should be reduced by $2,922.90 because of her total failure to seek employment for over a five-month period. (Note that the claimant's back pay period runs from October 1, 1975 until June 8, 1978.) After she obtained a position, she fully mitigated her damages by maintaining that employment throughout the back pay period. The Company has made a clear showing of strike participation as of June 22, 1977, and back pay shall be terminated as of that date. The claimant's interim earnings prior to that date ($6,040.56 + $3,278.62 = $9,319.18) should be deducted from her total adjusted gross back ($11,178.62). The claimant is owed $1,859.44.

56. JOHN LATCHAW is entitled to no damages because of his total failure to afford discovery to the Company and to cooperate in any way in these proceedings.

57. BERNARD LAWSON earned more in interim employment than he would have earned had the Company reinstated him in accordance with the Award of the Arbitrator. He is entitled to no award of damages.

58. ALFRED LEE used reasonable efforts to seek interim employment so as to mitigate his damages. The record shows that an earnest effort was made. (The Company argues that the claimant has not met "his burden of showing that he looked for any work beyond the efforts listed . . . ." The Company has incorrectly inverted the burden of persuasion. It had full opportunity to further discover mitigation facts in the claimant's testimony before the Special Master, but did not.) However, because of the claimant's admitted participation in the strike as of December, 1977, his back pay must be cut off as of that time. He should receive no back pay for 1978 and his 1977 back pay shall be reduced to $8,253.54. The claimant's total adjusted gross back pay is $13,174.01. No deduction should be made for Union assistance. The claimant is entitled to $13,174.01.

59. LARRY LEMON is entitled to no damages because of his total failure to afford discovery to the Company and to cooperate in any way in these proceedings.

60. ROSELLA LEWIS used reasonable efforts in seeking interim employment so as to mitigate her damage. Considering her age and the impact of the loss of her husband, the claimant's efforts were sufficient. Her strike participation as of June 21, 1977 acts to terminate her back pay as of that date and reduces her gross back pay figure for 1977 to $863.17. The claimant's total adjusted gross back pay is $1,702.20. Insur-

 ance premiums prior to strike participation must be added to the damages ($450.63). Union assistance shall not be deducted. The claimant is entitled to $2,152.83.

61. HERBERT MANN used reasonable diligence in mitigating his loss by holding employment throughout the back pay period. It can be concluded, however, that the claimant earned more in this interim employment than he would have earned had the Company reinstated him in accordance with the Award of the Arbitrator. The claimant is entitled to no award of damages.

62. DAVID MARSH used reasonable efforts to mitigate his loss by seeking and obtaining interim employment throughout the back pay period. The Company notes that the claimant did not appear at his noticed deposition, that he did not answer the Company's Interrogatories, nor did he file a complete affidavit. However, the evidence in the record does indicate that reasonable efforts were taken by the claimant to mitigate his loss. It was incumbent upon the Company, if it felt the record was in any way deficient, to use available means to meet its burden of persuasion on mitigation. On the other hand, the Company has made a sufficiently clear showing that the claimant participated in the 1977 economic strike as of June-July of that year and, accordingly, the claimant's gross back pay for 1977 should be reduced by $4,747.09. The claimant's total adjusted gross back pay amounts to $10,123.78. Interim earnings prior to strike participation ($1,367.41) should be deducted. Insurance premium payments prior to strike participation ($1,072.94) should be added. The claimant is owed $9,829.31.

63. RAY MARZELLA is entitled to no damages because of his total failure to afford discovery to the Company and to cooperate in any way in these proceedings.

64. WILLIAM MARKS is entitled to no damages because of his total failure to afford discovery to the Company and to cooperate in any way in these proceedings.

65. THOMAS MAUL used reasonable diligence in mitigating his loss by seeking and holding employment throughout the back pay period. Unemployment compensation payments received should not be deducted from back pay. He is entitled to his corrected gross back pay ($16,622.72), reduced by his actual interim earnings ($16,180.38). The claimant is owed $442.34.

66. JUSTIN MAXWELL used reasonable diligence in mitigating his damage by seeking and maintaining employment throughout the back pay period. He is entitled to his total gross back pay ($15,592.34), reduced by his actual interim earnings ($14,850.09). The claimant is owed $742.25.

67. JOHN MILAN used reasonable efforts to mitigate his damage by seeking and maintaining employment from the beginning of the back pay period until December, 1977, when his illness made him unavailable for work. Prior to that time, the claimant made an earnest effort to find employment. His quit from Karman Rubber based on the working conditions of the job cannot be considered unjustified. Because of his unavailability for work during and after December, 1977, the claimant's gross back pay for 1977 must be reduced to $7,350.02, and he is to receive no back pay for 1978. The claimant's total adjusted gross back pay ($11,941.85) must be reduced by his actual interim earnings ($1,133.91). No deductions should be made for Union or welfare assistance or unemployment compensation. The claimant is owed $10,807.94.

68. ANTHONY MILLER did use reasonable diligence in seeking and keeping employment during the back pay period; his employment record evidences a good-faith effort and inclination to work. The Company has made the requisite clear showing of strike participation as of July 7, 1977, and the claimant is entitled to no back pay after that date. Prior to July 7, 1977, the claimant would have received $5,338.78 in gross back pay from the Company in 1977. His total adjusted gross back pay ($11,119.70) should be reduced by his interim earnings prior to strike participation ($7,311.66). The claimant is owed $3,808.04.

69. CHARLES MILLER used reasonable efforts to obtain employment by seeking and holding interim employment until March 12, 1977. The Company does not contest Mr. Miller's efforts at mitigation before this date. A claimant might be justified in some instances in quitting an interim job because the pay level was too low, if that action is followed by a diligent attempt to find alternative employment. The evidence here indicates that the claimant did not make such an earnest effort after leaving his position. The claimant is entitled to no back pay after March 12, 1977. (While the evidence of actual strike participation is sufficiently clear, the date when the activity began is left uncertain by the evidence in the record. In any case, the claimant does not receive any back pay for the period of the economic strike, because of his failure to mitigate.) The claimant is to receive the portion of gross back pay for the period prior to March 12, 1977 ($5,570.66) plus insurance premiums prior to that date ($923.13), reduced by actual interim earnings ($772.80). The claimant is owed $5,720.99.

70. LEE MILLER participated in the 1977 economic strike as of June 21, and thus his back pay should be cut off as of that date. Because of his decision to have the double hernia operation, Mr. Miller was unable to work for a five-week period at the end of 1976 and for the first week of 1977. The decision to have the operation was a voluntary one; Mr. Miller found the timing convenient and the resultant loss of six weeks of pay must be considered willful idleness. Prior to obtaining the position at Hamlin Steel Products, the claimant held an almost full-time job at Harmon and Reudy Motors, working, by his testimony, 35–36 hours a week. While he made no further efforts to seek other employment after June 8, 1976, other than his successful application to Hamlin Steel, the holding of the Herman and Reudy job is certainly a sufficient effort to mitigate. After he obtained full-time employment (for 30 days in 1976 at Hamlin Steel and then after February 1, 1977, at Hamlin Steel) he continued to hold the part-time job. The Union contends that since the claimant held this position since 1962 while he was employed on a full-time basis by the Company, the income from this job should not be set off because it was not income in lieu of Falls Stamping income. The claimant would have continued to hold the part-time position and receive income therefrom even if the Company had reinstated the claimant in accordance with the Award of the Arbitrator. Thus, the income received from the position at Harmon and Reudy will be deducted only during those periods when it was the sole source of income to the claimant, thus constituting substitute employment, i. e., June-September, 1976, and three weeks in January, 1977. For the same periods, the part-time position will constitute sufficient evidence of mitigation of damages, and no further deductions should be made.

In 1976, Mr. Miller's gross back pay from the Company would have been $8,430.86. Actual interim earnings from Hamlin Steel ($430.76) and the calculated amount of earnings at Harmon and Reudy when it was the sole source of income ($2,747.52) should be deducted. An additional deduction should be made for five weeks willful idleness ($1,453.55). The amount due for 1976 is $4,229.79. Mr. Miller's 1977 gross back pay from the Company prior to June 21, 1977, amounts to $6,498.45. Deduction should be made for actual interim income at Harmon and Reudy for the three weeks worked in January, 1977 ($396.27) and the actual income at Hamlin Steel prior to June 21, 1977 ($4,934.11). The amount due for 1977 is $1,168.07. The total amount due the claimant is $5,397.86.

71. CLARENCE MITCHELL is entitled to no damages because of his total failure to afford discovery to the Company and to cooperate in any way in these proceedings.

72. ROBERT MONTGOMERY did look extensively for interim employment during the back pay period. His disinclination to search for lower paying jobs makes the resolution of his case difficult. A claimant must certainly lower his sights somewhat in his attempt to mitigate. However, considering all the evidence concerning Mr.

Montgomery's efforts, it can be said that he demonstrated a continuing inclination to seek employment and made good-faith efforts in that regard. The Company has not met its burden of persuading the Special Master that the claimant failed to use reasonable diligence in the circumstances. However, the claimant's admitted strike participation in December, 1977, will bar any recovery of back pay for 1978 and reduce his gross back pay for 1977 to $9,988.08. His total adjusted gross back pay is $15,735.61. Union assistance should not be deducted. The amount claimant is owed is to be paid to the Common Pleas Court of Ohio, Domestic Relations Division, under the Order of Judge Zurz of October 6, 1978. The claimant is owed $15,735.61.

73. PAUL MOYER used reasonable diligence in seeking and holding interim employment so as to mitigate his damage. While Mr. Moyer technically "retired" and collected social security at age 62, the evidence clearly shows that he did not abandon the job market. To the contrary, he continued to search for work with noteworthy diligence for a person of his age. However, the Company has made the requisite clear showing of strike participation as of June 17, 1977, and back pay will be terminated as of that date. The claimant's 1977 gross back pay must be reduced to $5,224.06. The claimant's total adjusted gross back pay ($11,258.45) must be reduced by his interim earnings ($4,799.44). The claimant is owed $6,459.01.

74. FERENE NEMETH is entitled to no damages, because of his total failure to afford discovery to the Company and to cooperate in any way in these proceedings.

75. GEORGE ORAVECZ is entitled to the difference between the vacation pay and bonuses he did receive and the vacation pay and bonuses he would have received had his seniority been restored. This amounts to a net vacation pay due of $1,962.80 and a net bonus of $93.30. This claimant is owed a total of $2,056.10.

76. JACK PANTON failed to use reasonable diligence in seeking interim employment so as to mitigate his loss. He did not make an earnest effort. He is entitled to no award of back pay.

77. BEN PARTIN earned more during the back pay period than he would have earned from the Company had he been reinstated in accordance with the Award of the Arbitrator. He is entitled to no award of back pay.

78. CASPER PHILLIPS was unavailable for work throughout the back pay period based upon his physical disabilities, and he did not use reasonable diligence in mitigating his damage. While it is regrettable that the claimant suffered a loss of sight in one eye during 1976, the fact remains that he did not seek work at all during the back pay period. Less than strenuous efforts in this regard may have been sufficient to meet the mitigation burden, but no effort at all cannot suffice. The evidence also indicates that the claimant returned to full-time employment with the Company when reinstated in June, 1978, thus suggesting that he was physically capable of at least some search for interim employment during some part of the back pay period. The claimant is entitled to no award of damages.

79. EDWARD PIECZYNISKI did not use reasonable efforts to mitigate his damage by seeking employment during the back pay period. Although the fact that he retired in early 1976 is not determinative, the record indicates that the claimant made only one single attempt to find part-time employment during the entire back pay period. No effort was made to find full-time employment during the back pay period. Recognizing his age as an important factor in assessing what efforts are required, it still appears to the Special Master that this claimant did not make an earnest effort and did not evidence an inclination to work. The claimant also participated in the 1977 economic strike as of June 21, 1977. That fact, of course, cannot be considered to relieve the claimant of his obligation to make efforts to mitigate his damage during the back pay period. If anything, it shows the claimant was physically capable of making at least some minimum search for employ-

ment. The claimant is entitled to no award of back pay.

80. RICHARD POWELL earned more in interim employment than he would have earned from the Company. He is entitled to no award of back pay.

81. WILLIAM REES is entitled to the difference between the vacation pay and bonuses he did receive and the vacation pay and bonuses he would have received had his seniority been restored. This amounts to a net vacation pay due of $778.53 and a net bonus of $54.22. This claimant is owed a total of $832.75.

82. ARMOND RICCHIUTO used reasonable diligence to mitigate his loss by searching for work throughout the back pay period. The evidence indicates that the claimant wanted to work and made an earnest effort in that direction, especially for someone his age. However, the Company has made the requisite clear showing of participation in strike activity as of June 20, 1977, and the claimant's back pay shall be terminated as of that date. The claimant's gross back pay for 1977 shall be reduced to $5,978.81. His total adjusted gross back pay amounts to $13,201.62. Union assistance shall not be deducted; insurance premiums prior to strike participation must be added to gross back pay ($49.80). The claimant is owed $13,251.42.

83. GILBERT RICE used reasonable diligence to mitigate his damages by maintaining employment status throughout the back pay period. The fact that Mr. Rice was a Union officer does not mean that he actually participated in the 1977 economic strike. It is not the official status of a claimant which triggers termination of back pay under the Orders of the Court, but rather a clear showing of actual participation in any manner. The evidence to that effect was insufficient to make the requisite clear showing. The claimant is entitled to the difference between his gross back pay ($21,971.09) and his actual interim earnings ($20,878.72). The claimant is owed $1,092.37.

84. JOHN ROBERTS did not use reasonable diligence in seeking interim employ-

ment so as to mitigate the damage he has suffered. A 25-year-old head-of-the-household should certainly be held to a duty to do something more than apply at two places he can recall (and a few others he cannot recall) during a two-year period of unemployment. The two named jobs were only sought towards the end of the back pay period in 1978. The fact that Mr. Roberts was unsuccessful is not material; it is his limited efforts which indicate a failure to mitigate. The claimant is entitled to no award of back pay.

85. JOSEPH ROBINSON used reasonable diligence to mitigate his damage by holding a job throughout the back pay period. His strike participation, however, will act to terminate his back pay as of June 17, 1977, and his gross back pay figure for 1977 will be reduced to $4,197.43. Union assistance is not deducted. The claimant is entitled to his total adjusted gross back pay ($9,190.77), minus actual interim earnings prior to strike participation ($2,987.73 + $1,876.86 = $4,864.59). The claimant is owed $4,326.18.

86. BETTY RUCKER used reasonable diligence in searching for work during the back pay period so as to mitigate her damage. The Company's clear showing of strike participation will terminate her back pay as of June 17, 1977. The claimant's 1977 gross back pay figure must be reduced to $3,633.82. Her total adjusted gross back pay amounts to $7,941.05. Union assistance shall not be deducted. The claimant is owed $7,941.05.

87. ROBERT SALATA is entitled to no damages because of his total failure to afford discovery to the Company and to cooperate in any way in these proceedings.

88. WILLIAM SANTANGELO is entitled to the difference between the vacation pay and bonuses he did receive and the vacation pay and bonuses he would have received had his seniority been restored. This amounts to a net vacation pay due of $1,710.85 and a net bonus of $80.49. This claimant is owed a total of $1,791.34.

89. MICHAEL SEHIKA used reasonable efforts to mitigate by seeking and holding interim employment. The Company does not claim to the contrary. Unemployment compensation should not be deducted. Insurance premium payments of $1,923.60 should be added to his total gross back pay of $19,035.64, and interim earnings of $5,477.76 should be deducted. The claimant is owed $15,481.48.

90. ROGER SEYMOUR fully mitigated his damages by holding employment throughout the back pay period. The Company has not proven that the claimant's surgery in 1977 resulted in a loss of earnings; a "surgery" can require varying periods of recuperation. The record is barren as to whether this surgery had *any* impact on the claimant's ability to mitigate his loss; it was incumbent upon the Company to seek such evidence if it desired to reduce the amount it owed the claimant. Deduction should not be made for the $35.00 received from the Teamsters in strike pay. There is no indication that it was compensation for work performed. The claimant should receive the difference between total gross back pay ($22,582.60) and his actual interim earnings ($19,282.84). The claimant is owed $3,299.76.

91. BARRY SHAFFER used reasonable diligence to mitigate his damage by searching for and maintaining employment throughout the back pay period. The Company only contests a nine-week period in 1977, during which time it determined the claimant was unemployed. The record of the claimant's efforts to seek employment certainly suffices to rebut a claim of lack of diligence during 1977. Union assistance shall not be deducted. The claimant is entitled to gross back pay ($16,967.08) plus insurance premiums ($578.17), reduced by interim earnings ($9,988.20). The claimant is owed $7,557.05.

92. DONALD SHOWMAN used reasonable efforts to mitigate his damages by maintaining his employment status throughout the back pay period. Since the Company has not made the requisite clear showing of strike participation, the claimant is entitled to the difference between his total gross back pay ($25,072.33) and his interim earnings ($23,684.00). The claimant is owed $1,388.33.

93. LLEWELLYN SIMMONS used reasonable diligence to mitigate his damage by seeking and holding employment throughout the back pay period. The Company does not claim that the claimant failed to mitigate. The Company has not made the requisite clear showing of strike participation, and thus the claimant is entitled to his total gross back pay ($23,061.58) reduced by his interim earnings ($15,886.73). Union assistance shall not be deducted. The claimant is owed $7,174.85.

94. BERNARD SLIDER used reasonable diligence in mitigating his damage by seeking and holding employment throughout the back pay period. During a period of 1977 the claimant held a part-time position at Arby's while working full-time at Austin Machine. The claimant should not be charged with the part-time Arby's income, which he could have continued to earn even if the Company had reinstated him in accordance with the Award of the Arbitrator. Union assistance should not be deducted. The claimant is entitled to gross back pay ($11,295.77) plus insurance premiums ($2,024.00), reduced by actual interim earnings ($11,897.86). The claimant is owed $1,421.91.

95. JOSEPH SPALDING used reasonable diligence in seeking employment during the back pay period, considering his age. The Company has not demonstrated that the claimant failed to make sufficient efforts. The Company argues, however, that during his deposition Mr. Spalding promised to give the Company his unemployment record book, but never did. The Company never sought to have the book produced in a formal manner, nor did it call Mr. Spalding to testify before the Special Master, where the claimed failure to mitigate could have been further explored. Because of his participation in the 1977 economic strike as of June 20, 1977, the claimant's gross back pay for 1977 must be reduced to $5,853.22. His total adjusted gross back pay prior to strike

participation is $12,840.06, to which must be added insurance premium payments prior to June 20, 1977 ($376.77). Union assistance shall not be deducted. The claimant is owed $13,216.83.

96. MARIE SPRAGUE is entitled to no back pay award because she died prior to the issuance of the Arbitrator's Award.

97. NED STALLWORTH used reasonable efforts to mitigate his damage by seeking and holding employment throughout the back pay period. While the claimant's most extensive efforts were made after June, 1977, he did look for work prior to that time. The Company has not shown that these efforts were insufficient. While it can always be said that a claimant could do more to mitigate his damage, the question to be answered is whether the Company has shown that he did not do enough. The record indicates repeated employment inquiries were made. However, the claimant admits participating in the 1977 economic strike from the very beginning of that concerted activity, i. e., June 10, 1977. Thus, his back pay for 1977 must be reduced to $3,283.85. The claimant received no interim earnings prior to his strike participation. Union assistance shall not be deducted. Insurance premiums prior to June 10, 1977 ($1,202.25) must be added to his total adjusted gross back pay of $7,198.55. The claimant is owed $8,400.80.

98. STEVEN STARKS did not use reasonable diligence in seeking interim employment so as to mitigate his damage. When he finally obtained a job on May 15, 1978, he earned more in the three weeks remaining in the back pay period ($760.84) than he would have earned had he been in the Company's employ ($450.57). Considering the evidence concerning this claimant as a whole, it does not appear that he made the earnest effort required of someone of his age to find interim employment. He is entitled to no award of back pay.

99. HOWARD STRICKER is entitled to no damages because of his total failure to afford discovery to the Company and to cooperate in any way in these proceedings.

100. DINO TAMBINI is entitled to the difference between the vacation pay and bonuses he did receive and the vacation pay, bonuses, and leader pay he would have received had his seniority been restored. This amounts to a net vacation pay due of $2,176.88, a net bonus of $90.49, and leader pay of $299.72. This claimant is owed a total of $2,567.09.

101. STEVE TATAR is entitled to the difference between the vacation pay and bonuses he did receive and the vacation pay and bonuses he would have received had his seniority been restored. This amounts to a net vacation pay due of $771.29 and a net bonus of $17.07. This claimant is owed a total of $788.36.

102. DEAN TITTLE is entitled to no damages because of his total failure to afford discovery to the Company and to cooperate in any way in these proceedings.

103. CHARLES TREVASKIS used reasonable efforts to mitigate his damage by seeking and maintaining employment throughout the back pay period. While the evidence does indicate that the claimant sought employment from some of the named employers prior to the commencement of the back pay period, this pattern of efforts evidencing an earnest effort to find work continued throughout the back pay period. Indeed, the claimant appears to have been wrongfully discharged from a job obtained in May, 1976, which would have brought him interim earnings and employment during the back pay period. A trained welder, Mr. Trevaskis lowered his sights to find any employment during the back pay period. The Company has made the requisite clear showing of strike participation as of June 17, 1977, and, accordingly, the claimant's back pay for 1977 must be reduced to $3,992.78. His total adjusted gross back pay is $8,516.25. Union assistance shall not be deducted. The claimant received no interim earnings prior to the date of his strike participation. The claimant is owed $8,516.25.

104. JAMES WALDRON is entitled to no damages because of his total failure to afford discovery to the Company and to cooperate in any way in these proceedings.

105. WILLIAM WATTS did use reasonable diligence in seeking employment. He is not entitled to back pay for the period December, 1977 until April, 1978, because he was unable to seek employment as a result of his ankle injury. The gross back pay and insurance premiums due for that period amount to $2,585.28 and should be deducted from the damages owed. Union assistance and unemployment compensation should not be deducted. He is entitled to total gross back pay plus insurance premiums ($15,256.70) with actual interim earnings ($5,500.00) deducted and the $2,585.28 amount deducted for the period he was disabled. The amount owed is $7,171.42.

106. MARY WHITE used reasonable diligence to mitigate her damage by seeking and holding employment during the back pay period. She was justified in leaving her employment in November, 1977, under the orders of her physician. Such a voluntary quit by a claimant would constitute a failure to mitigate if it were followed by a lack of diligence in seeking other employment. The record is clear, however, that Mrs. White immediately made an earnest effort to seek replacement employment. (It should be noted that her position at the Company prior to her discharge did not require heavy lifting, and her doctor advised her to seek work similar to the work she was doing at the Company.) The Company has made the requisite clear showing of strike participation as of June 23, 1977, and the claimant's gross back pay for 1977 must be reduced to $5,292.15. The Union argues that the claimant's participation in the 1977 economic strike was based solely upon the duties of her office as Union Vice President and later as Union President. That fact is immaterial; under the Court's Orders the question for the Special Master is whether there was participation "in any manner". That participation was shown here as of June 23, 1977. The claimant is entitled to the portion of insurance premium payments which would have been received prior to her strike participation ($552.24) added to her total adjusted gross back pay ($11,715.09). Unemployment compensation and Union assistance shall not be deducted. Interim earnings of $1,762.50 shall be deducted. The claimant is owed $10,504.83.

107. TERRANCE WHITE did use reasonable diligence in mitigating his damage by seeking and holding interim employment throughout the back pay period. Union assistance should not be deducted. He is entitled to his gross back pay plus insurance premiums ($27,002.89 + $2,024.40) with actual interim earnings ($23,626.45) deducted. The claimant is owed $5,400.84.

108. DON WILLIAMS is entitled to no damages because of his total failure to afford discovery to the Company and to cooperate in any way in these proceedings.

109. WILLIAM WOLFE used reasonable diligence in mitigating his damage by seeking and holding employment throughout the back pay period, and the Company does not claim to the contrary. The Company has made the requisite clear showing of strike participation by the claimant as of July 7, 1977. Accordingly, his gross back pay for 1977 must be reduced to $3,882.71, and thus his total adjusted gross back pay figure is $7,880.39. He is also entitled to insurance premiums which he would have received prior to his strike participation ($391.10). Union assistance shall not be deducted. Interim earnings prior to strike participation ($857.92), however, should be deducted. The claimant is owed $7,413.57.

110. BERNARD WYNE earned more from his interim employment than he would have earned had the Company reinstated him in accordance with the Award of the Arbitrator. He is entitled to no award of back pay.

V. *CONCLUSION*

Unfolding like a three-act play, the theme and characters of this action were revealed to the Special Master scene-by-scene. While the leitmotif of this drama has been a somewhat ponderous back pay computation, there has been an intriguing quality to the task of reconstructing the work lives of the many men and women involved. The Special Master was able to

see and meet 43 of these men and women, as well as the Company and Union officials who have played their roles in this proceeding.

While in a legal sense the conclusions reached above attempt to make the claimants whole in accordance with the Orders of the Court, the resolution of the questions presented here cannot bring peace and stability to the relationship between these parties. Only the persons directly involved can do that, and only if they desire that it be so. After four years of litigating this matter before an Arbitrator, the District Court, the Court of Appeals, and now the Special Master, the best that can be hoped for is that with regard to one ancient skirmish in the parties' labor wars, the denouement is in sight.